Mark L. Shurtleff (Utah State Bar #4666)
3135 South 1300 East
Salt Lake City, Utah 84106
(801) 441-9625
mark@shurtlefflawfirm.com

R. Reed Pruyn (Utah State Bar #9985)
276 South 1000 East
Salt Lake City, Utah 84102
Telephone: (801) 792-2410
rrpglaw@gmail.com

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH: CENTRAL DIVISION

---

| | |
|---|---|
| Alpine Straightening Systems, Inc. d/b/a Alpine Body Shop; A.F. Collision Repair, Inc.; Perks Auto Repair Inc.; Jenson Enterprises, Inc.; B & B Auto Body & Paint, Inc.; Lindon Collision Center L.L.C.; J.P.'s Custom Body & Paint, Inc. d/b/a J.P.'s Collision Center; Dave's Body Shop, Inc.; and Chris Body & Paint, Inc.;  )  )  )  )  )  )  )  )  )  ) | FIRST AMENDED COMPLAINT  **JURY TRIAL DEMANDED** |
| Plaintiffs,  )  ) | Case No.  2:14-cv-000261 PMW |
| vs.  )  )  ) | |
| State Farm Mutual Automobile Insurance Company**,** Farmers Insurance Group, Inc., Mid-Century Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Insurance Company, American Family Mutual Insurance Company, Progressive Classic Insurance Company, Progressive Direct Insurance Company, Geico General Insurance Company, Farm Bureau Property & Casualty Company, Liberty Mutual Fire Insurance Company, Allstate Property & Casualty Insurance  )  )  )  )  )  )  )  )  )  )  )  ) | |

1

Company, USAA Casualty Insurance            )
Company, United Services Automobile         )
Association, Bristol West Insurance          )
Company & Western United Insurance          )
Company d/b/a AAA Insurance Company,        )
Safeco Insurance Company of America,        )
United Automobile Insurance Company and     )
United Insurance Company d/b/a United       )
Insurance Group,                             )
                                             )
    Defendants.         )
_____

  Through undersigned counsel, the above-captioned Plaintiffs complain and allege:

## **PARTIES**

1.  Plaintiff Alpine Straightening Systems, Inc., doing business as Alpine Body Shop, is incorporated in and has its principal place of business in Utah.

2.  Plaintiff A.F. Collision Repair, Inc. is incorporated in and has its principal place of business in Utah.

3.  Plaintiff Perks Auto Repair Inc. is incorporated in and has its principal place of business in Utah.

4.  Plaintiff Jenson Enterprises Inc. is incorporated in and when still operating until recently had its principal place of business in Utah.

5.  Plaintiff B & B Auto Body & Paint, Inc., at times relevant to this action, was incorporated in and had its principal place of business in Utah.

6.  Plaintiff Lindon Collision Center L.L.C., is registered in and has its principal place of business in Utah.

7.     Plaintiff J.P.'s Custom Body & Paint, Inc., doing business as J.P.'s Collision Center, is incorporated in and has its principal place of business in Utah.

8.     Plaintiff Dave's Body Shop, Inc. is incorporated in and has its principal place of business in Utah.

9.     Plaintiff Chris Body & Paint, Inc. is incorporated in and has its principal place of business in Utah.

10.    Defendant State Farm Mutual Automobile Insurance Company ("***State Farm***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at One State Farm Plaza in Bloomington, Illinois and it may be served with process through its registered designated agent, Paul L. Short, 10619 South Jordan Gateway, Suite 300 in South Jordan, Utah.

11.    Defendant Farmers Insurance Group, Inc. is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 4680 Wilshire Boulevard in Los Angeles, California and it may be served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah. [1]

12.    Defendant Mid-Century Insurance Company ("***Mid-Century***"), upon information and good faith belief is a subsidiary of Farmers, is registered with the Utah Department of Insurance

---

[1]  Upon information and good faith belief, Defendant Farmers Insurance Group, Inc. acquired Defendant Mid-Century Insurance Company (see Paragraph 9, infra,) in 2011 or 2012 and has since been operating in Utah as or through Mid-Century, but it is unknown to Plaintiffs if Mid-Century acquired the liabilities of Farmers at issue herein.

to do business and is doing business within Utah, its corporate headquarters are located at 4680 Wilshire Boulevard in Los Angeles, California and it may be served through its designated registered agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

13.      Defendant Allstate Fire and Casualty Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 3075 Sanders Road, Suite H1 E in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

14.      Defendant Allstate Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 2775 Sanders Road in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

15.      Defendant American Family Mutual Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its headquarters are located at 6000 American Parkway in Madison, Wisconsin and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

16.      Defendant Progressive Classic Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

4

17.     Defendant Progressive Direct Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

18.     Defendant Geico General Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 5260 Western Avenue in Chevy Chase, Maryland and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

19.     Defendant Farm Bureau Property & Casualty Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 5400 University Avenue in West Des Moines, Iowa, 50266, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

20.     Defendant Liberty Mutual Fire Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 175 Berkeley Street in Boston, Massachusetts, 02116, and it may be served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

21.     Defendant Allstate Property & Casualty Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate

headquarters are located at 2775 Sanders Road in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

22.     Defendant USAA Casualty Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 9800 Fredericksburg Road, F3E, in San Antonio, Texas, 78288, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

23.     Defendant United Services Automobile Association is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 9800 Fredericksburg Road, E3E, in San Antonio, Texas, 78288, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

24.     Defendant Bristol West Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 900 South Pine Island Route, Suite 600 in Plantation, Florida, 33324, and it may be served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

25.     Defendant Western United Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah as AAA Insurance Company, its corporate headquarters are located at 3055 Oak Road, MS-W340 in Walnut Creek, California,

94597, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

26.     Defendant Safeco Insurance Company of America is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 1001 Fourth Avenue, Safeco Plaza in Seattle, Washington 98154, and it may be served through its registered designate agent, Corporation Service Company at 2180 South 1300 East, Suite 650 in Salt Lake City, Utah.

27.     Defendant United Automobile Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 1313 NW 167th Street in Miami Gardens, Florida 33169-5739, and it may be served through its registered designated agent, National Registered Agents, Inc. at 1108 East South Union Ave. in Midvale, Utah.

28.      Defendant United Insurance Company, doing business as United Insurance Group, is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 4956 North 300 West, Suite 101 in Provo, Utah 84604-5880 and it may be served with process at that location through its agent Lynn Gordon Connelly who is registered in that capacity with Utah's Division of Corporations and Commercial Code.

## JURISDICTION AND VENUE

29.     This Court has original jurisdiction over the Sherman Act claims stated below, pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1391(b)(2).

7

30.     A substantial part of the events, acts and omissions giving rise to said claims occurred in this United States judicial District.

## FACTS

31.     Each Plaintiff is in the business of repair of motor vehicles that have been involved and damaged in a collision.

32.     Each Defendant is an insurer providing automobile policies to consumers throughout Utah.

33.     Each Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing them motor vehicle collision repair service.

34.     Each Defendant is responsible for payment for those repairs for their respective policyholders and claimants.

35.     Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct, with State Farm acting as the spearhead, to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

36.     One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with the individual Plaintiffs.  Although each Defendant's program agreements have unique titles, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("***DRPs***")."

37.     DRPs were presented to the Plaintiffs as a mutually beneficial opportunity.  In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list the body shop as a preferred provider.

38.     However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits.  The Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiffs' businesses in a variety of manners, well beyond that of an ordinary business agreement.

39.     Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the individual Plaintiff's businesses in order to force compliance with unreasonable and onerous concessions.  Failure to comply results in removal from the program (s) combined with improper "steering" of customers away from the individual Plaintiff's business or simply punishment to decrease the number of customers utilizing the individual Plaintiff's services.

40.     According to the Utah Department of Insurance in its 2012 Company Market Share Report, State Farm had as of December 31, 2012 captured about 16.29% of the private passenger automobile insurance business in Utah; its next closest competitor, Defendant Mid-Century, had 10.93%, and State Farm's next closest competitor, the Allstate Defendants (collectively Allstate Fire and Casualty Insurance Company, Allstate Insurance Company and Allstate Property & Casualty Insurance Company, which are each named above), had 10.83%.  See attached hereto as Exhibit A, a true and correct copy of the 2012 Utah Department of Insurance Private Passenger Automobile Insurance Company Market Share Report.

41.    Overall, the Defendants controlled about 66.13% of the 2012 private passenger automobile insurance market in Utah. Id.

42.    Of the remaining 134 insurance companies reporting earned premiums in the Utah market for private passenger automobile insurance in 2012, the average share for each was approximately 0.25%. Id.

43.    Based upon these (the most recent available) statistics, State Farm holds the unchallenged dominant position within the automobile insurance industry in the Utah market. Id.

44.    The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs; the insurance-paying customers account for between seventy and ninety-five percent of each shop's revenue; and sister federal courts to this Court acknowledge the significant role insurance companies play in funding automobile collision repairs and their concomitant ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repair. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (aff'd, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007).

45.    As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the going rate in the market area.

46.    State Farm however systematically establishes the "market rate" through what it calls "surveys."

47.    The geographical boundaries of the market area "surveyed" are wholly within the control and direction of State Farm.

48.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes the market area, the market rate or any other factual bases for its determination of the "market rate."  The program agreement contains no provisions for independent and neutral verification of the data utilized or any oversight not directly within the control and direction of State Farm.  The shops are simply required to blindly accept State Farm's pronouncements regarding these matters.

49.     Previously State Farm conducted this "survey" by sending written material to an auto body shop of which a representative would complete and return to State Farm; more recently, State Farm has developed and employs a business to business web-based portal whereby an auto body shop completes and submits the "survey" online.

50.     State Farm does not perform a survey in the traditional sense, where information is obtained and results produced, establishing a baseline of all the shops' information.  With respect to labor rates as an example, State Farm's methodology does not represent what the majority of shops in a given area charge: quite the contrary.  State Farm's methodology lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

51.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  Those are then totaled and State Farm employs its "half plus one" method.  If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shops technicians until the

11

"half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

52.     There could, arguably, be some validity to this method if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not.  However, the greatest problem with this method is that State Farm can and does alter the labor rates inputted by the shops, decreasing those arbitrarily deemed too high–or higher than State Farm wishes to pay.

53.     By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate."  The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

54.     Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey" and retains the right to alter the "survey" results (and does so) all without disclosure or oversight.

55.     Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard.  See attached hereto as Exhibit B a true and correct copy of State Farm's Dashboard.

56.     The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.  It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

57.     Within the quality criterion, the shop's reported customer satisfaction, customer complaints and quality issues identified by an audit are scored.

58.     The efficiency criterion evaluates repair cycle time—the number of days a vehicle is in the shop as determined by a cars' drop-off and pickup dates.

59.     The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized and the number of hours to complete a repair and similar matters.  See page 2 of Exhibit B, a true and correct copy of a State Farm Score or Report Card.

60.     In rating a shop, 1000 total points are possible, but State Farm claims it is under no obligation to disclose the weight or total number of points allocated to each factor in reaching a shop's "score," particularly those factors included under the competitiveness criterion; and State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

61.     State Farm maintains complete and unsupervised authority to determine an individual shop's rating, and it is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit and complete compliance with all repair cycle time and efficiency requirements, and yet still have a low rating; it is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations, and yet have a very high rating.

62.     Significantly, a shop's Dashboard and Report Card rating determines its position on the preferred provider list; so, when a claimant logs on to the State Farm web site seeking an auto

body repair shop, shops with the highest ratings are displayed first whereas ones with low ratings will be at the bottom of the list—often pages and pages down—making it difficult and less likely for a potential customer to find a shop rated arbitrarily low by State Farm and its criteria.

63.      Additionally, if a customer calls State Farm, State Farm's practice and/or procedure is for its representative to identify and recommend preferred shops holding the highest Dashboard/Report Card rating.

## Suppression of Labor Rates

64.      Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate."  The actual method by which State Farm determines "market rate" however is described above.

65.      If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

66.      If the body shop advises a labor rate increase is required, a State Farm representative will inform the body shop it is the only shop in the area that has raised its rates, and therefore the higher rate does not conform to the "market rate" and is thus a violation of the direct repair program agreement.

67.      At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop it is the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

14

68.     Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures: it will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate"; it will threaten to remove the shop from the direct repair program to coerce compliance; and/or it will remove the shop from the direct repair program.

69.     The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate and control shops for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

70.     The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they will pay no more than State Farm pays for labor. These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates.  These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiffs' financial ability to remain operating.

### **Suppression of Repair and Material Costs**

71.     Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

72.     Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; and de facto compulsory utilization of parts procurement programs.

73.     Defendants have also intentionally and repeatedly failed to abide by auto repair industry standards as set forth below.

74.     Three leading motor vehicle collision repair estimating databases are in ordinary usage within the auto body collision repair industry: (a) ADP; (b) CCC; and (c) Mitchell.

75.     These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[2] presented by the procedure databases and the actual needs of a particular repair.

_____

[2] The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

76.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials.  In many instances the Defendants will even refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

77.     A true and correct copy of a non-exhaustive list of procedures and processes for which the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit C.

78.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

79.     With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is Defendants' position even when the authoritative databases specifically state that such materials are <u>not</u> included in the repair procedure pages.

80.     The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type

of vehicle involved or any other factor.  Defendants pay only based upon arbitrary caps that are self-established and unrelated to actual costs to the Plaintiffs.

81.     This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

82.     The automobile collision repair industry has expressed dissatisfaction with the insurance industry's practices of refusing to compensate shops fully and fairly for repair procedures and materials and endorsing application of estimating databases only when it was in insurance companies' financial best interest to do so.

83.     Despite several of Defendants' acknowledgements of the estimating databases' general legitimacy and applicability, Defendants continue to collude and refuse to pay Plaintiffs and other auto body shops for all necessary and proper repairs, labor and materials.

84.     State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

85.     Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept

as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

86.     Further, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

87.     Though the foregoing conduct is led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm and do so solely to increase their profits but to the substantial detriment of the Plaintiffs.

## Steering

88.     The Defendants also regularly and routinely "steer" their policyholders away from auto body shops perceived as not complying with an aspect of their Program Agreement and towards shops they favor and perceive as compliant, causing substantial harm to Plaintiffs' business reputation and operations.

89.     Examples of steering include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred

shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

90.     These statements have been made about Plaintiffs without any attempt to ascertain the truth thereof, and some of the ills recited, which implicitly criticize the shops, are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop–consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants.  Asserting the shops charges more is often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are conveyed to the public as problems with the shop.

91.     The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed.  In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

92.     Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

///

///

20

## Intentional Nature of Defendants' Conduct

93.     In 1963, a Consent Decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon a complaint filed in the United States Southern District of New York wherein the allegations included violations of Sections 1 and 3 of the Sherman (Antitrust) Act.  A true and correct copy of this Decree is attached hereto as Exhibit D.

94.     Specific wrongful conduct actions supporting the allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) and channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The Complaint alleged further a conspiracy and combination in unreasonable restraint of trade and commerce.

95.     The Consent Decree ordered and provided for the following relief and enjoined the defendants therein from: (1) placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

21

96.     Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

97.     The Consent Decree being known to the Defendants, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

### CLAIMS FOR RELIEF

### COUNT ONE:
### QUANTUM MERUIT: CONTRACT IMPLIED IN LAW, QUASI-CONTRACT AND UNJUST ENRICHMENT

98.     Plaintiffs incorporate and restate by reference herein all allegations set forth above.

99.     Quantum meruit rests in part upon the equitable legal principle that a party is not permitted to enrich itself at the expense of another and that a legally enforceable promise in the nature of a contractual one is implied in and by law that Defendants must compensate Plaintiffs for the value of the labor and materials furnished by their collision repair services.

100.    Plaintiffs have conferred legally cognizable benefits upon the Defendants by expending material resources and performing valuable collision repair services for Defendants and to properly repair their insured policyholders/claimants' vehicles, and Defendants are required as the insurers to pay completely for all aspects of those collision repair services.

101.    Plaintiffs have conferred these benefits upon Defendants and their insureds with a reasonable expectation of full compensation for the value of all aspects of the collision repair services.

102.    Defendants appreciate and know of the benefits that Plaintiffs have conferred upon them and their insureds' vehicles, but Defendants unjustly and inequitably compensate Plaintiffs if and how Defendants' choose rather than commensurate with the actual value of the benefits.

103.    Defendants thereby actually retain for themselves substantial measures of the value of the benefits conferred and enrich themselves unjustly at the expense of the Plaintiffs under circumstances making it inequitable for them to do so.

104.    Under the circumstances of this action, the value of the benefits which Defendants are retaining unjustly and inequitably is the monetary cost of all the services, which the Plaintiffs furnish and expend in repairing the Defendants' policyholders/claimants' vehicles back on the road in pre-accident condition, and for which monetary cost the Defendants are required to pay on behalf of their insureds.

105.    Plaintiffs are equitably entitled to recover all the value of the benefits they confer upon Defendants, to wit, complete payment for and compensation of the labor furnished and materials the Plaintiffs expend in the necessary proper collision repair services performed for Defendants and their policyholders' vehicles.

## COUNT TWO: QUASI-ESTOPPEL

106.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

107.    Quasi-estoppel is an equitable legal principle that precludes a party from acting like a chameleon, asserting to another's disadvantage a right that is inconsistent with a position the former has previously taken or in which the former has previously acquiesced.

108.    Defendants rely selectively upon and assert the general validity of the industry accepted estimate databases when it is to their advantage to do so, and then to the Plaintiffs substantial economic disadvantage, they change their previously taken position when it would not be financially advantageous for them to remain consistent with their reliance upon the databases.

109.    Defendants have acknowledged the general or baseline application of the databases but continue to say one thing but then rely selectively upon the databases according to when it would financially benefit them and substantially harm the Plaintiffs.

110.    Defendants' inconsistent and contradictory positions regarding the industry databases continue to engender distrust between the auto insurance and collision repair industries and financially harm the Plaintiffs, who must absorb labor and materials costs when, at Defendants' whim, they insinuate themselves into the repair business and improperly decide what are necessary and reasonable repairs and refuse to compensate the Plaintiffs for entire costs of repairs that benefit the Defendants and their insureds.

111.    Plaintiffs seek to have the Defendants estopped from changing their reliance on the general applicability of the databases to denying such applicability when it results in them refusing to fully compensate and thereby financially harm and disadvantage the Plaintiffs.

///

///

///

## COUNT THREE:

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

112.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

113.    Defendants intentionally interfere with the Plaintiffs' existing and/or prospective economic relations by steering large amounts of business away from them as alleged above.

114.    Defendants do so for an improper purpose and/or by improper means.

115.    Defendants' improper purpose is to punish and economically beat the Plaintiffs into submission for complaining about Defendants manipulating and setting artificial and oppressive market labor rates, for refusing to kowtow and rather charge fair and actual market labor rates and/or for complaining about Defendants' selective application of the estimate databases, setting of arbitrary price ceilings and refusals to compensate the actual and entire labor and materials repair costs.

116.    Defendants' concomitant improper purpose is to steer policyholders toward auto body shops not because they do the best quality work or provide the best value but rather to improperly reward those shops for submission and silence about Defendants' economic aggrandizement of themselves at the expense of the collision repair industry.

117.    In addition, Defendants have employed improper means since steering is contrary to Utah statutory, regulatory and/or common laws.

118.    Defendants are injuring the Plaintiffs by improperly decreasing the volume of their business operations, forcing the Plaintiffs to absorb collision repair costs and expenses of which the Defendants should be paying on behalf of their policyholders and damaging their reputations amongst consumers who are possibly victimized themselves by the steering.

## COUNT FOUR: CONVERSION

119.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

120.    Conversion requires willful interference with property without lawful justification where the party entitled to the property is deprived of its use or possession and entitled to its immediate possession at the time of the conversion.

121.    Plaintiffs have performed reasonable and necessary quality work and expended appropriate labor and materials to do it, for which Defendants are required to but refuse to pay or pay in full, even after demand is made.

122.    Defendants' action constitutes wilful interference with Plaintiffs' property—their money, the fruits of their labor—without lawful justification, since Defendants did not perform the work are not in the business of determining what a reasonable and necessary quality repair entails or costs.

123.    Defendants' action further constitutes wrongful possession of Plaintiffs' money, which accounts for the reasonable and necessary costs of the labor spent and materials used to repair and restore to pre-accident condition the vehicles of Defendants' policyholders/claimants.

## COUNT FIVE: VIOLATIONS OF THE SHERMAN ACT– PRICE-FIXING

124.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

125.    Pursuant to 15 U.S.C. §1, the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, and such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

126.    Through parallel actions and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

127.    The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co.* V*s. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

128.    The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the motor vehicle collision repair industry.

129.    The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the motor vehicle collision repair industry.

130.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of the Plaintiffs.

131.    Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed payment structure, admitting the baseline application of the industry databases but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

27

132.    The aforesaid offenses have had, among others, the effect of eliminating competition within the motor vehicle collision repair industry, elimination of some auto body shops from a substantial segment of the business in the industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting shops to collective control and supervision of prices by the Defendants and co-conspirators.

133.    Neither the Plaintiffs nor other members of the collision repair industry are able to engage in competitive business practices since the Defendants have effectively and explicitly determined what their business practices will be.

134.    The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

### COUNT SIX: VIOLATION OF THE SHERMAN ACT– BOYCOTT

135.    Plaintiffs incorporate and restate by reference herein all allegations set forth above.

136.    The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

137.    The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable

business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

138.    This boycott was specifically designed to pressure, intimidate, and/ or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

139.    It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

140.    Enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

141.    In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

142.    Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

143.    Defendants actions are violation of federal law and have directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

///

///

## **PRAYER FOR RELIEF**

As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted; the Plaintiffs therefore pray for the following relief:

A.    Compensatory damages for or restitution of the value of all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.    Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.    Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.    Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.    Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)    Placing into effect any plan, program or practice which has the purpose or effect of:

(a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

(b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

     (2)    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

     (3)    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

     (4)    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and to deter each Defendant and similar entities from pursuing this illegal and improper conduct in the future.

G.    Pre- and post-judgment interest.

H.    Any additional relief the Court deems just and appropriate.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiffs demands a judgment against Defendants in an amount sufficient to fully compensate Plaintiffs for damages incurred and/or restitution of the value of benefits lost to them as a result of Defendants' conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief to which the Court deems the Plaintiffs are entitled.

Respectfully submitted this _2_nd day of June, 2014

                    For Plaintiffs Straightening Systems, Inc. d/b/a Alpine Body Shop, A.F. Collision Repair, Inc., Perks Auto Repair, Inc., Jenson Enterprises, Inc., B&B Auto Body & Paint, Inc., Lindon Collision Center, LLC, J.P.'s Custom Body & Paint, Inc.

d/b/a J.P.'s Collision Center, Dave's Body Shop, Inc. and Chris Body & Paint, Inc.


BY:    ___/s/ R. Reed Pruyn_____

R. REED PRUYN (USB # 9985)

ATTORNEYS FOR PLAINTIFFS

32