Mark L. Shurtleff (Utah State Bar #4666)
Shurtleff Law Firm
P.O. Box 900873
Sandy, Utah 84090
(801) 441-9625
mark@shurtlefflawfirm.com

R. Reed Pruyn (Utah State Bar #9985)
276 South 1000 East
Salt Lake City, Utah 84102
Telephone: (801) 792-2410
rrpglaw@gmail.com

Allison P. Fry, Esq., MSB #100725
John Arthur Eaves
Attorneys at Law
101 N. State Street
Jackson, MS 39201
Telephone: 601.355.7961
allison@eaveslaw.com

_____

**IN THE UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**
_____

| | |
|---|---|
| Alpine Straightening Systems, Inc. d/b/a<br>Alpine Body Shop; A.F. Collision Repair,<br>Inc.; Perks Auto Repair Inc.; Jenson<br>Enterprises, Inc.; B & B Auto Body & Paint,<br>Inc.; Lindon Collision Center L.L.C.; J.P.'s<br>Custom Body & Paint, Inc. d/b/a J.P.'s<br>Collision Center; Dave's Body Shop, Inc.;<br>and Chris Body & Paint, Inc.;<br><br>    Plaintiffs,<br><br>vs.<br><br>State Farm Mutual Automobile Insurance<br>Company, Farmers Insurance Group, Inc.,<br>Mid-Century Insurance Company, Allstate<br>Fire and Casualty Insurance Company, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>Case No. 6:14-cv-06003-GAP-TBS<br>MDL Case No. 6:14-md-2557-GAP-TBS |

1

Allstate Insurance Company, American )
Family Mutual Insurance Company, )
Progressive Classic Insurance Company, )
Progressive Direct Insurance Company, )
Geico General Insurance Company, Farm )
Bureau Property & Casualty Company, )
Liberty Mutual Fire Insurance Company, )
Allstate Property & Casualty Insurance )
Company, USAA Casualty Insurance )
Company, United Services Automobile )
Association, Bristol West Insurance )
Company & Western United Insurance )
Company d/b/a AAA Insurance Company, )
Safeco Insurance Company of America, )
United Automobile Insurance Company and )
United Insurance Company d/b/a United )
Insurance Group, Bear River Mutual )
Insurance Company )
                           )
         Defendants. )
                           )

---

Through undersigned counsel, the above-captioned Plaintiffs complain and allege:

## <u>PARTIES</u>

1.    Plaintiff Alpine Straightening Systems, Inc., doing business as Alpine Body Shop, is incorporated in and has its principal place of business in Utah.

2.    Plaintiff A.F. Collision Repair, Inc. is incorporated in and has its principal place of business in Utah.

3.    Plaintiff Perks Auto Repair Inc. is incorporated in and has its principal place of business in Utah.

4.      Plaintiff Jenson Enterprises Inc. is incorporated in and when still operating until recently had its principal place of business in Utah.

5.      Plaintiff B & B Auto Body & Paint, Inc., at times relevant to this action, was incorporated in and had its principal place of business in Utah.

6.      Plaintiff Lindon Collision Center L.L.C., is registered in and has its principal place of business in Utah.

7.      Plaintiff J.P.'s Custom Body & Paint, Inc., doing business as J.P.'s Collision Center, is incorporated in and has its principal place of business in Utah.

8.      Plaintiff Dave's Body Shop, Inc. is incorporated in and has its principal place of business in Utah.

9.      Plaintiff Chris Body & Paint, Inc. is incorporated in and has its principal place of business in Utah.

10.     Defendant State Farm Mutual Automobile Insurance Company ("**State Farm**") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at One State Farm Plaza in Bloomington, Illinois and it may be served with process through its registered designated agent, Paul L. Short, 10619 South Jordan Gateway, Suite 300 in South Jordan, Utah.

11.     Defendant Farmers Insurance Exchange ("**Farmers**") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 4680 Wilshire Boulevard in Los Angeles, California and it may be

served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah. [1]

12.     Defendant Mid-Century Insurance Company ("*Mid-Century*"), upon information and good faith belief is a subsidiary of Farmers, is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 4680 Wilshire Boulevard in Los Angeles, California and it may be served through its designated registered agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

13.     Defendant Allstate Fire and Casualty Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 3075 Sanders Road, Suite H1 E in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

14.      Defendant Allstate Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 2775 Sanders Road in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

15.     Defendant American Family Mutual Insurance Company ("*American Family*") is registered with the Utah Department of Insurance to do business and is doing business within

---

[1]  Upon information and good faith belief, Farmers acquired Defendant Mid-Century Insurance Company (see Paragraph 9, infra,) in 2011 or 2012 and has since been operating in Utah as or through Mid-Century, but it is unknown to Plaintiffs if Mid-Century acquired the liabilities of Farmers at issue herein.

Utah, its headquarters are located at 6000 American Parkway in Madison, Wisconsin and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

16.     Defendant Progressive Classic Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

17.     Defendant Progressive Direct Insurance Company (together with the defendant named in the preceding paragraph ("*Progressive*") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 6300 Wilson Mills Road in Mayfield Village, Ohio and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

18.     Defendant Geico General Insurance Company ("*GEICO*") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 5260 Western Avenue in Chevy Chase, Maryland and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

19.     Defendant Farm Bureau Property & Casualty Company ("*Farm Bureau*") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 5400 University Avenue in West Des Moines, Iowa, 50266,

and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

20.     Defendant Liberty Mutual Fire Insurance Company ("***Liberty Mutual***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 175 Berkeley Street in Boston, Massachusetts, 02116, and it may be served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

21.     Defendant Allstate Property & Casualty Insurance Company (together with Defendants named in paragraphs 13 and 14 the "***Allstate Defendants***" or "***Allstate***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 2775 Sanders Road in Northbrook, Illinois and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

22.     Defendant USAA Casualty Insurance Company is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 9800 Fredericksburg Road, F3E, in San Antonio, Texas, 78288, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

23.     Defendant United Services Automobile Association (together with the Defendant named in the preceding paragraph "***USAA***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 9800 Fredericksburg Road, E3E, in San Antonio, Texas, 78288, and it may be served through its

registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

24.     Defendant Bristol West Insurance Company ("***Bristol West***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 900 South Pine Island Route, Suite 600 in Plantation, Florida, 33324, and it may be served through its registered designated agent, Corporation Service Company at 2180 South 1300 East in Salt Lake City, Utah.

25.     Defendant Western United Insurance Company ("***Western United***") is registered with the Utah Department of Insurance to do business and is doing business within Utah as AAA Insurance Company, its corporate headquarters are located at 3055 Oak Road, MS-W340 in Walnut Creek, California, 94597, and it may be served through its registered designated agent, CT Corporation System at 1108 East South Union Avenue in Midvale, Utah.

26.     Defendant Safeco Insurance Company of America ("***Safeco***") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 1001 Fourth Avenue, Safeco Plaza in Seattle, Washington 98154, and it may be served through its registered designate agent, Corporation Service Company at 2180 South 1300 East, Suite 650 in Salt Lake City, Utah.

27.     Defendant United Automobile Insurance Company ("**United Auto**") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 1313 NW 167th Street in Miami Gardens, Florida 33169-5739, and it may be served through its registered designated agent, National Registered Agents, Inc. at 1108 East South Union Ave. in Midvale, Utah.

28.     Defendant United Insurance Company, doing business as United Insurance Group ("**United**") is registered with the Utah Department of Insurance to do business and is doing business within Utah, its corporate headquarters are located at 4956 North 300 West, Suite 101 in Provo, Utah 84604-5880 and it may be served with process at that location through its agent Lynn Gordon Connelly who is registered in that capacity with Utah's Division of Corporations and Commercial Code.

29.     Defendant Bear River Mutual Insurance Company ("**Bear River**") is registered with the Utah Department of Insurance to do business and is doing business within Utah. Its corporate headquarters are located at 778 E Winchester St, Murray, UT 84107 and it may be served with process at that location through its agent Don H. Adams who is registered in that capacity with Utah's Division of Corporations and Commercial Code.

## JURISDICTION AND VENUE

30.     This Court has original jurisdiction over the Sherman Act claims stated below, pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1391(b)(2).

31.     A substantial part of the events, acts and omissions giving rise to said claims occurred in the United States Judicial District of Utah.

## FACTS

32.     Each Plaintiff is in the business of recovery and repair of vehicles damaged in a collision.

33.     Each Defendant is an insurer providing automobile policies to consumers in Utah.

34.     Each Plaintiff has done business at various times over the course of years with Defendants' policyholders and claimants providing motor vehicle collision repair service.

8

35.     Each Defendant is responsible to pay for repairs for their respective policyholders and claimants.

36.     Over the course of several years, the Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct, to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

37.     Defendants have combined to utilize their aggregate market power to exert control over every aspect of the collision repair industry, including but not limited to price fixing of labor rates, price fixing of replacement parts, compulsory use of substandard and thus dangerous replacement parts, compulsory use of a parts procurement program which directly financially benefits State Farm and indirectly benefits the remaining Defendants and risks harm to consumers, boycotting shops which refuse to comply with fixed prices or use substandard or improper parts, and interfering with Plaintiffs' current and prospective business relations by intentionally misrepresenting and making knowingly false statements regarding the quality, efficiency and ethical reputation of their businesses, exerting economic duress and coercion upon Plaintiffs to capitulate and also upon consumers including direct threats to refuse coverage or portions thereof if the consumer persists in his/her effort to do business with the given Plaintiff.

38.     Defendants' actions have eradicated competition within the body shop industry.

39.     Defendants' actions violate federal and state laws.

<u>Defendants' Market Share within Market Area of Utah</u>

40.     According to the Utah Department of Insurance in its 2013 Company Market Share Report, State Farm had as of December 31, 2013 captured about 15.06% of the private passenger

automobile insurance business in Utah. Its next closest competitor, Mid-Century, had 11.00%. Its next closest competitor, the Allstate Defendants, had 5.78%. State Farm's next closest competitor, Bear River Mutual Insurance Company had 4.99%. See attached hereto as Exhibit A, a true and correct copy of the 2013 Utah Department of Insurance Private Passenger Automobile Insurance Company Market Share Report.

41.     Overall, the Defendants named herein controlled about 71% of the 2013 private passenger automobile insurance market in Utah. Id.

42.     Of the remaining 133 insurance companies reporting earned premiums in the Utah market for private passenger automobile insurance in 2013, the average share for each was approximately 0.25%. Id.

43.     The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs; the insurance-paying customers account for between seventy and ninety-five percent of each of Plaintiffs' revenue; and federal courts acknowledge the significant role insurance companies play in funding automobile collision repairs and their concomitant ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repair. See, e.g., *Allstate Ins. Co. v. Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006) (aff'd, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151 (5th Cir. 2007).

44.     State Farm holds the unchallenged dominant position within the automobile insurance industry in the Utah market, and the named Defendants collectively represent very substantial if not near complete control over claims in the state for collision repairs whether as first-party insurer or third-party carrier in Utah.

45.     State Farm plays a leading role in establishing the fixed prices and boycotting and violations of federal and state laws.

Body Shop Cost and Revenue Structure

46.     Body shops have several sources of cost and revenue—be it labor, parts, paint and other materials, mechanical, electrical and administration with each of these categories often having variable cost subcategories.

    A.     Labor

47.     Collision repair involves several stages and each involves different activities and processes: body labor, painting and refinishing. Ordinarily, each of these stages have individual rates. For example Plaintiff Chris' Body and Paint's posted rates are body labor at $46.00 per hour, paint labor at $46.00 per hour and paint materials at $32.00 per hour; and Plaintiff Dave's Body Shop's posted rates are body labor at $48.00 per hour, paint labor at $48.00 per hour and paint materials at $35.00 per hour.

    A.1.     Body Labor

48.     Body Labor is the repair process wherein damage to the body of the vehicle is repaired, either by replacing or mending a damaged part.

49.     Within body labor, there are different rates which vary with the material of which a vehicle is constructed. Fiberglass composites and aluminum are generally more difficult to repair than steel, require additional, specialized equipment and different skill sets of its technicians. Therefore repairs on vehicles made of fiberglass composites (such as Corvettes) or aluminum body panels (such as Buick LeSabre, BMW Z8 and 7 Series and Nissan Altima) have necessarily higher hourly labor rates.

11

50.     Another aspect of labor is frame/unibody repair. In order to repair the frame/unibody of a vehicle, the vehicle must be stabilized on a dedicated frame machine so as not to further damage the frame/unibody, measured (usually by a laser measuring tool or other computerized optic or manual measuring tool) to determine both where the frame/unibody is damaged and how much damage has been sustained. The frame is then slowly pulled via hydraulic towers to reverse the incurred damage. This process must be done at a deliberate pace as a rushed frame pull may cause further damage or destroy the frame altogether.

    A.2.    Refinish

51.     Refinishing includes the processes necessary to complete repairs and smooth the repaired or replaced body surfaces once the body repair has been completed in preparation for painting. Common refinishing processes include application of primer, sealer (a barrier coat between the bare material and paint necessary to prevent negative reaction with the paint), base coat, and, depending upon the finish of the vehicle, an additional mid-coat. Refinishing also includes the mixing of the liquid component colors to match and blend with the undamaged paint on the vehicle.

52.     Refinish labor rates are usually equal to or slightly less than body labor rates.

    A.3.    Paint and Materials

53.     Painting a vehicle is, in many ways, a process which does not require explanation; however, application is a multi-step process. Paint is usually applied in a paint booth, a self-contained controlled environment separate from the repair areas of a shop. The booth must have

a clean air intake filtering system to filter and reduce contaminants entering the booth and an outgoing filtering system to reduce the contaminants released into the atmosphere.[2]

54.     Prior to painting, the vehicle must be washed. The undamaged portions must be covered (or "masked") and taped off to avoid over-spray, including tires and wheel wells. Once the paint has been completed, a clear coat is applied and the vehicle left to dry.

55.     The process from repair to refinish to paint is usually not linear. Most repairs require several refinishing processes and paint processes at various points in the repair. For example, replacing a bumper: it must be sanded and primed and the inside painted to match the vehicle before it is bolted onto the vehicle and the vehicle returned to the refinish and paint processes to complete the repair. Depending on the nature of the repair made and its location on a vehicle, a repair may require several refinish and paint procedures interspersed with repair procedures before completion.

56.     Additionally, it is not only the damaged portion of a car which must be addressed. In order to avoid clashing paint at the point where the repaired portion meets the undamaged portion, the undamaged portion must be sanded and the paint blended into the existing color to create a seamless transition between original paint and new paint.

57.     Because it is not possible, even in the controlled environment of a paint booth, to completely remove all dust and contaminants from a vehicle that has been on the open roads (particularly the undercarriage), the air pressure of the paint process causes some amount of dust and small contaminants to become airborne and settle in the paint. When the paint dries, these

---

[2]     Shops comply with Environmental Protection Agency regulations for hazardous material emissions and disposal.

contaminants cause an uneven surface in the paint. An additional refinish process must be completed to smooth out the imperfections. While there is some regional variation in the name, this process is generally recognized as de-nibbing and finessing. Without this process, the finished product would not return the vehicle to its pre-loss condition.

58.     Traditionally, paint labor rates have included material costs, calculated as a percentage of refinish hours for a given repair and expressed as an hourly rate based upon a standard repair. However, in many instances, this method does not compensate the shop for the actual costs of labor and materials and results in the shop working at a loss. For instance, pearlized finishes on vehicles require multiple steps, different paints and finishes to be applied in several coats and the job takes far longer and requires more labor than a one-step coat of white paint.

59.     Other times, vehicles have unique colors that require both special-order paints and mixing to achieve the desired result to blend with the undamaged portion of the vehicle. Ferrari red, for example, is a unique color with high color saturation and brightness.

60.     Because of this variability, which has become more frequent in recent years, the traditional method has not kept pace with the actual costs of completing repairs. Many shops, though not all, have begun using a paint and material calculator, or PMC. A PMC is a computer program which calculates the cost of the paint and materials actually used in a particular repair. Actual costs are pre-programmed to account for the costs of specific materials (i.e., Sikkens brand of paint versus Axalta brand of paint). A shop can load the type of repair completed and the program calculates the amount and cost of the materials used and produce an invoice and this becomes part of the final bill along with the paint labor costs.

B.     <u>Parts</u>

61.     Parts constitute a significant expense for shops. There are three types generally recognized in the body shop industry: Original equipment manufacturer parts ("OEM" parts) are new and manufactured by the same manufacturer as the vehicle and thus designed for specific cars.

62.     Aftermarket parts are new but manufactured by a company other than the original manufacturer and frequently referred to as imitation or counterfeit parts.

63.     Salvage parts are parts stripped from previously wrecked vehicles and often referred to as "recycled parts" by insurance companies.

64.     Body shops do not keep a supply of all parts on hand; they are ordered as needed.

65.     With occasional exceptions, the Defendants write estimates requiring use of aftermarket or salvage parts. Aftermarket and salvage parts are ostensibly less expensive than OEM parts, and according to Defendants of equal quality to OEM parts. This is not true as discussed below.

66.     Some of the Defendants such as State Farm require use of subscription online parts procurement programs. For example, Farmers requires the use of TheShopofChoice.com. The most egregious mandatory parts procurement program is State Farm's PartsTrader program. PartsTrader is a subscription online vendor market place. In theory, a subscribing shop can go onto the PartsTrader web site, input the part required and will receive bids from vendors who have the part available for sale and from these bids, the shop may select the proper part at a competitive price or, if a quality part is not available, may purchase the part elsewhere.

67.     In reality, State Farm requires compulsory use of PartsTrader for its direct repair facilities (see below). A shop is not permitted to select the proper part or shop elsewhere if a quality part is not available through PartsTrader. State Farm requires the purchase of the cheapest part

available, even if it is not of like kind or quality, originates from a source of questionable or unknown provenance or even is known to be manufactured of poor quality.

68.     If a shop refuses to purchase such parts, but opts for a higher quality, safer part, the Defendant insurers, particularly but not exclusively State Farm, will pay only the amount for which the part could have been purchased, regardless of its quality or lack thereof.

69.     With respect to State Farm in particular, this practice benefits it in two direct ways. First, it immediately reduces the amount State Farm pays out in repair costs. Second, State Farm is a primary investor in PartsTrader. It underwrote the cost of developing the program and has a contract with the ostensibly independent company for repayment of this investment as well as a portion of the profits going forward.

70.     All other Defendants benefit too by insisting through their own formal or unwritten parts procurement systems such as Shop of Choice and HyperQuest, on use of aftermarket or salvage parts as a means of reducing claims payments. In many instances, a Defendant will order the parts independently and ship them to the body shop or directly specify a part and vendor from which a purchase must be made, again, regardless of quality, kind and fit.

71.     Professional repairers on the whole prefer and recommend use of OEM parts for both safety and quality reasons. Aftermarket parts, while new, are often inferior. There are no federal safety requirements for aftermarket parts. Aftermarket parts are often made of thinner materials or multiple pieces spot-welded together instead of a single piece, which directly affects a vehicle's safety performance in a subsequent crash. Because they are not subject to federal safety testing, aftermarket parts are not guaranteed to perform as OEM parts.

72.     For instance, in a front-end crash, the bumper plays a critical role in deployment of a vehicle's air bags. The bumper is the first structure to absorb impact which creates a series of vibrations which then alert air bag sensors to the possible need to deploy and how fast they need to deploy. Often being made of different, thinner, cheaper materials, aftermarket bumpers do not vibrate in the same manner as OEM bumpers, if they vibrate at all, and can result in failure of the air bag system.

73.     Vehicle hoods are also designed to crumple in a particular manner so as to absorb and distribute impact energy to protect people within the passenger compartment. Aftermarket hoods, again made of thinner, cheaper material, do not crumple in the same manner OEM parts are designed and tested to perform and thereby endanger people within the vehicle.

74.     Even aftermarket windshield glass poses a safety risk to vehicle occupants. In a rollover crash, the windshield works to keep the vehicle roof from collapsing. Aftermarket glass is thinner than OEM glass and not designed to fit a particular vehicle. As with other aftermarket parts, replacement glass is not subject to crash testing requirements, thinner glass may shatter rather than providing protection in a rollover or may simply pop out altogether.

75.     The majority of the time, aftermarket parts simply do not fit properly. A study conducted by the California Department of Consumer Affairs, Bureau of Automotive Repair found that four of five non-OEM crash parts tested were inferior to OEM parts. Non-OEM parts had to be modified to fit a vehicle they were supposed to fit without modification, resulting in additional labor time, the cost of which, in addition to the cost of the part itself, actually make the non-OEM part more expensive than the OEM part.

76.     However, in the vast majority of instances, Defendants refuse to pay the additional labor time to modify non-OEM parts they insisted be used, calling it "the cost [uncompensated cost to the Plaintiff shops] of doing business."

   C. <u>Mechanical</u>

77.     Often, collision repair involves not only damage to the body of the vehicle but also to mechanical parts such as the engine. In order to complete the repair, mechanical repairs are necessary.

78.     Some shops have mechanical repair specialists on premises. When they do, a separate hourly rate applies to work performed by mechanics. For instance, Plaintiff Dave's Body Shop performs mechanical work at the rate of $90.00 per hour, and Plaintiff Chris' Body and Paint charges $77.00 per hour.

79.     Shops which do not perform mechanical work in house sublet the job to an outside source. The cost of repair includes the actual cost of the mechanical repairs plus a "mark-up" ranging between twenty five and thirty five percent (25-35%) of the mechanical bill to cover the accounting and the cost of transporting the vehicle to and from the sublet location. The mark up covers not merely the actual costs of transportation, such as gasoline or a tow truck when needed, but also the cost of the employee who must transport the vehicle and be diverted from in-house duties. Some sublet's require payment prior to delivery.

   D. <u>Administration</u>

80.     Administrative costs are fees assessed for necessary non-repair work. Almost exclusively, non-repair administrative work constitutes tasks compelled by the Defendants. Insurers often

require numerous photographs be taken and transmitted electronically before approval for work will be given.

81.     Alternatively, many of the Defendants refuse to pay for processes or procedures performed or parts utilized unless a photograph is provided.

82.     State Farm demands photographs of de-nib and finesse procedures for every repair or will refuse to pay for any part of the procedure.

83.     Allstate frequently demands photographs of repairs at various stages or will refuse to pay for repairs.

84.     Parts must be received and inspected. As most aftermarket and salvage parts required by the Defendants are inappropriate, broken or of poor quality, they must be repackaged and returned to the seller routinely and new parts ordered utilizing employee time, resources and expenditure of funds which would not be required but for Defendants' stipulations.

85.     Administrative fees vary from shop to shop. But again, almost universally, Defendants refuse to pay these charges though the tasks are compelled by the insurers under threat of refusing to pay for repairs.

## ROLE OF DIRECT REPAIR PROGRAMS IN DEFENDANTS' VIOLATIONS OF FEDERAL AND STATE LAWS

### DRP Shops

86.     At their inception, direct repair programs ("DRP's") were touted to benefit consumers by means of a pre-screened pool of quality body shops available to which customers and claimants could be referred; Allstate is believed to have been at the forefront of this initiative in the 1970's.

87.     In addition to Allstate, the vast majority of insurers have created their own DRP's, including Defendants State Farm, Progressive, GEICO, Liberty Mutual, USAA, American Family, Farmers, Safeco and even less massive insurers like Western United, and each has a catchy name for their program.

88.     Over the course of intervening years, the emphasis of DRP's completely shifted course and direction. Defendants still tout their programs publicly as beneficial, time-saving and cost-saving for consumers—one-stop shopping for collision repairs-going to a DRP, a consumer can take of their claim needs, rental car needs and collision repair needs in one neat package.

89.     This continues to be the face of DRP's but the reality is starkly contrary. Instead of ensuring quality repairs, DRP's became vehicles for Defendants to suppress repair costs to the detriment of the Plaintiffs and consumers. Insurers steer or coerce consumers to their compliant DRP shops, again proclaiming their benefits while knowing many DRP shops across the nation consistently and willfully fail to make safe and proper repairs.

90.     Not all DRP's are poor repair facilities. Most are honorable, hard-working and professional collision repairers. Many Plaintiffs have associated with DRP's from time to time over the last twenty years though the majority have since left all such programs.

91.     DRP's are not in and of themselves a problem. It is the use to which Defendants have put them primarily over the last ten to fifteen years which have created a national atmosphere where one industry—insurance—controls and directs the entire business of a wholly separate industry—auto body collision repair—and the businesses which comprise it.

92.     DRP's were presented to the Plaintiffs initially as a mutually beneficial opportunity.  In exchange for providing guarantees of pricing under a "most favored nation" ("*MFN*") clause as

well as preferential timing of repairs, a Defendant would list the body shop as a preferred provider.

93.    However, over the course of years, the concessions demanded by individual Defendants with DRP's increased incrementally until in the present day insurers exert complete control over every aspect of a body shop's business.

94.    At present, Defendants with direct repair programs, such as State Farm, Farmers, Allstate, American Family, Liberty Mutual, Bear River, Progressive, Geico and USAA, require a shop to not only accept fixed prices on labor, fixed prices on paint and materials, fixed pricing procedures on parts, refusal to compensate or fully compensate for processes and procedures, but many also compel the shop to include the DRP sponsor as an additional insured on the shop's liability insurance (even though the sponsor holds no lien or other ownership interest), compel indemnification for liability assessed to the sponsor, compel primary assumption of liability for repairs using parts provided by or insisted upon by the sponsor, compel mandatory production of the shop's financial information and books upon demand, and authority to obtain background checks upon the shop's employees at the sponsor's will and pleasure.

95.    Some terms of DRP's are consistently disregarded by the sponsoring insurer when it is in their immediate financial interest to do so. For example, State Farm's Select Service DRP requires use of certified parts for crash-related parts such as bumper assembly and radiator supports. However, State Farm regularly and routinely writes estimates including and will only pay for salvaged crash-related parts of unknown provenance and without any indicia of soundness or crash worthiness.

96.     As noted above, DRP's also require the shop to both maintain the sponsoring insurer (in this example, State Farm) as a named insured on the shop's liability insurance and require indemnification for any liability as a result of parts failure even when, as State Farm does, the sponsoring insurer regularly and routinely breaches its own requirements.

97.     Failure to comply with DRP terms results in a pattern of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses. Failure to comply with any express term or failure to comply with a self-selected avoidance of a term by the sponsoring insurer (such as described immediately above) results in either removal from the program(s) combined with improper "steering" of customers away from the Plaintiffs' businesses, or simply punishment to decrease the number of customers utilizing the Plaintiffs' services, and/or increasing ongoing and improper refusals to pay for certain repair procedures and/or charges without valid or reasonable justification.

98.     Within the Stature of Limitations for this action, Plaintiff Jenson Enterprises was at times (when still in operation) in a DRP with Defendants Farm Bureau and Liberty Mutual; Plaintiff Dave's Body Shop has been at times in a DRP with Defendant Bear River, Allstate, American Family, Farmers, Progressive, Liberty Mutual & Safeco, but is not presently in any DRP; Plaintiffs Lindon Collision Center and JP's have not been in a DRP with any named Defendant; Plaintiff Chris' Auto Body has at times believed it was in a DRP with Defendants Liberty Mutual, but Chris' has been told by multiple adjusters that he/she/they cannot now locate said shop in "the system"; Plaintiff Alpine Body has at times been in a DRP with Defendants State Farm, American Family, Liberty Mutual and Bear River; Plaintiff Perks Auto has at times been

in a DRP with Defendants State Farm and Farm Bureau; and Plaintiff A.F. Collision has been in a DRP with Defendant State Farm.

Non-DRP Shops and Defendants Without DRPs

99.     Whether or not an insurer sponsors a formal direct repair program is irrelevant to this action. Equally irrelevant to this action is whether or not a Plaintiff body shop has associated with or is associated with any DRP's. The Defendant insurers collectively and through exertion of their combined market share power, enforce against non-DRP Plaintiffs, non-compliant DRP Plaintiffs and other body shops that are not DRP as many "DRP concessions" as they possibly can, either explicitly or by de facto substitute.

100.    Borrowing the concept of an MFN clause while turning it on its head, the Defendant insurers compel acceptance of a fixed pricing structure by asserting they, as a group and with the power of a group, have the ability to set the rates. All Plaintiffs and all body shops in Utah are permitted to charge for their services. The details of the pricing structure are set out below.

101.    No law or other authority has ever been identified which permits the Defendant insurers to set the pricing structure of the collision repair industry or compel them to purchase certain parts or materials or determine the work which constitutes a full and safe repair. Yet that is precisely what the Defendant insurers have done and do, simply by imposing their collective will upon the body shop industry and exploit every possible financial vulnerability.

102.    The Defendant insurers assert they are merely paying the "market rate" or "prevailing rate." However, this is a misrepresentation. "Market rate" and "prevailing rate" are terms used to describe a median or average of rates in a particular industry as they ebb and flow over both time

and geography, react to market influences, innovations and advances in the field, and free market competition between practitioners of that trade or profession.

103.    In other words, in any other industry, an MFN or "market rate" discussion would assume the existence of a free market. Gas stations compete with each other, introducing new products they hope will appeal to the public, raising and lowering their prices, sometimes with astonishing speed, based upon the competitions' published prices, market availability of an increasingly scarce resource, government regulation and world events. A trucking company entering into an MFN agreement with a gas station would require the best price that gas station makes available to any other customer.

104.    It would be wholly inconsistent with accepted principles of a free market, the law and contract term interpretation if that company decided that instead of demanding the best price available from the gas station, it banded together with nearly every other trucking company to exploit the gas stations' need for gasoline to be delivered by the trucking companies and arbitrarily decided what gas should cost for themselves. And not just at a single gas station but at every gas station in America.

105.    That is precisely what has occurred, aided by the formatting of DRPs and the enormous power the Defendants collectively hold.

106.    Defendants cannot legally compel non-DRP body shops to agree to parts' discounts the insurers have independently contracted with parts' suppliers as required in DRP agreements.

107.    The Defendants can, however, and do compel non-DRP shops to accept the de facto equivalent—Defendant insurers, as a concerted and agreed upon action, simply refuse to pay more for parts than the cheapest a part can be purchased. This is so whether or not the part is

safe, appropriate of like kind or quality, or even available. More than one insurer has limited parts' compensation to what a part could be purchased for in some other location even if it isn't available where the part is needed.

108. Defendants cannot legally compel non-DRP body shops to assume indemnification of them for liability arising out of repair procedures dictated by the Defendants, or parts purchases dictated by the Defendants, or product defects from the materials the Defendants dictate must be used.

109. They can, however, and do ensure that all documentation they prepare and produce clearly and unambiguously advises the consumer that no liability for any of those things is accepted by the Defendants for any unfortunate results of their dictates.

110. And certainly no legal authority permits Defendants to arbitrarily and through artificial, manipulated means, impose labor rates determined wholly within the insurance industry upon the collision repair industry. Nor does any legal authority permit the Defendants to maintain this status quo through combining their collective power, acting with uniform intent in concert in exercise of that collective power and exacting group retribution against those who do not comply.

111. Yet that (the allegations in paragraph 109)) is precisely what Defendants are doing in violation of federal and state laws.

## PRICE FIXING

A.    Labor Rates

112.    All Defendants assert they will pay no more than the "market rate" for labor in the market area. Why the Defendant insurers believe they are legally entitled to determine the rates an entirely separate industry is permitted to charge has never been publicly disclosed.

113.    However, even setting that aside, only one company, State Farm, conducts any sort of inquiry into body shop rates, what it terms its "surveys" to purportedly determine a labor market rate in a market area. This survey is described below.

114.    None of the other Defendants conduct any form of body shop-industry labor rate studies.[3]

115.    State Farm conducts its purported survey by asking shops to fill in their individual rates for body labor, refinish labor, paint, and so forth, via an online site, State Farm's Business2Business portal, or B2B.

116.    However, State Farm does not merely collect the information provided and perform statistical or arithmetic calculations. Upon receipt of rates it unilaterally deems too high, State Farm will contact the shop and order it to amend the survey response to a lower number it finds acceptable or it will unilaterally alter a shop's information without the knowledge or consent of the shop involved.

117.    Most often, though not exclusively, State Farm's orders to reduce or unilateral reduction of rates occurs with larger shops or independent shops which operate more than one location. The reason for this is described below.

---

[3]    Since the inception of this litigation, one or two Defendants claim to have made an effort at conducting some form of survey. However, these purported surveys have not had any discernable effect on the Defendants' group behavior.

118.     When State Farm selects the first option as an initial action, the order to reduce the rates entered on the B2B portal are accompanied by threats of removal from the DRP and to steer business away from the non-compliant shop.

119.     Once the information has been altered to State Farm's satisfaction (whether by a shop under duress or unilaterally without the shop's knowledge), it then performs a "half plus one" form of math. State Farm lists the shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and the least expensive hourly rates at the bottom.

120.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser. State Farm then totals the number of technicians or work bays and employs a "half plus one" math. As an example, if the total number of technicians/work bays for a given area as determined by State Farm equals fifty, State Farm's magic number would be twenty-six (half fifty plus one).

121.     Beginning at the bottom of the list with the cheapest shops, State Farm then counts the number of technicians/work bays up the list until it reaches its magic number. The rates of whichever shop this happens to fall upon is declared the "market" or "going rate."

122.     The problems with this methodology are numerous. The rates themselves are artificially created by State Farm at the very beginning of the process. The math does not represent any identifiable form of professionally accepted methodology, even if the numbers used in that process reflected the actual labor rates rather than the rates which State Farm selects itself.

123.     The method contains a built in bias towards the rates of larger shops or shops with more than one location such as multi-shop operators ("MSOs" or "chains" such as Service King, ABRA, Sterling or Caliber) as such facilities that have greater capacity, more work bays and

27

more technicians. As the number of work bays or technicians determines State Farm's "half plus one" results, it becomes imperative for larger shops' labor rates to conform to State Farm's predetermined outcome, which State Farm ensures they do.

124. Additionally, the method makes no provisions for work quality, equipment, quality of personnel or any other factor. State Farm's method does not provide a range of going rates, it produces only one. Therefore the worst shop in State Farm's determined market area is paid exactly the same as the best shop.

125. A State Farm employee has admitted to one of the Plaintiffs in the Tennessee action (Case No. 6:14-cv-06002), ICON, that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" of "whatever State Farm wants it to be." In speaking of the Louisiana Attorney General's action against State Farm, this same employee has admitted that everything in the Complaint is true, "we do all that," "every iota is the truth . . . . when you read [the complaint], it's like, 'that's us.'"

126. Plaintiffs in the instant action note the allegations and facts set forth in the Louisiana Attorney General action, Louisiana vs. State Farm, Case No. 6:14-cv-06017, also pending before this Court, are essentially identical to the facts and allegations of the present Amended Complaint.

127. State Farm does not disclose or make publicly available the geographic area it determines is a given "market area." State Farm can and does alter a given "market area" to further manipulate the results and punish noncompliant shops by including them in a different market area with lower rates.

128. State Farm does not publish or otherwise make publicly available its "survey" results.

28

129.    State Farm has, in fact, made significant efforts to keep this and other internal information confidential. State Farm does not even disclose to its claims team leaders the criteria for determining a "market area" or the criteria for changing a "market area."

130.    Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or confidential information. *See e.g., Hover v. State Farm Mut. Auto. Ins. Co*., 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co*., 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v. State Farm Mut. Auto. Ins. Co*., 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.*, 204 F.R.D. 420 (S.D. Ind. 2001).

131.    Despite the fact that State Farm does not make its results publicly available, the other named Defendants—who do not conduct any form of survey—pay only what State Farm pays and parrots State Farm that it is the "market rate."

132.    For instance, more than one Farmers agent has told Chris Perkins of Plaintiff Perk's Auto in the past, "our prevailing rate in your area $42.00." When asked by Mr. Perkins how Farmers determined that rate, the agents have said "we do a survey." Those agents have no response when Mr. Perkins has informed them that he has never seen a survey by any insurance company other than State Farm, and have not provided a copy of the alleged surveys when requested. When asked by Cory and Don Stanger of Plaintiff Alpine Body Shop how they set rates without doing surveys other Defendants reply "that's all our manager will approve", "that's what local adjusters are paying," or words to that effect. Robert Hogan of Defendant Chris' Body and Paint has never received a response other than that is the "market rate' when he asks adjusters of defendant

companies other than State Farm how they determine prevailing rates. They do not have an answer when he tells these adjusters that they work with all other shops, while he (Robert) works with all the other insurance companies, and that he doesn't know what they all charge, and asks "so how does the adjuster of the defendants know what all the other insurance companies are paying?"

133.    Defendants, including but not limited to, USAA, GEICO, Allstate,  Progressive, and Safeco, all consistently refuse to pay any rate different from what happens to be the State Farm established "market rate" in Utah communities.

134.    None of the named Defendants conduct labor rate surveys.

135.    None of the Defendants named in the paragraphs above have contacted the Plaintiffs over the last five years to ask their current posted rates.

136.    As noted above, State Farm also purports to establish market rates based upon "market area." This would presumably account for variations across metropolitan areas as well as discrete areas of a given state, such as Utah.

137.    However, under State Farm's method, there is apparently little to no variability anywhere within the State of Utah, as it determined the market rate of $42.00 per hour for vast portions of the state.

138.    Plaintiff Dave's Body Shop in West Jordan, Utah had posted labor rates in 2013 of $44.00 per hour body labor, $44.00 per hour refinish labor, $44.00 per hour paint labor, and $28.00 per hour for paint and materials. Defendants State Farm, Farmers, Mid-Century, Allstate, American Family, Progressive, Geico, Farm Bureau, Liberty Mutual, USAA, Bristol West,

AAA, Safeco, United Auto, United, and Bear River paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

139.     Plaintiff Chris' Body and Paint in Midvale, Utah posted labor rates in 2013 of $44.00 per hour body labor, $44.00 per hour paint labor, and $30.00 per hour for paint and materials. Defendants State Farm, Farmers, Mid-Century, Allstate, American Family, Progressive, Geico, Farm Bureau, Liberty Mutual, USAA, Bristol West, AAA, Safeco, United Auto, United, and Bear River paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

140.     Plaintiff Alpine in Ogden, Utah posted labor rates in 2013 of $46.00 per hour body labor, $46.00 per hour paint labor, and $30.00 per hour for paint and materials. Defendants State Farm, Farmers, Mid-Century, Allstate, American Family, Progressive, Geico, Farm Bureau, Liberty Mutual, USAA, Bristol West, AAA, Safeco, United Auto, United, and Bear River paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials.

141.     Plaintiff Lindon Collision in Lindon, Utah posted labor rates in 2013 of $46.00 per hour body labor, $46.00 per hour paint labor, and $30.00 per hour for paint and materials. Defendants State Farm, Farmers, Mid-Century, Allstate, American Family, Progressive, Geico, Farm Bureau, Liberty Mutual, USAA, Bristol West, AAA, Safeco, United Auto, United, and Bear River paid $42.00 per hour for body labor, refinish and $24.00 per hour for paint and materials

142.     The distance between the areas in paragraphs 135 through 138 covers thousands of square miles and numerous population centers, large and small. Despite there being demonstrable differences in the rates charged throughout the state, the named all assert the "market rate" in the "market area" was not only less than publicly posted rates but was less than

publicly posted rates based upon data which could only have been provided by State Farm to its ostensible competitors.

143.    The odds of all these named Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey would be outside the realm of possibility. This is even more obvious when one considers the possibility of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

144.    In addition to the above, available documents establish both conformity with and foreknowledge of a change in State Farm's unpublished "market rates" by the other Defendant insurers. For example, when State Farm decided to raise the unpublished "market rate" to $44.00 per hour in mid-2014. Other Defendant insurers decided the market rate was $44.00 per hour within the following thirty days. , GEICO was the last to increase, but finally raised its rate to $44.00 per hour after seeing that the other Defendants had done so. None of these Defendants conduct an independent survey of their own of body shop labor rates. As the new "market rate" still did not reflect known actual posted rates, the decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather than a reflection of what the market actually was in 2014.

145.    Over the last twenty years, in addition to manufacturing a "market rate," the Defendants have utilized other methods of intimidating the Plaintiffs and other body shops to suppress labor rates.

146.    Shops are frequently told they are the only shop trying to raise their rates, therefore the posted rates do not conform to "market rates" and the Defendants refuse to pay the posted rates. As shown by the above rates examples, Defendants assertions are false. All Defendants have said this to Plaintiffs.

147.    Plaintiff shops and others have heard through representatives of some Defendants that if they discuss labor rates with each other, they will be price fixing and breaking the law.

148.    Plaintiffs believe the foregoing facts establish the probability discovery will adduce additional information showing Defendants have intentionally acted in concert, combination and by agreement to fix and suppress the labor rates of the body shop industry in Utah.

149.    State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing. State Farm selects the geographical boundaries of the "survey" and retains the right to alter the "survey" results (and does so) all without disclosure or oversight.

150.    Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard.  See attached hereto as Exhibit B a true and correct copy of State Farm's Dashboard.

151.    The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.  It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

152.    Within the quality criterion, the shop's reported customer satisfaction, customer complaints and quality issues identified by an audit are scored.

153.    The efficiency criterion evaluates repair cycle time—the number of days a vehicle is in the shop as determined by a cars' drop-off and pickup dates.

154.    The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized and the number of hours to complete a repair and similar matters.  See page 2 of Exhibit B, a true and correct copy of a State Farm Score or Report Card.

155.    In rating a shop, 1000 total points are possible, but State Farm claims it is under no obligation to disclose the weight or total number of points allocated to each factor in reaching a shop's "score," particularly those factors included under the competitiveness criterion; and State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

156.    State Farm maintains complete and unsupervised authority to determine an individual shop's rating, and it is therefore possible for a shop to have no customer complaints, high customer satisfaction, no issues identified on an audit and complete compliance with all repair cycle time and efficiency requirements, and yet still have a low rating; it is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations, and yet have a very high rating.

157.    Significantly, a shop's Dashboard and Report Card rating determines its position on the preferred provider list; so, when a claimant logs on to the State Farm web site seeking an auto body repair shop, shops with the highest ratings are displayed first whereas ones with low ratings

34

will be at the bottom of the list—often pages and pages down—making it difficult and less likely for a potential customer to find a shop rated arbitrarily low by State Farm and its criteria.

158.    Additionally, if a customer calls State Farm, State Farm's practice and/or procedure is for its representative to identify and recommend preferred shops holding the highest Dashboard/Report Card rating.

B.    Repair Processes and Procedures

159.    Defendant insurers have over the course of years exerted their combined market share power to refuse payment for all the repair processes and procedures required to return vehicles to safe pre-accident condition.

160.    Defendants selectively follow collision auto repair industry standards and thereby fail to pay for all necessary processes and procedures to return vehicles to safe pre-accident condition.

161.    Three leading motor vehicle collision repair estimating databases are in ordinary usage within the auto body collision repair industry: (a) ADP; (b) CCC; and (c) Mitchell.

162.    These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario"[4] presented by the procedure databases and the actual needs of a particular repair.

---

[4]  The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are

163.    By default, database estimates are underestimates of actual repair times and materials.

164.    The database procedure pages set forth the anticipated repairs, repair times and materials for repair of an undamaged vehicle using original manufacturer equipment which are specifically designed to fit that particular vehicle. Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, which can substantially affect real world repair procedures required, repair times and necessary materials. It is, for instance, much faster and easier to remove an undamaged door from an undamaged vehicle than it is to remove a wrecked door from a wrecked vehicle, where removal often requires prying the damaged components apart from each other before they can be removed from the vehicle.

165.    Historically, these procedure databases were printed and distributed in hard copy to subscribers. Throughout the industry, they are referred to as "p-pages."

166.    Although now housed in electronic form as computer databases, they are still popularly referred to as "p-pages."

167.    All of the Plaintiffs subscribe to one or more of these databases and use the same to generate estimates for individual repairs.

168.    CCC is currently or has been used by USAA, Farmers, GEICO, Allstate, Safeco, Bristol West, Mid Century and Liberty Mutual.

169.    Mitchell is currently or has been used by Progressive and Allstate.

---

specifically designed to fit that particular vehicle.  Wrecked cars are obviously not undamaged and original manufacturer parts are not always used, particularly with repairs for which State Farm and the other Defendants are responsible for payment, which can substantially affect repair procedures required, repair times and necessary materials.

170.    ADP I Audatex is currently or has been used by State Farm, Farm Bureau and Western United/AAA.

171.    Some defendants use independent adjusters from time to time. Which databases are utilized by independent appraisers likely varies and cannot be ascertained with certainty at this time.

172.    The Defendants have admitted the accepted position of the estimating databases within the industry through their consistent use or more explicitly like State Farm.

173.    As much as twenty years ago, State Farm assured the body shop industry it does and would continue to abide by the standard operations of the "p-pages." Sitting on a panel discussion at the 1994 National Autobody Congress and Exposition, State Farm speaker Gerry Westerfield answered a question of how to handle State Farm adjusters who refused to pay for standard "p-page" operations with the following: "If a State Farm representative comes to your shop and says, 'We don't pay for that, it's company policy,' take it from me, we don't have that policy .... So tell them, 'I know your policy and that's not it. Who's your supervisor?'"

174.    Despite public endorsement and daily use of the databases, the Defendants have nonetheless engaged in a course of conduct of refusing to fully pay for necessary procedures and materials.  In many instances the Defendants will even refuse to allow the body shop to perform required procedures and processes, thereby forcing the Plaintiffs to either perform less-than-quality work—a choice they have not taken and will not take—or suffer a financial loss—which they have and still do.

175.    A true and correct copy of a non-exhaustive list of procedures and processes for which the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit C.

176.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendants will cite the database estimate and pay for only fifteen hours of labor time.

177.     At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when they perceive doing so to be to their respective financial advantage. For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

178.     Alternative but collateral to the above, Defendant insurers will alter the database estimates, unilaterally reducing either labor time or materials needed. Manual changes to database standards are automatically marked by the program either by underlining or an asterisk.

179.     Defendant insurers will designate these as "judgment items" without any further authority or justification.

180.     Quite often, though certainly not exclusively, these changes will be made by a Defendant insurer representative who is conducting a "desk review" of the shop repair estimate, without ever having personally seen the vehicle in question.

181.     Farmers has gone to a desk review process for most repairs. Utilizing NuGen IT software, Farmers no longer sends an adjuster/appraiser to actually inspect a vehicle.

182.    Instead, the shop prepares an estimate, uploads the estimate along with photographs into the Nu Gen IT system and an amended estimate is sent back to the shop with what the NuGen IT software feels is appropriate.

183.    Thus, Farmers reduces estimates and eliminate procedures without ever viewing a vehicle. One of the problems with this system, which seems efficient on the surface, is that many points of damage cannot be accurately assessed via photograph or cannot be photographed at all. A bent frame cannot be photographed; it can be felt in the way the vehicle pulls while in motion and can be measured via various assessment tools, but unless the vehicle is completely disassembled down to the raw frame, the damage cannot be visualized.

184.    Severity of visible damage is difficult to assess via photograph. Shops consistently receive back from NuGen IT estimates with substantially reduced labor time to repair dents solely because a photograph "doesn't look so bad" to the desk reviewer.

185.    Additionally, the system constitutes a windfall of free labor to Farmers; body shop invoices for payment of time for completing work which is the responsibility of the insurer—inspection, estimating preliminary cost to repair, photographs and file documentation—are regularly refused payment.

186.    However, the most common tactics for refusing to pay for necessary processes and procedures include, but are not limited to, simply refusing payment by making the false statement that a particular operation isn't a necessary operation, or the false statement that a particular operation is an included operation in another procedure and therefore payment for one is payment for both, or the false statements that either no other body shop in the area performs that operation or no other body shop in the area bills for that operation.

187.    Processes and procedures are routinely excluded by the Defendant insurers, though when performed, they are necessary to return a vehicle to pre-accident condition. The databases specifically note these procedures are not included in other repairs or refinish procedures and thus must be billed and paid as separate items.

188.    Examples of the foregoing include the following: Feather, prime and block: this procedure is a refinish operation that completes body work repair from 150 grit smoothness to the condition of a new undamaged panel. While this procedure is not required on every repair, when it is performed, all three databases clearly state it is not an included operation and it is a refinish operation.

189.    Within the last few months, State Farm has begun writing on estimates for payment of feather, prime and block but actually is not doing so. Instead, it reduces body labor operations by 0.4 hrs and labels that carved out time as feather, prime and block. Again, it is designated a body labor operation, instead of a refinishing operation and the shops are still denied materials compensation as a result. That calculation is made for refinish operations, not body labor operations. In the end, the shops are still not being paid for the work as State Farm's relabeling only works to change the line item entries, not the bottom line.

190.    Denib and Finesse (also known as color, sand and buff) is another refinish procedure denoted by all three databases as an included operation when required, but Defendants including State Farm, Progressive, GEICO, Farmers, Liberty Mutual, USAA, AAA and United refuse to pay for it.

191.    Air Condition procedures is another, which includes evacuation and system recharge and refrigerant recover; all three databases state these are not only included operations but also that each are separate items and not a group and must be paid at mechanical rates.

192.    Another tactic is for the Defendant insurers to refuse payment for procedures and processes because that shop, whichever shop it may be, is "the only one" who either performs particular procedures and processes, or is "the only one" who bills for it.

      C.     <u>Paint & Materials</u>

193.    As described above, traditionally, paint and materials have been compensated at an hourly rate. Separate and apart from paint labor rates, paint and materials rates were intended to compensate shops for the actual cost of paint and materials used in a repair.

194.    However, as also described above, contemporary vehicle finishes and the materials necessary to complete repairs have costs which have outpaced the traditional method. While it is inarguable materials must be expended to repair automobiles, the Defendants simply refuse to pay for them or pay fully the paint and materials costs submitted, asserting additional costs are part of the cost of doing business. This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair operations.

195.    All of the Defendants assert the paint and material rate they pay is the "going rate" or "market rates" in the area.

196.    However, none of the Defendants conduct any review of body shop posted rates to determine an area's "market rates," with the exception of State Farm. As described in detail above, however, State Farm's method of determining rates is to create them out of whole cloth. This is supported by the fact that Plaintiffs' posted rates are all higher than the purported

"prevailing rate" and the utter lack of variability across the entire state of Utah, though posted labor rates do vary by region, as one would reasonably expect.

197.    As also noted above, State Farm does not publish or otherwise make publicly available the results of its purported surveys.

198.    Despite there being demonstrable differences in the rates charged throughout the state, the named Defendants, all assert the "market rate" in the "market area" was not only less than publicly posted rates but was exactly the same as the rate State Farm concluded was the "market rate" based upon its purported, unpublished survey.

199.    The odds of all the Defendants independently reaching the same conclusion as State Farm without conducting even a pro forma survey of their own are outside the realm of possibility. This is even more obvious when one considers the probability of reaching an identical conclusion to that of State Farm when State Farm's conclusion is based upon a labor rate State Farm manipulates and creates via a fatally flawed methodology.

200.    Again, none of these Defendants conduct an independent survey of their own of body shop labor rates. As the new "market rate" still did not reflect known actual posted rates, the decision finding a "new market rate" could only have been provided by State Farm's internal and unpublished numbers distributed by it to the other Defendants, based upon State Farm's own decision as to what the "market rate" should be rather a reflection of what the market actually was in 2014.

201.    The Defendants have been provided with invoices showing the actual cost of paint exceeds the entirety of compensation received and prices fixed by the Defendants as the ceiling

are forcing body shops to operate at a loss for every car that is painted. Uniformly, this has been ignored by the Defendants.

202.    In fact, the response of all Defendants to this problem was to tell Plaintiff Dave's Body Shop it was using too high a quality of paint and materials, which was a waste they were not going to pay for because 'the average customer only keeps a vehicle for three years.

       D.    Parts

203.    Numerous sources have found aftermarket parts inferior to OEM parts. As noted above the California Bureau of Automotive Repair found aftermarket parts inferior and the majority of them simply did not fit.

204.    Ford Motor Company has conducted crash tests comparing OEM crash part performance to aftermarket crash part performance. The results, which are publicly available, found that not only did aftermarket parts fail to perform at the same level, but repair costs on vehicles fitted with aftermarket parts were often double that of OEM parts.

205.    Consumer Reports reached the same conclusion, a report also publicly available.

206.    Despite the fact that aftermarket and salvage parts have significant issues with safety, fit, form and function, all Defendants insist on their use as the least expensive alternative.

207.    Safety issues are particularly paramount in replacing crash related parts. Salvaged parts are not subject to any safety testing requirements or regulations. They are, by definition, parts removed from other vehicles, almost exclusively vehicles which have already been wrecked and most frequently vehicles which have been damaged so badly as to be declared total losses.

208.    State Farm has recognized the safety issues associated with crash related parts by writing into its DRP language that "the following crash related parts, when subject to certification

43

standards developed by an organization approved by State Farm, will be certified unless requested by the vehicle owner:

> -bumper components
>
> -lighting components
>
> -radiator supports/tie bars and associated mounting components
>
> -outer sheet metal and plastic/composite parts."

209.   Despite this, State Farm regularly and routinely writes estimates compelling use of salvaged bumper components, lighting components, radiator supports for repairs conducted at Plaintiffs' shops. Examples include:

- Remanufactured (salvaged) bumper covers, front and rear, and salvaged bumper assemblies
- Used side panels (salvaged)
- Salvaged radiator panel, cross member
- "Recycled" (salvaged) headlamp assembly and side marker lens
- Salvaged headlamp panel
- Salvaged tailamp assembly
- Salvaged radiator supports

210.   Other insurers have publicly recognized the safety issues with using crash-related salvaged parts. Farmers' spokesperson Kitty Miller has publicly stated, "Farmers does not use salvage parts to replace axles, suspensions, or transmissions. Most salvage parts are external sheet-metal parts."

44

211.    This is not a truthful statement. Not only Farmers, but all Defendants regularly require use of salvaged crash related parts including radiator supports, radiator assemblies, hoods, bumper assemblies, and fender assemblies in estimates written for repairs at Plaintiffs' shops.

212.    The insurance-industry wide practice of insisting on aftermarket parts, which are materially inferior and simply do not fit, or salvaged parts of dubious or unknown provenance, history and prior damage places Plaintiffs in the untenable position of either performing a repair with unsafe parts or performing safe repairs at their own expense.

213.    Despite the well-publicized advertising statements of insurers such as State Farm, GEICO, Liberty Mutual and Allstate, among others, that "guarantee" their repairs for as long as the consumer owns the repaired vehicle, these companies' own documentation disclaims this purported guarantee specifically with respect to aftermarket and salvaged parts.

214.    Defendant Progressive's repair estimates carry the warning, "This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle. The aftermarket crash parts used in the preparation of this estimate are warranted by the manufacturer or distributor of such parts, rather than the manufacturer of your vehicle." This is, in fact, warranty language required to be disclosed under Florida statute.

215.    On the same page, Progressive clarifies exactly what part of repairs come with a lifetime guarantee: "sheet metal and plastic body parts." That's it. Nothing else is guaranteed and other language makes clear Progressive does not warrant the aftermarket parts it requires to be used. That must be taken up with the manufacturer or distributor, if a consumer is able to identify the manufacturer or distributor.

216.    Allstate's documents also contain limiting language. "The insurance company guarantees the fit and corrosion resistance of any aftermarket/competitive outer body crash parts that are listed on this estimate and actually used in the repair of your vehicle for as long as you own it. If a problem develops with the fit or corrosion resistance of these parts, they will be repaired or replaced at the insurance company's expense."

217.    Defendant Liberty Mutual, which runs an extensive television campaign advertising its purported lifetime guarantee on repairs provides only the statutory minimum-notice that the manufacturer or distributor warrants the parts Liberty Mutual required to be installed.

218.    The immediate cost to the Plaintiffs is the loss of revenue and time lost in modifying aftermarket parts to fit, which the Defendants refuse to pay. With salvage parts, the shop must clean and often repair the parts prior to use, when they are usable, and that is also time and labor which the Defendant insurers refuse to compensate the Plaintiffs.

219.    The ultimate outcome of the limiting language used by the Defendant insurers is the body shops shoulder the immediate liability burden for failure or inadequacy of parts they had no voice in choosing.

220.    For shops which do remain associated with direct repair programs, the threat and potential cost is even greater. Most DRP terms, such as those of State Farm, USAA, and Progressive, require the shop to not only maintain an extensive liability policy with the DRP sponsor as a named insured, (for which the shop bears solely premium payment responsibility) but also contain language requiring the shop to assume liability for any problems arising from parts selection and/or usage, and agree to indemnify the sponsoring insurer in the event the insurer is found liable for its own action with regard to parts.

46

221.    Again, in the face of the combined market power exerted by the Defendants and their unified insistence on use of aftermarket or salvage parts, the only recourse a shop has is purchase appropriate parts and work at a loss on each such repair.

222.    This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

223.    The automobile collision repair industry has expressed dissatisfaction with the insurance industry's practices of refusing to compensate shops fully and fairly for repair procedures and materials and endorsing application of estimating databases only when it was in insurance companies' financial best interest to do so.

224.    Despite several of Defendants' acknowledgements of the estimating databases' general legitimacy and applicability, Defendants continue to collude and refuse to pay Plaintiffs and other auto body shops for all necessary and proper repairs, labor and materials.

225.    State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

226.    Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the

optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

227.    Further, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

228.    Though the foregoing conduct is led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm and do so solely to increase their profits but to the substantial detriment of the Plaintiffs.

## STEERING

229.    Within the body shop and insurance industry, "steering" is the term used to describe the practice of insurers of coercing or otherwise convincing a consumer to withhold patronage from a disfavored repair shop for failing to comply with fixed prices.

230.    Steering generally takes the form of an insurer relaying false or misleading information to a consumer after the consumer has identified a noncompliant target shop as the repair facility the consumer wants to perform repairs. Insurers will also steer using threats of economic consequences to the consumer if they persist in using the shop of their choice.

231.    Regardless of which insurer is involved, the Defendants' insurance representative ordinarily provides the same list of false or misleading "information" to consumers after they

have selected one of the Plaintiffs' shops as their choice of repair facility. Examples of these statements include but are not limited to the following:

• The selected shop is not on the insurer's preferred list;

• The insurer has received complaints about the quality of the shop's work;

• If the consumer takes their vehicle to the selected shop, repairs will take too long and the consumer will run out of rental car time and have to pay for a rental out of their own pocket;

• The selected shop charges too much and the consumer will have to pay the difference;

• The insurer has received complaints about that particular shop from other consumers. The consumer is required to take their vehicle to an approved facility for an estimate before they are allowed to go to the repair facility the consumer has identified as the repair facility of their choice.

• The insurer will provide a guarantee on repairs performed at its preferred shops.

232.    With respect to the statement that a consumer must visit a preferred shop for an estimate before proceeding to the shop of choice for repairs, while all Defendants engage in this practice to some degree, GEICO appears to be the most aggressive. GEICO claims handling documents refer to this as "capture and retention." If the GEICO employee handling the claim is successful at directing a vehicle to one of its direct repair shops for an estimate, the file is marked as a successful "capture." If GEICO successfully compels repairs at the facility which "captured" the vehicle, this is designated a successful "retention." GEICO internal documents repeatedly urge employees to capture and retain, directly tying such success to increased company profits and increased profit-sharing bonuses for employees.

49

233. The degree of steering has varied over the years but the hard core steering used by the Defendants against the Plaintiffs appears to have commenced in approximately 2004, continuing to the present day.

234. Early examples of steering are not so very different from contemporary ones. Several years ago a long-time customer of Plaintiff Dave's Body Shop was notified by State Farm that there were "issues" at Dave's and strongly urged the customer to remove his vehicle to a State Farm preferred shop; the customer was told if he left his vehicle at Dave's, it could take up to thirty days before State Farm could get around to inspecting his vehicle and the customer would have to cover the cost of additional rental expenses that State Farm would not pay. This customer had previous repairs at Dave's for which State Farm paid the costs without difficulty. Between those repairs, however, Dave's had terminated its DRP status with State Farm.

235. Over the years, other customers of Dave's have been told by all Defendant that they could not take their vehicles to Dave's for repairs "because it isn't on our list" or words to that effect.

236. Additional specific examples of these practices include the following:

<u>Sonja Maholland- State Farm</u>

237. In 2014, Consumer Sonja Maholland told State Farm that she was taking her vehicle to her trusted auto body shop, Dave's Auto Body. In what she perceived to be an attempt to prevent her from doing business with Dave's, Ms. Maholland was told by Defendant State Farm's agent that Dave's was not on State Farm's preferred body shop list, that Dave's would charge more than one of their "preferred shops," and she would have to bay the additional amount. She was also told that State Farm would not warranty the repair if she took it to Dave's and that if she

instead took it to a preferred shop, they could start the repair without having to wait for a State Farm appraiser to come out.

## Marlow Mitchell - Geico

238.     In December of 2013, Consumer Marlow Mitchell scheduled a repair of her 2012 Honda Odyssey van. Defendant Geico told her that she had to instead take it to the Geico office to have it appraised by a Geico agent and that if she kept it there for repair they could pay her directly and it would be done faster. That "office" happened to be in a Geico DRP shop, Larry Miller South Towne. They put her in a rental car so she "would not have to wait." She verbally instructed them to call her with the estimate and she would come get her van and take it to Chris' Body and Paint. The authorization for the estimate said "Sign here so we can get you an estimate." They did not call her but instead began repairing it. Two days later she called to ask for the estimate and was told it was repaired and in paint. The Geico DRP Larry Miller performed an unsafe repair on the van. The intrusion/crash bar on the sliding door was bent, and instead of replacing it, they filled the space with foam to get the skin on the door shell to appear smooth. A year later Ms. Marlow was involved in a second minor rear-end collision. She took it directly to Chris' where they discovered the failure by Larry Miller to replace the door damaged by the 2013 crash. Geico came out and inspected the door from prior repair and authorized Chris' to put on a new door, but billed Ms. Marlowe's policy twice instead of making Larry Miller pay for it since Larry Miller was no longer a Geico DRP.

## Dennis Turner – American Family

239.     In 2014 Consumer Dennis Turner ended up taking his vehicle to the shop American Family told him to take it to instead of the shop he had experience with and trusted, Chris' Body

and Paint. After Chris's gave American Family the estimate, the insurance company pressured and coerced Mr. Turner into believing he needed to take it to one of their preferred shops for an estimate.

### Luke Purrington - USAA

240.    In 2014, Consumer Luke Purrington wanted to take his vehicle to Chris' Body and Paint because he had history with, and trusted, them. USAA told Mr. Purrington that he should take it instead to their preferred shop for an estimate Chris' was not on their preferred list and they wouldn't warranty the repair done by Chris', but that they would warranty the repair by their preferred shop for as long as he owned the car.

### James Black – State Farm

241.    In 2013, Consumer James Black was coerced and pressured into taking his car for repairs to a State Farm DRP shop instead of Chris' which Mr. Black trusted. He didn't take it to Chris' where he wanted to because he was told that Chris' was not on their preferred list, wouldn't agree with their appraiser, he would have to pay more there, and State Farm wouldn't warranty the repair. They also told him that they had a hard time with Chris' and couldn't work with them.

### Kim Casper - USAA

242.    In February 2013, Consumer Kim Casper was told by her insurer USAA she had to take her car to ABRA for repairs. Ms. Casper had to take the car back two or three times during 2013 to try and get the repairs done right. In 2014, she drove the vehicle through a carwash and her passenger go wet because the car was leaking. She finally took it to Plaintiff Alpine which struggled to get cooperation from USAA , but after insisting finally got an adjuster and the manager of ABRA to come to the Alpine shop and approve the re-repair by Alpine. ABRA

agreed to pay the additional $5200 in repairs that were completed in January of 2015, nearly two years after the accident. This incident demonstrates that requiring insureds to take their vehicles to DRP shops is not in the insurance company's or the preferred shops' best economic interest.

Brandon Stewart - Farmers

243.    In 2015, Consumer Brandon Stewart was involved in a collision in his company truck. He took it next door to his friend and neighbor James Flynn owner of JP's Custom Body and Paint. He got on the phone with the Farmers adjuster who gave him a list of preferred shops pointed out JP's wasn't on it. They refused to authorize it until Mr. Flynn himself got on the phone. During the repair, Mr. Casper had a hard time getting the Farmers adjuster on the phone to agree pay for the repair, and eventually he was told they lost the claim number and there was nothing in their files. Only when Brandon got JP's back on the phone that they finally found the file. Before the repair was complete, Mr. Casper learned that Farmers had called Enterprise Rental Car and told them to cut off his rental. Mr. Casper finally got the adjuster on the phone and when he put an employee of JP's on the call, the adjuster hung up on him.

JP's Custom Body and Paint

244.    James Flynn, owner of Plaintiff JP's also runs a towing business and is often called by the Utah Highway Patrol to tow vehicles. In 2014, Mr. Flynn picked up a vehicle that the UHP thought was totaled. He gave the senior citizen car owner a ride back to his shop. She spoke wither insurance carrier Farmers and she was told that JP's wasn't on their list and she would have to take her car to another shop. Mr. Flynn explained to her that it was totally her choice where to have her vehicle repaired. He explained to her that a DRP did not guarantee a faster or better repair. Within the hour Farmers sent a tow truck to pick up the car from JP's. Mr. Flynn

called the driver and asked her told her they would not guarantee JP's work and that therefore she "was afraid" to let him repair it.

### Regina Morrill – Liberty Mutual

245.    In 2013, an existing customer of Plaintiff Lindon Collision Center, Regina Morrill took her damages Mercedes GL550 to Lindon, which is the only Mercedes certified repair shop from Utah County south to Las Vegas, Nevada, but when she spoke with her insurer Liberty Mutual, she was told that they weren't a preferred shop. She insisted that they had done work for her before and she wanted it done there but when the repair went over thirty days they refused to pay for more days and told her that if she had taken her car to a preferred shop they would have covered the additional fifteen day which ended up costing her more than $500.

### Lindon Collision Center

246.    In 2015, a longtime friend and customer of Plaintiff Lindon brought in his Audi R8 for repairs. The customer was told by State Farm that he had to take his car to one of their preferred shops that was using the Audatex estimating system and the car would have to be towed to 500 miles to Denver. State Farm tried to convince the insured that the damage was structural and had to be towed. It was not.

### Jayme Montgomery - Farmers

247.    In February 2015, Consumer Jayme Montgomery elected to take her damaged 2012 Toyota Camry to her trusted body shop, Plaintiff Perk's Auto. However, when she expressed this choice to her insurer Farmers, she was told that Perk's was not on their preferred list and she had to take her vehicle to ABRA. She says she felt forced to use ABRA because of Farmers' statement to her.

### Ken Caldwell - Geico

248.    In November 2012, Consumer Ken Caldwell had a drawn out argument with his

insurance carrier, Defendant Geico, which insisted that he take his vehicle to a preferred shop

thirty miles away in Salt Lake City to get a repair estimate rather than to his friend and neighbor

Chris Perkins, owner of Plaintiff Perk's. Geico further told Mr. Caldwell that Perk's was not one

of its preferred list of network shops, but that if he took it to one of their preferred shops, they

would warranty the repairs for as long as he owned his car. Although Mr. Caldwell ultimately

decided to take the car to Perk's because he knew and trusted them, but he swears that he felt

significantly pressured and coerced into changing his choice of repair shops to the one Geico

wanted him to go to.

### Paul Twitchell - Farmers

249.    In 2015, Consumer Paul Twitchell took his 2008 Toyota Corolla to his long-time (twenty

years) trusted body shop, Plaintiff Perk's Auto Repair. Mr. Twitchell's insurance company,

Defendant Farmers/Mid-Century, told Perk's owner Chris Perkins that they would pay for the

repair if, and only if, he would not question their judgment, and if he only used salvage or

aftermarket parts on Mr. Twitchell's car. Concerned for his customer's safety, Mr. Perkins

refused and worked hard to get Farmers to pay for OEM parts that he, as the expert, believed

were required for safety. At that point Farmers tried to steer Mr. Twitchell away from Defendant

Perk's to ABRA. When Mr. Twitchell insisted that he wanted his trusted body shop to repair his

vehicle, Farmers told Mr. Perk's that he would have to accept their conditions or they would not

pay for the repairs. Mr. Perkins still not wanting to put his customer at risk contacted a vendor

with whom he had a long-standing business relationship and tried to get them to match the price

on OEM parts that Farmers was only willing to pay for aftermarket parts. If he is unsuccessful in getting the vendor to match, Mr. Perkins will install OEM parts and eat the difference.

250.     The forgoing specific examples are only representative of the numerous specific facts that will be alleged and proven throughout the course of discovery and litigation. All of the Defendants regularly and routinely "steer" their policyholders away from auto body shops perceived as not complying with an aspect of their Program Agreement and towards shops they favor and perceive as compliant, causing substantial harm to Plaintiffs' business reputation and operations.

251.     As indicated in the specific cases noted above, examples of steering include advising that a particular chosen shop is not on the preferred provider list, advising that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

252.     These statements have been made about Plaintiffs without any attempt to ascertain the truth thereof, and some of the ills recited, which implicitly criticize the shops, are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop–consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants.  Asserting the shops charges more is often not a function of

what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant.  Yet both are conveyed to the public as problems with the shop.

253.    The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as none of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed.  In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

254.    Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

### Defendants' Steering is Malicious, Punitive & Intentional

255.    The punitive and malicious nature of Defendants' interference is exemplified by the failed steering instances described above. In each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of 0EM parts designed to fit a particular vehicle, capping paint and materials or similar activities or a combination of these or similar actions.

256.    The outcome was the same—each Defendant paid only what it chose to pay regardless of the actual cost of repairs.

257.    Each Defendant paid only what it would have paid a direct repair or cost-compliant shop. As such, steering becomes a financially pointless endeavor and does not benefit a legitimate interest of the Defendants. If each Defendant refuses to pay the full cost of repairs, regardless of where the repairs are performed, steering customers away from Plaintiffs' businesses can only be performed as a means to punish through improper means and attempts to compel compliance through financial coercion.

258.    Additional evidence of malice is the misrepresentation to consumers that certain difficulties attributed to Plaintiffs are actually and solely the result of the Defendant insurers' own deliberate choice. The statement that repairs will take longer at a Plaintiff shop is not the result of the shop taking longer to complete a repair but a Defendant insurer's decision to delay every part of the repair.

259.    This usually commences at the beginning of the process where the Defendant insurer will delay sending a representative to the shop to perform an initial evaluation but threatens the shop that if work begins before they inspect, payment for repairs will be withheld.

260.    Quite often a Defendant insurer will tell both the customer and the shop an estimator will be sent, but days or weeks will pass, calls are not returned and when someone finally answers the phone, will again assure all concerned an estimator is being dispatched, again with no result.

261.    Only after considerable time has passed will a representative arrive for the initial evaluation, claiming the repair had "just been assigned."

262.    A Defendant insurer will next delay in addressing supplements, often stating repeatedly over the course of days or weeks that supplements were never sent by the shop. Even when proof

is provided, such as emails or fax confirmation sheets, a Defendant insurer will deny receiving it, further delaying the repair.

263.    Even after acknowledging a supplement has been sent, a Defendant insurer will refuse to allow the additional work to commence until an in-person inspection of the supplemental work requested has been made. Again, there are delays in returning to the shop.

264.    Alternatively, disagreement between a Defendant insurer and a shop on the scope and extent of repairs results in the insurer invoking the appraisal clause. This results in the insurer waiting days or weeks to send an independent appraiser and/ or days or weeks to acknowledge receipt of the appraiser's report, usually the reports prepared by the independent appraisers hired by both the insurer and the consumer.

265.    Specific examples of this behavior include but are not limited to the following:

• Defendant State Farm routinely waits two to three days to send a representative to perform an initial estimate.

• Defendant GEICO routinely waits at least three to four days to arrive for an initial estimate.

• Defendants State Farm, Allstate, GEICO and Progressive routinely order the cheapest part which generally are salvaged parts which are unfit for use, must be returned and others ordered (sometimes this cycles through two or three times because he set of parts are unfit for use), substantially increasing the length of time to complete repairs.

266.    Also reprehensible are the Defendants' assertions that Plaintiffs' work cannot be guaranteed but if the consumer goes to one their network or preferred shops, the insurer will guarantee the work.

267.    This is deeply misleading for three reasons. First, no insurance company and certainly none of the named Defendants performs any repair work. Therefore there is nothing for them to

guarantee and asserting to Plaintiffs' customers and potential customers they will guarantee the work is both misleading and inaccurate. As phrased, Defendants' guarantee assertions reasonably lead consumers to believe the repairs are guaranteed by the insurer, which they are not.

268.    A correct statement would be the Defendant insurers require network and preferred shops to guarantee their own work. However, reality has proven that even when repairs are performed at a network or preferred shop, neither the shop nor the insurer can or does live up to even this hypothetical statement.

269.    As set out above, Defendant insurers and their network/preferred shops regularly and routinely perform poor work or simply fail to perform necessary repairs at all. Repeat trips for re-repairs usually yield nothing and more than once, failure to make required repairs in at least an adequate manner leads only to both the insurer and the network/preferred shop shrugging and walking away with the repairs incomplete, poor and often leaving a vehicle that is unsafe to drive and ultimately more expensive to repair.

270.    At the same time, these same insurers—who tout guarantees—refuse to allow another shop to make repairs. More often than not, "guaranteed" repairs end with a previously repair-able vehicle being declared a total loss, sometimes when the vehicle is still beneath the total loss threshold but the insurer simply does not wish to be bothered with it anymore.

271.    Third, Defendant insurers' statements mislead Plaintiffs' customer and potential customers into assuming Plaintiffs do not guarantee their own work. Were this not the intent, to lead listeners to this conclusion, there would be no effect or gain to the Defendant insurers in telling consumers that work done at a network/preferred shop would lead to a guarantee, coupled with disavowal of guarantees at the Plaintiffs' shops.

272.    No legitimate business interest of any of the Defendant insurers allows them to defame the Plaintiffs with falsehoods, accuse the Plaintiffs of misdeeds and malfeasance which is solely attributable to the insurers' own actions, or financially punish a shop when the cost of their own actions and inactions becomes more than they wish to pay.

273.    These actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

<u>Effect of Steering</u>

274.    As noted above, it is generally well accepted by the courts that insurers exert an enormous amount of influence over where consumers take damaged vehicles for repairs.

275.    Insurance-paying customers constitute between seventy-five and ninety-five percent of a given Plaintiffs' annual business. Given these proportions, the effect of Defendants' steering is dramatic.

276.    As an example, Plaintiff Dave's Body Shop has been a victim of insurer steering for decades. The proliferation of steering was multiplied a hundred fold with the advent of direct repair. The DRP model has allowed insurance companies self-justification to blatantly steer customers to their DRP shops. As a shop the detrimental effect is when a customer has already told their claims person that they would like to have their vehicle repaired by us and yet the claims person insists on telling the customer about the "benefits" of utilizing their DRP program. Many times these tactics result in the customers changing their mind and agreeing to go to a DRP shop.

277.    Stan Ware, owner/operator of Plaintiff Dave's Body Shop, who has been with the company since 1983 has personally witnessed first-hand conversations between insurers and his customers designed to pull repair business away from his shop. The number of repairs that lost to this tactic over the past five years alone is in the hundreds and possibly even thousands.

278.    Steering not only deprives legitimate repair shops of hard earned customers, it also has a potential to harm the consumer. Every DRP shop is required to perform at a very high level with respect to repair costs and repair cycle time as well as customer satisfaction indexing, however no measure of repair quality is considered in these Key Performance Indicators. In an ongoing race by all DRP shops to garner more DRP business the emphasis is to continually cut costs and reduce cycle time. Ultimately the repair quality will suffer in the race to do the repairs faster and cheaper. Considering that there are no licensing requirements in the United States to be a collision repair technician, coupled with the fact that poor structural repairs to a vehicle can put consumers in grave danger, makes this issue one of great importance.

279.    The effectiveness of State Farm's campaign of falsehood and misinformation is shown in the numbers. In the three years prior to being dropped as a State Farm "Service First" shop, Plaintiff Dave's averaged $707,794 in revenue from State Farm insureds and claimants. In the following three years, after State Farm began steering customers and potential customers away, Dave's revenues averaged $241,251 – more than a 40% decline in revenues.

280.    Similarly, Dave's was a Liberty Mutual direct repair shop for more than fifteen years. It was a DRP relationship that evolved through the years to a level of difficulty that was no longer a good business model for Dave's so owner Stan Ware voluntarily removed his shop from

Liberty Mutual's program in May 2014. Some of the reasons for removing itself from Liberty Mutual's program included:

- They raised the labor hours-per-day calculation from 5 hours to 6 hours per day (the accepted industry standard is 5). This basically means that a 30 hour job needed to be complete in 5 days instead of 6. Any vehicle that exceeds the formula required the shop to pay any rental costs above the formula;

- They began to require that its DRP shops prepare estimates for customers who had already mentioned that they had no intentions of having that shop fix their car;

- They only allowed a maximum of 2 labor hours for tear down and inspection unless receiving prior authorization from the local supervisor;

- They had an average refinish labor mark that was originally set at 7.2 hours per repair but each year that mark was lowered until in May 2014 it was at 6.8 hours per repair. The only way to achieve this number was to adulterate the database and lower the published refinish times - process in which they were coached by the local supervisor; and

- Whenever a local DRP supervisor had a mechanical problem with a vehicle repaired at one of his other network shops, he would direct the vehicles to Dave's to re-work their mistakes and try to have Dave's turn around the customer and make them happy with Liberty Mutual, all the while allowing these other shops to continue as part of their DRP program.

281.    As soon as Dave's removed itself from Liberty Mutual's DRP, its claims center commenced a direct to direct previous customers who had used Dave's and were now involved in a claim with Liberty Mutual to have repairs completed at one of their other shops.

282.    The techniques utilized by Liberty Mutual to dissuade customers from coming to Dave's were the same as previously used by many other carriers such as State Farm. For example, our prior customers and other insureds who wanted to bring their vehicles to Dave's were told the following by Liberty Mutual agents:

- "You will need to take your vehicle to one of our other network shops for an estimate and then you can take it back to Dave's if you still want to."

- "Dave's is no longer on the program because they take too long to fix vehicles";

- "Dave's is no longer on the program because they charge too much, you might have to pay additional out of pocket expenses if you have your car fixed there";

- "If you go to one of our other network shops we will offer you a lifetime warranty on the repairs"; and

- "If you have your car towed to one of our network shops they can start the repairs right away, if you take it to Dave's you will need to wait several days for our appraiser to make it to the shop".

283.    These statements were relayed to Dave's through loyal customers who chose to have Dave's complete their repairs even after the attempted steering.

284.    Dave's total sales with Liberty Mutual from June 2013 to May 2014 were $348,433. Dave's total sales with Liberty Mutual from June 1 2014 to May 2015 were $110,152 - a revenue loss of 238,281 in just 11 months.

285.    From 2008-2010, Plaintiff Lindon Collision Center the Number 1 rated shop in its market area by Defendant Progressive. In 2010 Mr. Reed complained to Progressive about their unfair and unreasonable paint caps (which were less than half of what was routinely needed.) One week later he was told by Progressive that they were going to send their insureds to Cascade (which at the time was Number 12 on the Progressive DRP list.) The only reason given by Progressive was that Cascade was a "better drive-in shop." Mr. Reed put up complaints about Progressive's arbitrary actions and was forced by Progressive to take it down. Since then, Plaintiff Lindon has lost approximately $60,000 per month in Progressive sales.

286.    As these numbers show, the effect of Defendants' steering has a dramatic impact upon the financial health of the Plaintiffs' businesses and their ability to remain open as a going concern.

287.    Defendants' actions are intentional, willful and malicious, conducted by the named Defendants with full knowledge of the falsity of their misrepresentations, without furtherance of a legitimate business interest and done with the intent to injure and damage the Plaintiffs individually.

<u>Unity of Action by Defendants</u>

288.    Steering against noncompliant shops is not limited to retaliation by insurers from whom a DRP a Plaintiff shop has left. The Defendants share this information amongst and between themselves and steer business away from noncompliant shops as a group. Noncompliant shops are specifically targeted by the group of Defendant insurers.

289.     Steering is not limited to shops which have left DRPs. Shops, such as Plaintiffs Chris',

JP's, Perk's and Lindon, which are not associated with any insurer direct repair programs, also

suffer the shared wrath of the Defendant insurers. Defendants have all told customers that these

Plaintiff shops are not on their program and cars would have to be taken elsewhere.

290.     Significantly, while State Farm, Allstate, GEICO and the other Defendants were steering

customers away from the Plaintiffs making identical false statements and misleading innuendo,

there was a group silence and group failure to point out the shops to which the Defendants were

steering consumers had significant complaints lodged against them.

291.     Safeco does not disclose the failings of its network shops, has falsely stated that Chris'

Auto and Paint overcharges and the insureds would have to pay the difference, that it takes too

long to repair, and the insured would have to take its vehicle to a network shop for an estimate.

292.     State Farm likewise has not disclosed the failings of its network shops and has attempted

to coerce insureds from patronizing Plaintiff Chris' with misrepresentations and falsehoods.

293.     Also significantly, none of the Defendant insurers ever actually identified a single

instance of wrongdoing or malfeasance by any of the Plaintiffs they were defaming, not even

with an example that omitted personally identifiable information. They merely stated these bad

acts were occurring.

294.     The statements made by the Defendant insurers to intervene in the business relationship,

established or prospective, between the Plaintiffs and the individuals discussed above were all

false. The statements withheld by the Defendant insurers about their network and preferred shops

were all true.

295.    It would be absurd to suggest the Defendants simply forgot the truth about their own preferred shops but remembered falsehoods about non-network, target shops.

296.    The only reasonable conclusion from these facts is the named Defendants shared information about and specifically targeted as a group the particular shops who refused to comply with Defendants fixed pricing structures, parts procurement rules designed to minimize cost and general belief the body shops simply be quiet and do as they are told by the insurance industry.

297.    Given the identical nature of the false statements made by numerous Defendants, it is also only rational to conclude the high probability of prior agreement as to the most effective statements to make to successfully steer customers away from the targeted shops.

298.    Defendants actions were intentional, coordinated, relied upon shared information and utilized identical methods and content.

299.    Defendants' actions violate both state and federal law.

## OPPORTUNITIES FOR DEFENDANTS TO CONSPIRE

300.    Opportunities for individuals sufficiently high enough within the Defendants' corporate structure to make or influence substantive decisions exist in abundance.

    A. Trade Associations

301.    Currently available documentation establishes every national insurer and the vast majority of regional insurers belong to at least one of the three major insurance industry trade associations:

• American Insurance Association (AIA): Defendants including Farmers, Farm Bureau, Safeco and USAA are all members of the AIA. In addition to general membership, from time to time

67

over the course of at least ten years, Defendants including Farmers, Safeco, and USAA have all served in positions of authority within the AIA, including the PCI Board.

302.    The Property Casualty Insurer Association of America (PCI): Defendants including Allstate, GEICO, Liberty Mutual and Progressive are all members of PCI. In addition to general membership, from time to time over the course of at least ten years, these named Defendants have all served in positions of authority within the PCI, including the PCI Board.

303.    The National Association of Mutual Insurance Companies (NAMIC): Defendant State Farm is a member of NAMIC. In addition to general membership, State Farm has, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

304.    The members of the companies representing these Defendants on the respective boards in positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

305.    For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI. Others who have served over the years include but are not limited to Liberty Mutual's former chairman and CEO Edmund Kelly and Allstate's president, chairman and CEO, Thomas Wilson.

306.    As State Farm has been a member of NAMIC since at least 1961, the list of its executives who have served on the board of NAMIC and its various executive committees is extensive.

307.    Board meetings and other leadership obligations regularly bring the high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance

issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

308.    The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry. For instance, the associations work together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act, as well as the annual P/C Insurance Joint Industry Forum.

B.    Insurance Institute of Highway Safety

309.    The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

310.    This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

311.    Most or all Defendants are members of IIHS, either directly or through membership of their parent corporations. Current members of the board of directors include:

• Farmer's head of public policy research and development, government and industry, Brian Braddock;

• GEICO's vice president and legislative counsel, Hank Nayden.;

• Progressive's David J. Skove, general manager, South Region;

• State Farm's Angela Spark, vice president and actuary;

• Liberty Mutual' s president, personal insurance, Timothy Sweeney;

312.    Not only does membership and board membership provide the vast majority of the Defendants (including all national insurers) with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts.

313.    As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible. The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants.

C.    CAPA

314.    CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts. Specifically, aftermarket parts.

315.    When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA, which purportedly sets quality standards and conducts studies of aftermarket parts.

316.    What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm, specifically for the purpose of reducing collision repair costs.

317.    Current Board of Directors for CAPA include State Farm, Allstate, Liberty Mutual and GEICO and Tim Adelmann of ABRA, Inc., a multi-state operator collision repair shop (and

operator of some of the most compliant DRP shops in Utah for Defendants' State Farm, Allstate, GEICO, USAA, Farmers and Progressive.)

318.    As with membership in the IIHS, board membership for CAP A provides not only additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans by and between the largest property casualty insurers in the United States but CAP A is a crucial cog in its well-established corporate policy of purchasing less expensive aftermarket parts whenever possible.

319.    The Defendants have gone to great lengths over many years to convince the public and various state agencies of the safety and interchangeability of aftermarket parts with OEM parts. Acceptance of this premises is directly financially beneficial to the Defendants as it provides immediate reward in the form of drastically reduced claims they must pay out.

320.    The impartiality of CAPA, as the creation of the insurance industry, financed by the insurance industry and openly working toward the insurance industry goal of reduced claims costs, is worthy of gaze with a weather eye. This healthy skepticism is assisted by the substantial number of aftermarket parts CAPA de-certifies because they are of too poor quality to be in the stream of commerce.

321.    It is important to remember de-certification removes certification from aftermarket parts CAPA has already purportedly studied, tested and pronounced as quality collision repair parts.

322.    Last year, CAPA de-certified over a thousand aftermarket parts, many of them crash and safety parts, many of them for the most popular vehicles in the country, including hoods and fenders for the Toyota Camry, fenders, hoods and headlamp assembly for the Honda Accord, headlamp assemblies for the Subaru Outback, hoods for the BMW 3-Series, hoods, bumper

covers, fenders and fog lights for BMW 5-Series, radiator supports for Dodge Chargers, Ford

Edge, Ford Focus, Lincoln MKX, Mazda 6, Nissan Altima, Volkswagen Jetta and Honda Civic,

among many others.

323.    Through this organization, the largest insurers representing the Defendants' mutual

interests are in a position to not only make agreements affecting the body shop payment structure

but to ensure a generous supply of thousands of inexpensive, imitation aftermarket parts is

available for the Defendants to compel purchase to further reduce the money they must pay out

as claims.

## **MOTIVE TO CONSPIRE**

324.    Each Defendants has an obvious motive to agree, combine and conspire to fix prices,

boycott and punish noncompliant shops and interfere with Plaintiffs' businesses at every possible

level: profit.

325.    If the profits were minimal, the value of such a combination or agreement would be

questionable. However, the profits are massive not minimal.

326.    In 2013, State Farm reported a net income increase of 63%, resulting in a record high net

worth of $75.9 billion. Its underwriting gain was announced at $230 million.

327.    Allstate reported a 2013 net income of $2.3 billion.

328.    GEICO reported 2013 profits of $1.1 billion.

329.    Progressive reported 2013 net income of $1.16 billion.

330.    USAA reported 2013 net income of $2.7 billion.

331.   Without even considering the remainder of the Defendants, these amounts can be placed into perspective: the top market share holders in Utah had higher net incomes in 2013 than the gross national domestic product of eight African countries combined.

### IN THE ABSENCE OF AN AGREEMENT AMONG THE DEFENDANTS, THEIR ACTIONS WOULD INDIVIDUALLY BE CONTRARY TO BEST INTERESTS

332.   If taken individually, the Defendants' actions would be contrary to their own best interests. Such actions would substantially harm a lone Defendant.

333.   An auto insurer's mandate is to insure risk and, when that risk is realized, to pay the loss incurred. An auto insurer which regularly fails or refuses to pay for full and complete repairs to vehicles, insists on using salvaged or imitation parts, or in any fashion left a vehicle unsafe or noticeably less safe to operate would very likely soon find itself losing its customers to other insurers and in some instances paying a great deal more to actually repair a vehicle it first lowballed.

334.   This is particularly so in a world of instant communication, people like to share and they are able to share with the entire world in the push of a Twitter button or Facebook post.

335.   Stories of complete failure to repair and just as complete lack of concern by the insurer as related above, would substantially damage both the reputation and the viability of the business as a going concern.

336.   The overwhelming power exerted by the Defendants collectively allows the evidenced scheme to succeed. While one or two Defendants leaving the group could find stability or even marginal additional success as the companies who care and pay for proper repairs, the remainder would far outstrip the minority in sheer profits.

## EFFECTS ON COMPETITION IN THE BODY SHOP INDUSTRY

337.   Defendants' actions have effectively removed all competition from the collision repair industry. As one Defendant told one Plaintiff, 'it's like you work for us.'

338.   While it may certainly be said the Defendants actions have achieved great effect for the insurance industry, particularly in the area of financial profit, it cannot be said Defendants' actions have in any fashion stimulated competition in the collision repair industry or made driving safer or costs less for consumers. Whether competition between insurers is robust is irrelevant, whether the insurance industry has benefitted from its illegal actions is irrelevant. Considering that would be very much the same as suggesting a thief who has profited by his deeds justifies the loss to the victim and is therefore excused.

339.   The Plaintiff body shops are not in competition with the Defendants. As traders within an identifiable market product, auto collision repair, the effect of competition between collision repair shops is the only effect to be measured.

340.   In the present case, there is no competition whatsoever. Competition presumes a free and open market, where innovation is encouraged. That is not the present state of the body shop industry. There have been no economies or efficiencies created within the body shop industry, nor have prices decreased as a result of a dynamic market nor have incentives been created.

341.   The Defendants fix price ceilings for the Plaintiffs, as well as all other body shops. The Defendants generally leave a particularly fixed price structure in place for several years in a row. The determined "market" or "prevailing" rate for Utah was $42.00 per hour body labor for at least three years.

342.    Attempts at expansion without capitulating and kowtowing to the Defendants are not rewarded, investments in capital equipment is risky, though necessary as federal guidelines regarding gas mileage minimums continue to rapidly evolve the physical structure of vehicles, requiring new equipment, new training and substantial investment.

343.    Consumers have not benefitted by the absence of collision industry repair competition. To the contrary. As shown above, the repair shops to which the Defendants encourage patronage quite often do extremely poor work, very dangerous work and a consumer is left is a worse position than whence begun. Quality is not encouraged nor even necessary as the fixed prices/punishment system created and perpetuated by the Defendants as a concerted group rewards the worst body shop at the same level as the very best.

344.    Certainly some body shops are successful. But negative effects on competition are not weighed and measured by the effect on competitors, but on competition.

345.    In this case, the Defendants violations of state and federal law have effectively eradicated competition in the body shop industry. The Defendants actions have had a wholly detrimental effect on the body shop industry and detrimental to the public.

## INTENTIONAL NATURE OF DEFENDANTS' CONDUCT

346.    In 1963, a Consent Decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon a complaint filed in the United States Southern District of New York wherein the allegations included violations of Sections 1 and 3 of the Sherman (Antitrust) Act.  A true and correct copy of this Decree is attached hereto as Exhibit D.

347.    Specific wrongful conduct actions supporting the allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather

than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) and channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The Complaint alleged further a conspiracy and combination in unreasonable restraint of trade and commerce.

348.    The Consent Decree ordered and provided for the following relief and enjoined the defendants therein from: (1) placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

349.    The clear terms of the Decree apply to and are binding upon "each defendant and upon its officers, directors, agents, servants, employees, committees, successors and assigns, and upon all other persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise."

350.    Many of the named Defendants are members of the contemporary associations which are still bound by the Consent Decree's terms.

351. The 1963 Defendant Association of Casualty and Surety Companies merged with the American Insurance Association ("AJA") in 1964 to form the "present-day AJA."

352. As the successor organization upon completion of the merger in 1964, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the AJA and its members, and all other persons in active concert or participation with the AJA, whether or not an actual member of the AJA.

353. The 1963 Defendant American Mutual Insurance Alliance became the Alliance of American Insurers in 1977 when membership was opened to stock and other non-mutual insurance companies. The Alliance of American Insurers subsequently merged with the National Association of Independent Insurers to form the present-day Property Casualty Insurers Association of America ("PCI").

354. As the successor organization upon completion of all mergers to date, the terms and requirements of the 1963 Consent Decree are binding upon and enforceable against the PCI, its members, and all other persons in active concert or participation with the PCI whether or not an actual member of the AJA. As noted above, all but a few of the Defendants are known to be members of these organizations, and those that are include Allstate, Liberty Mutual, GEICO, Progressive and Farmers.

355. Defendants were and have always been fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## **CLAIMS FOR RELIEF**

## COUNT ONE:
## QUANTUM MERUIT: CONTRACT IMPLIED IN LAW, QUASI-CONTRACT AND UNJUST ENRICHMENT

356.    Quantum meruit includes the principle that one party is not allowed to enrich itself at the expense of another and, even absent an express contract, there is an implied promise the former must pay the latter all reasonable amounts for labor and materials furnished.

357.    Regardless of whether a Plaintiff is currently, or ever has been, in a DRP with any Defendant, Defendants must as a matter of law pay every Plaintiff the value of every collision repair which the former authorizes the latter to perform, as said value is the all costs to restore vehicles of insureds and claimants to safe pre-accident conditions.

358.    Plaintiffs perform valuable services and expend materials and resources with reasonable expectation of full payment/compensation.

359.    Said services, materials and resources benefit Defendants by allowing them to reap massive customer and business advantages and fool consumers into believing they fully pay for repairs when they do not.

360.    Defendants collect millions of dollars of premiums and settle thousands of claims purportedly meeting obligations to insureds and claimants, but their obligations are to pay amounts that restore vehicles to safe pre-accident conditions - not some lesser repair or amount.

361.    Plaintiffs serve as the means through which Defendants purportedly meet such obligations.

362.    Defendants are supposed to only be in, and should be restricted to, the business of insurance since they do not know how to restore vehicles to safe pre-accident conditions much less how to assess the costs of doing so.

78

363.    Defendants purport to reserve the unilateral right to grant permission to Plaintiffs to commence work until such time and place deemed appropriate; and although authority for such orders lie with consumers, Defendants assert entitlement to certain rights and privileges in advance of Plaintiffs commencing work.

364.    Defendants know of, and appreciate, the benefit conferred on them by Plaintiffs when they give permission and direct Plaintiffs to perform collision repairs, and Plaintiffs accordingly have a reasonable expectation of, and indeed an implied contractual right to collect, full compensation for restoring all such insured damaged vehicles to safe pre-accident conditions.

365.    Regardless of whether Plaintiff is currently, or ever has been, in a DRP with any Defendant, before an authorized repair begins there is no negotiation, or even an opportunity for or any legitimate negotiation, of what the reasonable value for labor and materials and resources will be to restore an insured's or claimant's vehicle to safe pre-accident condition.

366.    Utah requires consumers to have some minimum passenger vehicle insurance coverage for property damage, and as a foreseeable result thereof, insured vehicles comprise between at least 70 to 95 percent of Plaintiffs' businesses, none of the Plaintiffs are in a viable position to turn away that business since doing so would be tantamount to occupational suicide.

367.    Further, Plaintiffs do not turn away insureds and claimants who have chosen them to repair their vehicles in lieu of the absence of opportunity to negotiate prices with Defendants, because doing so would risk those insureds and claimants being steered (illegally) by Defendants to shops that put savings before safety because Defendants own or operate them in whole or part, or have become so compliant with and thus capitulate enough to Defendants' interests, to allow Defendants to undercut the actual cost of the repair and reap the business advantage.

368.    While always foreseeable that Plaintiffs were working and providing services and materials and resources because Defendants agreed that work could commence, Defendants unlawfully claim, after the repairs are completed, that they can withhold full payment unless they choose to provide it, and they thereby enrich themselves at Plaintiffs' expense by failing to fully pay for the agreed repair.

369.    Under the circumstances set forth above in this cause of action and as alleged in Plaintiffs' federal antitrust claims, it would be unjust for Defendants not to pay quantum meruit damages and continue gaining customers and reaping business advantages without paying all the amounts that it costs shops to restore insured vehicles to safe pre-accident conditions.

370.    Plaintiffs are equitably entitled to receive full payment for all materials and services rendered.

## COUNT TWO:

## TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS

371.    In direct violation of Utah Code Section 31A-26-303(1) and (4)[5] and Utah Administrative Code Rule 590-190-1[6] and Rule 590-190-11(4)[7] defendants intentionally interfere with the Plaintiffs' existing and/or prospective economic relations by steering large amounts of business away from them as alleged above.

---

[5] UCA 31A-26-303  "Unfair claim settlement practices. (1) No insurer or person representing an insurer may engage in any unfair claim settlement practice under Subsections (2), (3), and (4)... (4) The commissioner may define by rule, acts or general business practices which are unfair claim settlement practices, after a finding that those practices are misleading, deceptive, unfairly discriminatory, overreaching, or an unreasonable restraint on competition."

[6] Rule 590-190-1 "... Authority to promulgate rules defining unfair claims settlement practices or acts is provided in Subsection 31A-26-303(4)."

[7] Rule 590-190-11 ... "(4) Insurers are prohibited from requiring a claimant to travel an unreasonable distance to inspect a replacement automobile, to obtain a repair estimate or to have the automobile repaired at a specific repair shop."

372.    Defendants do so for an improper purpose and/or by improper means.

373.    Defendants' improper purpose is to punish and economically beat the Plaintiffs into submission for complaining about Defendants manipulating and setting artificial and oppressive market labor rates, for refusing to kowtow and rather charge fair and actual market labor rates and/or for complaining about Defendants' selective application of the estimate databases, setting of arbitrary price ceilings and refusals to compensate the actual and entire labor and materials repair costs.

374.    Defendants' concomitant improper purpose is to steer policyholders toward auto body shops not because they do the best quality work or provide the best value but rather to improperly reward those shops for submission and silence about Defendants' economic aggrandizement of themselves at the expense of the collision repair industry.

375.    In addition, Defendants have employed improper means since steering is contrary to Utah statutory, regulatory and/or common laws.

376.    Defendants are injuring the Plaintiffs by improperly decreasing the volume of their business operations, forcing the Plaintiffs to absorb collision repair costs and expenses of which the Defendants should be paying on behalf of their policyholders and damaging their reputations amongst consumers who are possibly victimized themselves by the steering.

## COUNT THREE: CONVERSION

377.    Conversion requires willful interference with property without lawful justification where the party entitled to the property is deprived of its use or possession and entitled to its immediate possession at the time of the conversion.

378.    Plaintiffs have performed reasonable and necessary quality work and expended appropriate labor and materials to do it, for which Defendants are required to but refuse to pay or pay in full, even after demand is made.

379.    Defendants' action constitutes willful interference with Plaintiffs' property—their money, the fruits of their labor—without lawful justification, since Defendants did not perform the work are not in the business of determining what a reasonable and necessary quality repair entails or costs.

380.    Defendants' action further constitutes wrongful possession of Plaintiffs' money, which accounts for the reasonable and necessary costs of the labor spent and materials used to repair and restore to pre-accident condition the vehicles of Defendants' policyholders/claimants.

## COUNT FOUR: VIOLATIONS OF THE SHERMAN ACT– PRICE-FIXING

381.    The United States economy rests upon open market systems in which vigorous competition benefits individuals and businesses alike. The federal government has long recognized the necessity of public policies and a regulatory framework designed to foster and protect the free market system from activities that restrict interstate commerce and/or marketplace competition. The Sherman Act, passed in 1890 as U.S.C. §§ 1-7 and amended by the Clayton Act in 1914 (15 U.S.C. §§ 12-27) functions "not to protect businesses from the working of the market; [but] to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).

382.   Pursuant to 15 U.S.C. §1, the Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade, and such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

383.   Through parallel actions and/or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

384.   The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co.* V*s. Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

385.   The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the motor vehicle collision repair industry.

386.   The aforesaid combination and/ or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops as shown by the "market rate" adopted by the Defendants as a group, though none are purported to have access to the survey conducted by only one of them; uniformity of prices fixed across vast geographic areas of Utah though the "market rates" are purported to related to an undefined but specific geographic area

387.   Evidence of this conspiracy or combination include, but is not limited to, uniformity of action in instances where Defendants should not have access to particular information; to wit, State Farm does not publish or make public its survey results, without mathematical value

though it is, and the remaining Defendants do not conduct their own purported survey and yet reach the same "market rate" as State Farm.

388.    The Defendants all raise their "market rates" within days of State Farm raising their rates, although, again, these Defendants are not supposed to have access to State Farm's information.

389.    State Farm regularly and routine seeks to keep what it considers proprietary information, including internal training and assessment manuals, sealed from public view.

390.    The Defendants all utilize and admit the applicability of the body shop industry databases but regularly and routinely ignore the databases in the exact same fashion, i.e, calling the same procedures included operations when the databases say the opposite, denying the applicability of processes and procedures the databases states are necessary repairs, admitting the baseline application of the industry database but failing to conform to that minimum standard, numerous defendants telling different Plaintiffs each is the only one to perform or demand payment for the same set of processes, i.e., seat belt safety checks, detailing for delivery and de-nib and finesse.

391.    The aforesaid offenses have had, among others, the effect of eliminating competition within the motor vehicle collision repair industry, elimination of some auto body shops from a substantial segment of the business in the industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, harming consumer choice and public interests, subjecting shops to collective control and supervision of prices by the Defendants and co-conspirators.

392.    Neither the Plaintiffs nor other members of the collision repair industry are able to engage in competitive business practices since the Defendants have effectively and explicitly determined what their business practices will be.

393.   The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT FIVE: VIOLATION OF THE SHERMAN ACT– BOYCOTT

394.   The Sherman Act makes illegal every contract, combination or conspiracy in unreasonable restraint of interstate commerce. 26 Stat. 209, as amended, 15 U.S.C. §1.

395.   While most Sherman Act claims are analyzed under the rule of reason standard, some actions pose such a habitual unacceptable risk of restraining trade they are unreasonable per se. *Vacation Break US.A., Inc. v. Mktg. Response Grp.*, 169 F.Supp. 2d 1325 (M.D. Fl. Tampa Div. (Mar. 26, 2001).

396.   The United States Supreme Court has repeatedly held that a boycott constitutes a *per se* violation of the Sherman Act, *See, e.g., United States v. Gen. Motors Corp.*, 384 U.S. 127, 86 S. Ct. 1321, 16 L. Ed. 2d 415 (1966); *Radiant Burners v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S. Ct. 365, 5 L. Ed. 2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959); *Fashion Originators' Guild Assoc. v. FTC*, 312 U.S. 457, 61 S. Ct. 703, 85 L. Ed. 949 (1941)(boycott designed to coercively influence trade practices, rather than to fully eliminate boycott victims from the market held still per se illegal).

397.   Those decisions that have rejected the per se rule generally applied to boycott activity in favor of a rule of reason analysis have been limited to circumstances where the conduct complained of may reasonably be shown to fall outside the rationale of the per se rule; that is, where the conduct arguably furthered a public policy goal such as improving market efficiency

or increasing healthy competition. *See, e.g., US.A. v. Realty Multi-List, Inc.*, 629 F. 2d 1351 (5th Cir. 1980).

398.    Defendants' common scheme herein acts to restrain trade and diminish competition and market functionality for Plaintiffs and consumers. Whether viewed under a per se rule or a rule of reason analysis, Plaintiffs allege herein a restraint of trade in violation of the Sherman Act.

399.    "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541 (1978). "It does not matter how the end is achieved, if one or more firms is deprived of suppliers or customers (or other essential trade relationships) by concerted action among other firms aimed at keeping the victim firms from competing, the arrangement is in purpose and effect a boycott. Id. at 543 (citing L. Sullivan, Handbook of the Law of Antitrust 231 (1977)).

400.    Each of the Defendants have actively participated in, and gained economic advantage from a common scheme, agreement, or conspiracy designed to pressure, intimidate, and/or coerce each of the Plaintiffs into complying with the Defendants' price-fixing scheme. This common scheme constitutes a continuing agreement, understanding, combination, and/or conspiracy to unreasonably restrain trade, so as to limit or exclude Plaintiffs' and customers' participation in the market.

401.    The common scheme involves multiple forms of illegal boycott activity including, inter alia, steering actual and potential customers away from Plaintiffs through knowing dissemination of false and misleading statements about Plaintiffs; manipulating delays and obstacles in approving, obtaining and paying for repairs obtained from Plaintiffs; threats that use of Plaintiffs'

services will incur additional and greater out-of-pocket costs to customers; alteration and manipulation of the Defendants' referral and rating systems to limit or otherwise influence customer access to service providers. Each of these forms of conduct individually constitutes an unreasonable restraint of trade and a per se violation of the Sherman Act § 1.

402.    The enlistment of third parties in an agreement not to trade, as a means of compelling capitulation by the boycotted group, long has been viewed as conduct supporting a finding of unlawful boycott. *St. Paul Fire &Marine Ins. v. Barry*, 438 U.S. 531, 544-5 (1978).

403.    Defendants have enlisted, and continue to enlist third party consumers in need of auto repairs, as unwitting participants in their common scheme to coerce Plaintiffs.

404.    Defendants' ongoing conduct in furtherance of the common scheme to boycott, and to thereby coerce Plaintiffs has had substantial negative impact on the Plaintiffs' business practices and relationships, the ability of customers to freely obtain safe and full repairs, and the functionality of the relevant market.

405.    Defendants' actions are violations of federal law and have directly caused the Plaintiffs ·to incur substantial damages. Defendants are continuing and will continue the aforementioned offenses unless the relief requested herein is granted.

## PRAYER FOR RELIEF

As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted; the Plaintiffs therefore pray for the following relief:

A.   Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.   Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.   Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.   Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.   Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)   Placing into effect any plan, program or practice which has the purpose or effect of:

(a)   directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

(b)   fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)   Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)   Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)     Prohibiting Defendant State Farm from altering or amending any Plaintiff
response to its market labor rate "survey" without the express written
permission of the affected Plaintiff.

F.     Punitive and/or exemplary damages sufficient to punish Defendants for their
intentional acts and to deter each Defendant and similar entities from pursuing
this illegal and improper conduct in the future.

G.     Pre- and post-judgment interest.

H.     Any additional relief the Court deems just and appropriate.

## <u>CONCLUSION</u>

While this matter has many aspects and trade terms, the essence of our claim is simply
this: In the American marketplace there are two types of body shops. There are shops who strive
to serve the customer, the owner of the car, and there are those shops who believe the insurance
company is their customer. The defendants have successfully created a "market" system that
rewards the body shops that will cut comers so they can increase profits and punishes body shops
who are unwilling to compromise the quality or safety of the American consumers repair. The
whole intent of anti-trust actions was and is to increase competition for the sole benefit of the
American consumer. Defendants' actions have violated the letter and the spirit of the law. Instead
of providing the best quality repairs for the lowest cost they have fixed the costs to their utmost
benefit and forced the market into a race to the bottom in terms of quality to the customer.

WHEREFORE, Plaintiffs demand a judgment against all Defendants in an amount
sufficient to fully compensate Plaintiffs for damages incurred as a result of Defendants' conduct
with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive

damages, attorneys' fees, expenses, costs and any other relief to which the Court deems the Plaintiffs are entitled.

Respectfully submitted this 18th day of May, 2015

For Plaintiffs Straightening Systems, Inc. d/b/a Alpine Body Shop, A.F. Collision Repair, Inc., Perks Auto Repair, Inc., Jenson Enterprises, Inc., B&B Auto Body & Paint, Inc., Lindon Collision Center, LLC, J.P.'s Custom Body & Paint, Inc. d/b/a J.P.'s Collision Center, Dave's Body Shop, Inc. and Chris Body & Paint, Inc.

BY:    ___/s/ Mark L. Shurtleff_____

MARK L. SHURTLEFF (USB # 4666)

BY:    ___/s/ R. Reed Pruyn_____

R. REED PRUYN (USB # 9985)

___/s/Allison P. Fry_____

ALLISON P. FRY (MSB #100725)

ATTORNEYS FOR PLAINTIFFS