ALPINE STRAIGHTENING SYSTEMS,
INC., *et al.*,

                Plaintiffs,

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, *et al.*,

                Defendants.

**Case No. 6:14-MD-2557-Orl-31TBS**

**RE: No. 6:14-CV-06003-Orl-31-TBS**

DISPOSITIVE MOTION

## GEICO GENERAL INSURANCE COMPANY'S MOTION AND SUPPORTING MEMORANDUM TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Despite this Court outlining fundamental defects in their pleadings and repeatedly outlining them in its dismissal of nearly identical pleadings in the many copycat cases before this Court, Plaintiffs' late-filed Second Amended Complaint ("SAC")[1] is just another iteration of the same defective pleading. Plaintiffs have had 13 months since they filed their original Complaint to develop their factual allegations, as well as the benefit of Magistrate Judge Smith's Report and Recommendation (Doc. 95, "*Alpine* R&R") and this Court's dismissal Order (Doc. 101, "*Alpine* Order") to assist them in framing those allegations to plead valid claims. Plaintiffs' counsel have even had the benefit of instructions provided by the Court in the numerous dismissal Orders and Reports and Recommendations of the nearly identical pleadings – yet Plaintiffs still cannot state a valid legal claim against GEICO General Insurance Company ("GEICO"). Despite all the time and resources spent by the federal court system (primarily this Court) and all the Parties, Plaintiffs are still not close to stating valid legal claims. The time has come to dismiss Plaintiffs' claims with prejudice.

Specifically, Plaintiffs have not addressed the following deficiencies:

1. ***Plaintiffs still do not plead plausible facts about GEICO to support their allegations.*** Plaintiffs cannot support their claims with sufficient factual allegations *against GEICO* to meet the requirements of *Twombly* and *Iqbal*.

2. ***Plaintiffs continue to ignore this Court's direction that they must plead plausible allegations that support each of their claims against GEICO (rather than against the "Defendants").*** Plaintiffs again leave it to GEICO and this Court to wade through a 90-page rambling, and often group-pled, SAC to decipher what GEICO is alleged to have done (if anything) and which factual allegations support which claims by which Plaintiff, in direct violation of Federal Rules of Civil Procedure 8(a), 9(b) and this Court's Orders.

3. ***Plaintiffs do <u>not</u> and <u>cannot</u> allege facts sufficient to demonstrate the existence of a conspiracy, or that GEICO joined the putative***

[1] Plaintiffs filed their initial Complaint ("Complaint") on April 10, 2014 (Doc. 1), Amended Complaint ("FAC") on June 2, 2014 (Doc. 13), and SAC on May 20, 2015 (Doc. 102), two days after the Court's deadline, even though Plaintiffs' counsel dated the SAC May 18, 2015. *See Alpine* April 27, 2015 Order at 3 ("Plaintiffs may file an amended pleading not more than 21 days after the date of this order."); *see also* Notice Regarding Court's Jurisdiction, Doc. 188, Case No. 6:14-MD-2557-ORL-31TBS (May 1, 2015 M.D. FL).

*conspiracy.* Plaintiffs attempt to base their claims on alleged parallel conduct but the conduct alleged shows that Defendants (including GEICO) have unique systems for estimating and specifying parts, that Defendants are acting independently and that GEICO is acting out of its own economic self-interest.

4. ***Plaintiffs fail to allege facts tending to prove any of the required substantive elements of their antitrust claims***. The rule of reason applies to Plaintiffs' antitrust claims and they allege no facts tending to prove it does not. Besides failing to allege GEICO joined an illegal conspiracy, Plaintiffs allege no facts supporting any of the other rule of reason elements.

5. ***Plaintiffs ignore this Court's Order to plead plausible facts as to their tortious interference claim and fail to identify which Defendants interfered with which Plaintiffs, likely because they cannot.***

6. ***Plaintiffs fail to allege facts tending to prove they rendered valuable services to GEICO or that they had a reasonable expectation of payment that would support a quantum meruit claim.***

7. ***Plaintiffs still fail to plead a valid claim for conversion, and have made no effort at all to cure the defects articulated by the Court.***

Rather than address the fundamental defects identified by this Court, Plaintiffs' SAC merely escalates the rhetoric, but still does not plead ***facts*** that state a claim that GEICO conducted any unlawful or tortious act against Plaintiffs. Plaintiffs alleging a broad-brush horror story about the insurance industry without facts, and then occasionally remembering to insert the name "GEICO" into those allegations cannot state a claim against GEICO. The SAC should be dismissed with prejudice.

## I.     PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE FACTS IN SUPPORT OF THEIR CLAIMS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level." *A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6-14-CV-2257-GAP-TBS, 2015 WL 304048, at *4 (M.D. Fla. Jan. 21, 2015) (citing *Twombly*, 550

U.S. at 555). A complaint is insufficient if it offers "only labels and conclusions." *Iqbal*, 556 U.S. at 678. The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." *Id*. Here, Plaintiffs' SAC should be dismissed with prejudice because the claims are supported by nothing more than labels, conclusory statements, threadbare recitals of the elements of the causes of action and contradictory facts that do not state a plausible claim for relief or come anywhere near to raising a right to relief above the speculative level.

## II. GROUP PLEADING "DEFENDANTS" AND "PLAINTIFFS" IS IMPROPER

Plaintiffs may not plead in the "common" or "group," but must adequately connect specific defendants to the acts they are alleged to have committed. *See A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.*, No. 6:14-cv-310-Orl-31TBS, at ¶ 4 (M.D. Fla. June 11, 2014) ("*A&E* June 2014 Order") (group pleading is inadequate); *Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* 619 F. Supp. 2d 1260, 1271-74 (M.D. Fla. 2009) *aff'd,* 451 Fed. App'x. 862 (11th Cir. 2012) ("The grouping of [d]efendants . . . does not afford these [d]efendants fair notice of the basis for the claims against them"). When a plaintiff fails to make specific allegations about a defendant, the claims are implausible and fail as a matter of law. *Id.* at 1273; *see also Synergy Real Estate of SW Fla., Inc. v. Premier Prop. Mgmt. of SW Fla., LLC,* No. 2:11-CV-707- FTM-29, 2012 WL 4009534, at *2 (M.D. Fla. Sept. 12, 2012) ("indiscriminately lumping 'defendants' together" fails to comply with Rule 8).

## III. PLAINTIFFS' PURPORTED FEDERAL ANTITRUST CLAIMS DO NOT ALLEGE A PLAUSIBLE CONSPIRACY – OR ANY CONSPIRACY – LET ALONE THAT GEICO KNOWINGLY JOINED THAT CONSPIRACY

"The elements of a conspiracy to restrain trade under Section 1 [of the Sherman Act] are (1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 1001 (11th Cir. 1993) *certified question answered,* 264 Ga. 295, 443 S.E.2d 833 (1994) (internal citations omitted). Just like

the *A&E* SAC and the Amended Complaint here, Plaintiffs' SAC does not allege any plausible facts tending to prove a conspiracy existed, let alone that GEICO acted with a unity of purpose or common design or pursuant to a "meeting of minds in an unlawful arrangement." *Id.; see also A&E Auto Body,* 2015 WL 304048, at *10 ("aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when."); *Alpine* R&R at 12 (recommending dismissal of *Alpine* antitrust claims for reasons stated in *A&E Auto Body,* 2015 WL 304048, at *9-12); *Alpine* Order at 3 (adopting R&R).

Plaintiffs must allege facts tending to prove "the challenged anticompetitive conduct 'stem[s] from . . . an agreement, tacit or express'" with competitors and not from independent decisions. *A&E Auto Body,* 2015 WL 304048, at *9 (quoting *Twombly*, 550 U.S. at 553). "To prove an agreement to restrain trade, a plaintiff must demonstrate a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement. To adequately plead that such an agreement exists requires allegations plausibly suggesting – not merely consistent with – agreement." *A&E Auto Body,* 2015 WL 304048, at *11 (internal citation omitted); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (pleading a Section 1 claim requires plaintiff to establish agreement between two or more persons to restrain trade – unilateral or independent conduct is not actionable); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (for implausible claim making no economic sense, more persuasive evidence than otherwise necessary is required). Plaintiffs' failing to plead facts plausibly demonstrating a conspiracy after a year of trying dictates dismissal of their antitrust claims with prejudice.

A.    **Plaintiffs Do Not Offer Direct Evidence Of Any Conspiracy**

Plaintiffs do not plead direct evidence of a conspiracy or that GEICO knew of or joined a purported conspiracy. "[D]irect evidence must be explicit and requires no inferences

to establish the proposition or conclusion being asserted." *Holiday Wholesale Grocery Co. v. Philip Morris Inc.*, 231 F. Supp. 2d 1253, 1273 (N.D. Ga. 2002) *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (internal citation omitted). Plaintiffs do not plead facts demonstrating the existence of an agreement to conspire, that GEICO knew of the purported conspiracy's general scope or purpose or that GEICO ever discussed, entered or acted in furtherance of the purported conspiracy. *See, e.g.*, SAC ¶¶ 99, 148, 313, 355, 383-386, 387-393, 400 (generally alleging Defendants engaged in a putative conspiracy, but *not* alleging facts demonstrating the existence of a conspiracy or how or when GEICO joined it).

**B.    Plaintiffs Do Not Allege Facts Demonstrating Parallel Conduct**

Absent direct evidence of an illegal antitrust conspiracy, Plaintiffs purport to rely on circumstantial evidence to show an illegal antitrust conspiracy premised on alleged parallel conduct. *See* SAC ¶¶ 383 (conceding the conspiracy allegations rest on alleged "parallel actions, and/or explicit agreement"). These "allegations" of an illegal conspiracy fail. While Plaintiffs allege Defendants exhibited parallel conduct, this allegation is contradicted over and over again by allegations Plaintiffs make demonstrating non-parallel conduct by Defendants in general and GEICO in particular. This Court "need not accept factual claims that are internally inconsistent," *Campos v. I.N.S.*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998), and "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.

For instance, Plaintiffs allege Defendants use different repair-estimating databases, SAC ¶¶ 168-171, and have different practices regarding the use of aftermarket or salvaged parts. SAC ¶¶ 66, 70. Certain Defendants allegedly refuse to pay for feather, prime and block, others pay for it. SAC ¶ 187, 189. Some, but not all, Defendants allegedly refuse to pay for denib and finesse. SAC ¶¶ 190. Some Defendants allegedly require photographs

before approving work.  SAC ¶¶ 80-81, 83.  Defendants have different policies regarding administrative costs.  SAC ¶ 85.  Rates paid by Defendants allegedly vary.  *See, e.g.*, SAC ¶¶ 137-141 (alleging certain (not all) Defendants paid the same rate as State Farm in 2013).  Some, but not all, Defendants allegedly have DRP agreements.  SAC ¶¶ 87.[2]  Since Plaintiffs allege different Defendants operate differently, there is no allegation of parallel conduct.

### C. Bare Assertions Of Conspiracy Will Not Suffice

Even if Plaintiffs alleged parallel conduct (they did not), "[i]t is well settled in this circuit that evidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that . . . each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other 'plus factors' tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade."  *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 570-71 (11th Cir. 1998) (internal citations, brackets and quotations omitted).  To support their antitrust claims, Plaintiffs' allegations of conscious parallelism "must be placed in a context that raises a suggestion of a preceding agreement . . ."  *Twombly*, 550 U.S. at 556-57 ("an allegation of parallel conduct and a bare assertion of conspiracy will not suffice"); *A&E Auto Body,* 2015 WL 304048, at *10.

"Plus factors" refer to "the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy."  *See* 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1433(e) (3d ed. 2010) ("Areeda"); *Williamson Oil Co.*, 346 F.3d at 1301 (11th Cir. 2003) (plus factors "remove [ ] evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious

---

[2] GEICO does not have DRPs as alleged and defined in the SAC, but the SAC's DRP allegations are accepted as true for purposes of this Motion only.

parallelism"). To be a "plus factor," a fact must "tend to exclude the possibility" of independent action. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). "Even the fact that competitors have knowingly charged identical prices is a neutral fact in the absence of evidence which would lead one to expect that the prices would have been different if truly independent decisions had been made." *City of Tuscaloosa*, 158 F.3d at 570-71 (citations omitted) (contrasting collusion with legal price maintenance and leadership, noting "unilateral or procompetitive conduct is not [to be] punished or deterred").

This Court has already determined that the Defendants, under substantively similar allegations, were acting in a manner perfectly **consistent with independent, procompetitive behavior, meaning these factors are not plus factors**. *A&E Auto Body*, 2015 WL 304048, at *10 ("It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay. . . ."); *id.* at n.11 ("The fact that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement.").

> i. *Changing Pricing Strategies at Similar Times Is Consistent with Independent, Procompetitive Behavior*

According to Plaintiffs, on *some* occasions, *some* Defendants alter their prices to meet the price changes of other Defendants, *see* SAC ¶ 144, or pay the same prices as other Defendants, *see* SAC ¶ 138-142. With respect to GEICO, the SAC affirmatively pleads that GEICO's approved rates were **not** the product of any actual agreement with other Defendants, but that GEICO reluctantly changed its rate to follow suit after other insurers had done so. *See* SAC ¶ 144 ("Other Defendant insurers decided the market rate was $44.00 per hour within the following thirty days [after State Farm raised its rate.] GEICO was the last to increase, but finally raised its rate to $44.00 per hour after seeing that the other Defendants had done so.").

Even had Plaintiffs alleged GEICO, or even all Defendants, paid the same labor rates as State Farm, this Court has already held such an allegation is not a meaningful plus factor because it would absolutely occur without an illegal conspiracy. *A&E Auto Body,* 2015 WL 304048, at *10 ("The Defendants' statements about paying no more than State Farm pays for labor do nothing to demonstrate that the Plaintiffs are entitled to relief. It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay. . . ."); *see also In re Graphics Processing Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("[C]ompetitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing."); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1205 (7th Cir. 1981) ("[T]he practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place . . . is the very essence of competition.") (internal quotation marks omitted); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309-10 (S.D. Fla. 2010) ("Many courts have found in concentrated industries . . . conscious parallelism and follow-the-leader pricing typically result from firms' rational recognition that the market structure [] in which they operate will most easily yield profits by means other than price competition . . . . A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader . . . . One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.") (internal quotations omitted).

GEICO has every reason to pay the lowest price the market will bear and to match a competitor when that competitor pays a lower price. *See Williamson Oil*, 346 F.3d at 1311 (rejecting as a plus factor competitors following price increases, as it was in the economic interest of the competitors to do so); *Todorov*, 921 F.2d at 1456 n.30 (meaningful plus factors threshold not met where alleged violators ***acted in independent economic interests***). Body

shops would surely trumpet to other insurers that the insurer they believe is the market leader (State Farm) is paying them more so other insurers will pay more too; therefore, even if State Farm did not make the information publicly available, it would become public when it went into effect. *See Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1357 (N.D. Ga. 2012) ("[P]laintiff [ ] cannot state an antitrust claim by showing only that the [d]efendants made price information publicly available and thus had the opportunity to conspire.") (internal quotations omitted). That GEICO and State Farm have similar pricing is not indicative of any conspiracy, and Plaintiffs allege no facts plausibly suggesting otherwise.[3]

Plaintiffs' inconsistent allegations regarding State Farm's rate surveys do not make Plaintiffs' claims any more plausible. First, the factual allegations do not support the Plaintiffs' inference. By the SAC's own allegations, State Farm does not share its survey results. *See, e.g.*, SAC ¶¶ 128, 129, 130, 131, 149, 387. Yet Plaintiffs ask the Court to draw the opposite inference, that Defendants (writ large) must have access to State Farm's information due to their similar approved rates. *See, e.g.*, SAC ¶¶ 387, 388 ("The Defendants all raise their 'market rates' within days of State Farm raising their rates, although, again, these Defendants are not supposed to have access to State Farm's information."). Second, even had Plaintiffs alleged competent allegations that State Farm shared its pricing information with other Defendants, sharing information is not, by itself, indicative of an agreement to conspire. *See, e.g.*, Areeda, ¶ 2113f ("Also relatively clear is the situation where one firm, acting entirely unilaterally, gives pricing information to a rival. For example, suppose that Firm A, upon raising its published prices by 10 percent, simply faxes its revised price list to a rival. On those facts alone, there has been no Sherman Act

---

[3] Likewise, Plaintiffs' allegation that GEICO tells body shops not to raise their rates is also perfectly consistent with GEICO's independent economic interests. *See* SAC ¶¶ 181-83; *Todorov*, 921 F.2d at 1456 n.30.

agreement between the sender and the receiver of the fax."); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223-24 (3d Cir. 2011) ("[T]he exchange of price information still requires showing that the defendants had an agreement."). The SAC's allegations are not sufficient to allege a conspiracy, let alone one that GEICO joined.

Ultimately, Plaintiffs' true complaint is that the market for body shop labor rates is too transparent and efficient. Presumably, if pricing information was less available to GEICO, to other Defendants, and to vehicle owners, Plaintiffs could extract higher prices for their services. But Plaintiffs operate in an efficient, competitive market, in which GEICO is a sophisticated consumer. That GEICO seeks the lowest cost for quality body repair services, and has enough expertise and market experience to seek favorable pricing, is no indication of conspiratorial conduct. It only indicates sound business practice, which is not actionable under any theory.

> ii. *Membership in Trade Associations Is Consistent with Independent, Procompetitive Behavior*

GEICO's alleged participation in trade associations also does not constitute "an overt act more consistent with some pre-arrangement for common action than with independently arrived-at decisions." Areeda, ¶ 1416 at 103; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *A&E Auto Body,* 2015 WL 304048, at *10 n.11 ("The fact that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement.").

Plaintiffs' allegations demonstrate Defendants' estimating practices are not parallel; let alone, a "plus factor" permitting an inference of illegal conspiracy.   For instance, Plaintiffs allege Defendants do not all use the same repair-estimating databases, SAC ¶¶ 168-171, and that Defendants' have varied estimating processes.   *See, e.g., id.* ¶ 189 (alleging certain, but not all, Defendants have refused to pay for feather, prime and block); ¶ 190 (alleging certain, not all, Defendants refuse to pay for denib and finesse).   Far from demonstrating parallel behavior, Plaintiffs' allegations demonstrate Defendants have unique processes for estimating repairs.

iv.    *Plaintiffs Fail to Allege Defendants Adhere to Parallel Estimating Practices For Replacement Parts*

Plaintiffs' SAC also demonstrates Defendants do not uniformly specify the use of aftermarket or salvaged parts or parts procurement programs.   *See* SAC ¶¶ 66-67 (stating that only some insurers, like State Farm, require use of parts procurement program); ¶ 70 ("[i]n many instances, a Defendant insurer will order the parts independently and ship them to the body shop or directly specify a part and vendor from which a purchase must be made"); ¶ 208 (State Farm writes estimates for salvaged bumper components, lighting components and radiator supports).   As alleged, Defendants make unique decisions about the utility of when and how to specify the use of salvaged or aftermarket parts.

v.    *Rather than Allege Plausible Facts Suggesting An Agreement To Refuse To Deal With Plaintiffs, They Allege GEICO Does Deal with Plaintiffs*

Despite this Court's holding in this case that alleging a "concerted refusal to deal" is a condition precedent to a valid Sherman Act boycotting claim, Plaintiffs still do not allege facts tending to show that GEICO engaged in a concerted refusal to deal with them.   *See Alpine* R&R at 12 (adopting reasoning of *A&E Auto Body,* 2015 WL 304048 re plaintiffs' antitrust claims); *Alpine* Order at 3 (adopting the *Alpine* R&R); *A&E Auto Body,* 2015 WL

304048, at *12 (finding that "the Amended Complaint does not set forth a 'concerted refusal to deal,'" and that "[t]he Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices"). GEICO is still allegedly reimbursing its insureds and claimants for repairs performed by Plaintiffs' shops. *See*, *e.g.*, SAC ¶ 232 (alleging "consumer must visit a preferred shop for an estimate *before proceeding to the shop of choice for repairs*") (emphasis added). Still, "there is no [plausible] allegation that [GEICO] refused to allow any of its insureds to obtain a repair from such a shop or refused to pay for repairs performed at such a shop." *A&E Auto Body,* 2015 WL 304048, at *12.

Plaintiffs' allegation that at least seventy-five percent, and up to ninety-five percent of a given Plaintiffs' annual business comes from insurance-paying customers directly contradicts any alleged agreement by insurers to boycott Plaintiffs. SAC ¶ 275; *see also* SAC ¶¶ 278-286 (alleging that after certain Plaintiffs disassociated with certain DRPs their revenue from repairs paid for by some Defendants, but not GEICO, decreased). Plaintiffs Dave's Body Shop, Chris's Auto Body, Alpine Body Shop and Lindon Collision Center have all alleged that they have ***not*** been in a DRP relationship with GEICO (SAC ¶ 98), but each also alleges that it has been paid for services by GEICO. *See*, *e.g.*, SAC ¶¶ 138-141. The conclusory assertion that GEICO has "boycotted" Plaintiffs is belied by the substantive factual allegations. Plaintiffs offer nothing more than what was alleged in the original complaints and *A&E*, which this Court already rejected.

### D. Plaintiffs Have Not Alleged GEICO Joined the Putative Conspiracy

Besides failing to allege either a conspiracy to fix prices or a concerted refusal to deal, Plaintiffs also fail to allege that GEICO joined any putative conspiracy. To properly plead an alleged conspiracy, Plaintiffs must allege facts showing that:

1. GEICO knew about the alleged conspiracy ***and*** its unlawful objective;

2. GEICO intended to join the alleged illegal conspiracy; and

- 12 -

3. GEICO acted in a manner that was interdependent with – not independent of – the other Defendants in that GEICO's conspiratorial benefits depended on the success of the overall conspiracy.

*See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.,* 376 F.3d 1065, 1078 (11th Cir. 2004) (stating elements of conspiracy); *U.S. Anchor Mfg.*, 7 F.3d at 1001; *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988); *In re Vitamins*, 320 F. Supp. 2d 1, 15-17 (D.D.C. 2004); *A&E* January 2015 Order at 17-20; *see also Marucci Sports v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (dismissing complaint for failure to allege facts demonstrating an intent to join a conspiracy); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1575 (11th Cir. 1991) (requiring facts showing defendants knew of a conspiracy, the object of which utilized unlawful means and that defendants joined the conspiracy); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 273 (D.N.J. 2003) (requiring facts showing defendants' knowing participation in a conspiracy); *Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1300 (M.D. Fla. 2002) (setting forth pleading requirements for an antitrust conspiracy). There are no non-conclusory allegations that GEICO (a) knew about any conspiracy *and* its unlawful objective or (b) intended to join the alleged illegal conspiracy. While there are allegations about GEICO's conduct in the marketplace, they do not tend to prove: (a) GEICO acted in a manner interdependent with – rather than independent of – the other Defendants; or (b) GEICO's "conspiratorial" actions depended on the success of the overall illegal conspiracy – rather than the operation of the free market.

## IV. PLAINTIFFS FAIL TO ALLEGE THE REQUIRED SUBSTANTIVE ELEMENTS OF THEIR ANTITRUST CLAIMS

The SAC makes **zero** effort to cure the FAC's pleading deficiencies regarding the elements of an alleged antitrust violation, thus the two antitrust claims should be dismissed with prejudice. As alleged, the rule of reason applies to both antitrust counts of the SAC as it did regarding the FAC. Count Four is subject to the rule of reason because Plaintiffs do not

allege facts tending to prove the alleged conduct is the type of hard core cartel-like price fixing conduct subject to the *per se* illegal test. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (explaining the rule of reason is the presumptive standard); *Cha-Car, Inc. v. Calder Race Course, Inc.*, 752 F.2d 609, 613 (11th Cir. 1985) ("The *per se* doctrine should not be extended to restraints of trade that are of ambiguous effect; any departure from the rule of reason standard must be based upon demonstrable anticompetitive economic effect, rather than formalistic line drawing."); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("even price fixing by agreement between competitors . . . are governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity.'") (citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 24 (1979) and *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 189 (7th Cir. 1985)). Boycott claims are also subject to the rule of reason when plausible justifications exist, as they do regarding Plaintiffs' Count Five. *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co*., 472 U.S. 284, 295-97 (1985);[4] *Leegin Creative Leather Prods., v. PSKS, Inc.*, 551 U.S. 877, 881-82 (2007); *Am. Needle v. Nat'l Football League*, 560 U.S. 183, 202-04 (2010).[5] The Supreme Court has also held that rule of reason, as opposed to *per se*, analysis applies to agreements by buyers "to purchase goods and services from one supplier rather than another," even when there is "no legitimate business reason for that purchasing decision." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). Plaintiffs allege no facts justifying a departure from the rule of reason.[6]

---

[4] The Supreme Court applied the rule of reason to a group boycott because it "would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive" by reducing costs. 472 U.S. at 295 (internal quotation marks omitted). The same is true here. Plaintiffs allege that the purpose of the alleged group boycott is to reduce costs by capping the maximum prices paid. SAC ¶¶ 324.

[5] *See also*, *United States v. Am. Exp. Co.*, 21 F. Supp. 3d 187, 194 (E.D.N.Y. 2014) (acknowledging that a boycott in the form of steering can have a procompetitive effect in certain circumstances).

[6] In addition to not meeting their burden to allege plausible facts establishing that the *per se* illegal test applies, Plaintiffs allege a purported illegal vertical conspiracy. *See* SAC ¶ 383. Purported vertical restraints are always

Besides failing to properly allege conspiracy or that GEICO joined the conspiracy, Plaintiffs also fail to allege the substantive elements of the rule of reason, including:

1. A product or service market relevant for antitrust purposes;

2. A geographic market relevant for antitrust purposes;

3. Market power in the relevant product/service and geographic markets;

4. Barriers to entry;[7]

5. Wrongful conduct resulting in anticompetitive effect (*i.e.*, conduct that raises prices above competitive levels, suppresses payments below competitive levels, or suppresses output below competitive levels);

6. The anticompetitive effects outweigh the pro-competitive benefits;

7. Antitrust injury or standing (*i.e.*, plaintiff has suffered injury caused by the anticompetitive conduct); and

8. Damages.

*See*, *e.g.*, *Image Technical Servs., Inc. v. Eastman Kodak, Inc*., 125 F.3d 1195, 1202 (9th Cir. 1997) ("*Kodak*"); *Levine v. Cent. Florida Med. Affiliates, Inc*., 72 F.3d 1538, 1552-55 (11th Cir. 1996) (stating the rule of reason test more generally); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US LLC,* No. 8:10-CV-2008-T-33TGW, 2011 WL 3035226, at *9-10 (M.D. Fla. July 25, 2011) (same); *Spanish Broad. Sys. of Fla.,* 376 F.3d at 1071-72 (same).[8]

### A. No Plausible Facts Supporting A Product/Service Relevant Market

Plaintiffs must allege plausible facts that tend to prove a relevant product or service market amounting to the "commodities reasonably interchangeable by consumers for the same purpose." *See*, *e.g.*, *Moecker v. Honeywell Int'l, Inc*., 144 F. Supp. 2d 1291, 1302-03 (M.D. Fla. 2001) (quoting *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *Levine*, 72 F.3d at 1552. A relevant market includes all existing firms that would compete in

---

subject to the rule of reason under federal antitrust law. *See, e.g., Leegin Creative Leather Products v. PSKS,* 551 U.S. 877, 877 (2007); *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1978).

[7] *See Nat'l Bancard Corp. VISA U.S.A. Inc.*, 596 F. Supp. 1231, 1259 (S.D. Fla. 1984) (discussing market power/barriers to entry re: Section 1 conspiracy claim); *Reazin v. Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) (barriers to entry relevant to Section 1 conspiracy claim market power analysis).

[8] The same rule of reason applies equally to conspiracy **and** monopoly claims. Areeda ¶ 1512 ("[T]he series of steps articulated for a §2 [monopoly] rule of reason case closely resembles that for the §1 [illegal conspiracy] inquiry.").

the event of a small but significant, non-transitory price increase.  *U.S. Anchor*, 7 F.3d at 995.

Whether Plaintiffs intend the alleged product market to be auto collision repair or auto

insurance is unclear.  *See* SAC ¶¶ 41, 339 (alleging Defendants hold over seventy-one

percent of the auto insurance market in Utah and that auto collision repair is an identifiable

market).  Plaintiffs plead no facts to support that either of their alleged "markets" are a

product or service market relevant for antitrust purposes.

### B.     No Plausible Facts Supporting A Relevant Geographic Market

Plaintiffs must allege plausible facts tending to prove a relevant geographic market.

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).  A relevant

geographic market is the geographic area of effective competition, including firms that would

enter in the event of a price increase.  *See*, *e.g.*, *Standard Oil Co. v. United States*, 337 U.S.

293, 299 n.5 (1949); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir.

1991) (explaining geographic market as an economic concept wherein courts examine

supplier-customer relations to determine "how economic actors function in terms of where

buyers seek supplies and sellers seek purchasers").

The SAC refers to the entire State of Utah, metropolitan areas and vast geographic

areas of Utah, but fails to explain why these might be a relevant geographic market.  *See e.g.,*

SAC ¶¶ 40-41.  Establishing a relevant geographic market is entirely Plaintiffs' burden – a

burden they do not meet.  *See*, *e.g.*, *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620,

626-27 (5th Cir. 2002) (affirming dismissal for failure to plead plausible relevant geographic

market, finding "the economic significance of a geographic area does not depend upon

singular elements such as population, income, ***political boundaries***, or geographic extent, but

rather upon the relationship between these elements and the characteristics of competition in

the relevant product market within a particular area") (emphasis added) (internal quotation

marks omitted).  There are simply no allegations tending to prove any relevant geographic

area for antitrust purposes.

**C.  Plaintiffs' Market Share Allegations Are Immaterial Under _Twombly/Iqbal_**

Under the rule of reason, Plaintiffs must allege that the putatively conspiring Defendants have market power in a properly-alleged relevant market.  *See*, *e.g.*, *Levine*, 72 F.3d at 1538, 1551; *Spanish Broad. Sys. of Fla.*, 376 F.3d at 1073.  High market share – absent proper market definition – does not tend to prove market power and is inconsequential.  Fed. R. Evid. 104(b), 401; *see Cont'l Airlines v. United Airlines*, 277 F.3d 499, 509 (4th Cir. 2002) (absent market power in a relevant market, any purported restraint of trade does not implicate §1 of the Sherman Act).  Plaintiffs allege no facts tending to prove market power.  Plaintiffs' "market share" allegations relate to the "private passenger auto liability market," providing no insight into Defendants' alleged market power in the "auto collision repair" market, if that even is an alleged product market.[9]  *See* SAC ¶¶ 40-42.

**D.  No Allegations Of Barriers To Entry**

Counts Four and Five also fail because Plaintiffs fail to allege barriers to entry in a relevant market.  *See, e.g.*, *Levine*, 72 F.3d at 1551, 1555; *Moecker*, 144 F. Supp. 2d at 1308.  A barrier to entry is any market feature capable of constraining normal operation of a relevant market to the extent the relevant market is unlikely to be self-correcting over time.  *Kodak*, 125 F.3d at 1208.  But, if the purported barrier to entry does not prevent self-correction over time, then the antitrust claim fails.  *Id.*  Plaintiffs must also allege facts tending to prove that new competitors (or existing competitors with excess capacity) seeking to enter the relevant market face high market barriers to entry.  *Id.* at 1207-08; *Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1078, 1079, n.6 (M.D. Fla. 2005).

Plaintiffs' failure to allege barriers to entry is incurable.  If the market is the

---

[9] Plaintiffs' statement that "[i]nsurance –paying customers constitute between seventy-five and ninety-five percent of a given Plaintiffs' annual business," SAC ¶ 275, is not informative of Defendants' alleged market share in the auto collision market.

automobile insurance market, Plaintiffs fail to plead barriers to entry because they concede 133 companies now provide automobile insurance in Utah. SAC ¶ 42. If barriers to entry were high, 133 companies could not be providing auto insurance services in Utah.

**E.     No Allegation That The Purported Restraints, Even If True, Result In Anticompetitive Effects And That The Anticompetitive Effects Outweigh The Procompetitive Benefits**

In Count Four, Plaintiffs fail to plausibly allege how the particular pricing conduct (*i.e.*, ensuring lower prices) might be anticompetitive. *See, e.g.*, *Aspen Skiing v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985); *Levine*, 72 F.3d at 1551 ("Rule of reason analysis requires the plaintiff to prove [ ] an anticompetitive effect of the defendant's conduct on the relevant market . . ."). The anticompetitive effects element cannot be met by simply alleging a restraint – particularly when that restraint is merely lower prices. *See Appleton v. Intergraph Corp.*, 627 F. Supp. 2d 1342, 1354 (M.D. Ga. 2008) (quoting *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1551 (11th Cir. 1996)) ("A plaintiff asserting a § 1 violation analyzed under the rule of reason must allege: '(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.'"). Low prices rarely raise antitrust concerns but, instead, are precisely the effects the antitrust laws are designed to promote. *Matsushita Electric*, 475 U.S. at 594. Low prices typically indicate competition, not the lack of it. *Id.* Yet here, as alleged, the purported pricing conduct is efficiency-enhancing and lowers costs used to set premiums charged to consumers. SAC ¶ 88-89, 383.

In Count Five, Plaintiffs allege a boycott of them – as suppliers, not competitors, of the Defendants. Besides not alleging that the purported boycott caused cognizable anticompetitive effects except in the most conclusory fashion, the SAC repeatedly alleges a strong ***procompetitive*** benefit – lower prices – and that the purpose of the alleged boycott was to ensure these lower prices. SAC ¶ 88-89, 383, 400. Plaintiffs do not allege cognizable

anticompetitive effects of a boycott, and do not plausibly allege procompetitive benefits outweighed by anticompetitive effects. *Nw. Wholesale Stationers*, 472 U.S. at 295-96.

### F. Plaintiffs Have Not Adequately Alleged Antitrust Injury

Plaintiffs must show an antitrust injury to have standing to bring a Sherman Act claim. *See*, *e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-43 (1983). Because the antitrust laws protect competition and not competitors, many injuries – including direct injuries – allegedly suffered by plaintiffs are not cognizable under the antitrust laws. *See*, *e.g.*, *id.; Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1299-300 (M.D. Fla. 2002) ("The purpose of the Sherman Antitrust Act is to protect competition, not individual competitors."); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989) ("The Sherman Act protects competition, not competitors, and does not reach conduct that is only unfair, impolite, or unethical."). Plaintiffs must allege more than conclusory statements of injuries allegedly suffered from anticompetitive effects of purported restraints, not injuries from Defendants' alleged goal of paying lower prices. Plaintiffs fail to do so.

## V. PLAINTIFFS' TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS CLAIM (COUNT TWO) FAILS

### A. Plaintiffs' Allegations Are Implausible On Their Face

Plaintiffs' tortious interference claim must be dismissed under Federal Rule of Civil Procedure 8(a)(2), *Twombly* and *Iqbal* because Plaintiffs do not indicate which of the SAC's 405 paragraphs allegedly support this claim and continue to rely on group pleading after this Court expressly instructed "Plaintiffs [to] identify specifically which Defendants interfered with which Plaintiffs." *See Alpine* R&R at 11. In dismissing Plaintiffs' tortious interference claim the first time, this Court held that "[a] general allegation that some unidentified Defendants – or all Defendants – interfered with some unidentified customers of some

unnamed Plaintiff does not satisfy the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Alpine* Order at 2. "Surely the Plaintiffs must have some basis to believe that certain Defendants interfered with certain of the Plaintiffs' customers." *Id.*

Plaintiffs once again generally allege that Defendants, presumably including GEICO, interfered with unidentified customers of some unnamed Plaintiff. *See* SAC ¶¶ 229-299 (alleging steering in general); ¶¶ 371-376 (alleging intentional interference in general). Plaintiffs' only discussion of GEICO in their allegations of steering and intentional interference include a general allegation that GEICO tells consumers they must have an estimate prepared at a preferred shop before the consumer can take their vehicle to a shop of the consumers' choice, SAC ¶ 232, one allegation related to Ms. Marlow Mitchell, whose van was allegedly repaired negligently and without her permission by nonparty Larry Miller South Towne, SAC ¶ 238 (in which GEICO *did* pay for subsequent repairs by Plaintiff Chris's Body and Paint), and an allegation that Mr. Ken Caldwell, whose repairs were performed at Plaintiff Perk's Auto Repair, "swears that he felt significantly pressured and coerced into changing his choice of repair shops," though he did not do so. SAC ¶ 248. None of Plaintiffs' allegations provide a basis for a tortious interference claim against GEICO, but as to those Plaintiffs that do not allege anything as to GEICO (*i.e.*, all Plaintiffs except Chris's Body and Paint and Perk's Auto Repair), their claims must be dismissed for the same reasons this Court dismissed their claims in the Complaint. *Alpine* Order at 2.[10]

**B.      Plaintiffs Do Not Plead The Requisite Elements**

To establish a claim for tortious interference with economic relations under Utah law,

---

[10] Further, to the extent Plaintiffs' tortious interference claim is based on any alleged misrepresentations made by GEICO, Plaintiffs must plead this claim with particularity pursuant to Federal Rules of Civil Procedure 9(b). Even though tortious interference is not labeled "fraud," if it rested on alleged misrepresentations, it would "sound in fraud" bringing it within the requirements of Rule 9(b). *See Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*, 561 Fed. App'x. 882, 884 (11th Cir. 2014) (citing *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–65 (11th Cir. 2007) (holding Rule 9(b) applies to claims that "sound in fraud"); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502 (7th Cir. 2007) (holding that Rule 9(b) applies to a tortious interference claim based on alleged fraudulent conduct).

a plaintiff must show "'(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) ... by improper means, (3) causing injury to the plaintiff.'" *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982)) (alterations in original). Establishing the use of "improper means" in Utah is a high threshold, and applies only where "the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991). Furthermore, to plead tortious interference, a plaintiff must plead facts showing a "causal connection" between the conduct alleged and the resulting damages "with sufficient particularity to show what facts are claimed to constitute [the] charges." *Brown v. Peterson*, 2004 UT App 439, 2004 WL 2689034 (Utah Ct. App. Nov. 26, 2004). Plaintiffs fail to allege the requisite elements of a tortious interference claim against GEICO.

Plaintiffs fail to plead facts to establish that GEICO (or any Defendant) acted tortiously, and specifically that they acted with "improper means" under Utah law. As Magistrate Judge Smith previously recognized in the *Alpine* R&R, the Utah Supreme Court ruled in January 2015 that plaintiffs may no longer establish tortious interference with economic relations through demonstrating "improper purpose," and instead must establish improper means. *Alpine* R&R at 10 (citing *Eldridge*). Plaintiffs ignore this change in the law, alleging that Defendants steer customers away from Plaintiffs "for an improper purpose and/or by improper means." SAC ¶ 372. Plaintiffs devote two paragraphs to their theory of why Defendants (generally) acted for an "improper purpose." SAC ¶¶ 373-74. But regarding improper means, Plaintiffs offer only the conclusory statement that "Defendants have employed improper means since steering is contrary to Utah statutory, regulatory and/or common laws." SAC ¶ 375. This "allegation" merely parrots the legal standard under *Leigh*

*Furniture* and *Eldridge*, and is therefore the classic example of a "threadbare recital of the elements of a cause of action" which is insufficient under *Iqbal*.

The Plaintiffs have not alleged the violation of any laws or statutes other than antitrust laws; if their antitrust claims fail (as they must, for reasons described above), they have no independent basis to assert a tortious interference claim. The only time GEICO is specifically identified as allegedly interfering with identified alleged customers, Plaintiffs do not identify any improper means employed by GEICO. Regarding Ms. Mitchell, Plaintiff merely alleges that GEICO directed Ms. Mitchell to a GEICO DRP shop, Larry Miller South Towne, "to have it appraised" and told her "if she kept it there for repair they could pay her directly and it would be done faster." SAC ¶ 238. The SAC also alleges that Ms. Mitchell (a nonparty) did not consent to have her car repaired by Larry Miller South Towne (a nonparty) but that the shop commenced repairs and performed them negligently. *Id.* No conduct by GEICO is alleged to violate any statute, regulation or rule of law.

Regarding Mr. Caldwell, Plaintiffs allege only that GEICO aggressively pressured Mr. Caldwell to take his vehicle to a "preferred shop thirty miles away . . . to get a repair estimate rather than to his friend and neighbor Chris Perkins, owner of Plaintiff Perk's." SAC ¶ 248. However, Mr. Caldwell declined, and GEICO paid for the repairs at Mr. Caldwell's chosen repair shop. No part of the alleged transaction is unlawful or tortious. In a footnote, Plaintiffs appear to allege that Defendants (generally) violated rules imposed by the Utah Insurance Department preventing insurers from "requiring a claimant to travel an unreasonable distance to inspect a replacement automobile, to obtain a repair estimate or to have the automobile repaired at a specific repair shop."[11] However, by Plaintiffs' own allegations, GEICO required none of this from its insureds. Plaintiffs' inability to identify a single alleged incidence of tortious interference with business relationships more than a year

_____
[11] SAC at 80 n.7, quoting Utah Admin. Code R. 590-190-11.

after filing their original Complaint mandates dismissal of this claim with prejudice as Plaintiffs have demonstrated that they cannot plead this claim.

## VI.    PLAINTIFFS' *QUANTUM MERUIT* CLAIM (COUNT ONE) FAILS

Plaintiffs have also failed to plead a valid claim for quantum meruit. "Quantum meruit is an equitable tool that allows a plaintiff to receive restitution for the reasonable value of services provided to the defendant." *Em. Physicians Integrated Care v. Salt Lake County*, 2007 UT 72, ¶ 10, 167 P.3d 1080, 1083 (2007). Under Utah law, remedies available under *quantum meruit* are "tools of equity," used only when no express contract is present. *TruGreen Cos., LLC v. Mower Bros., Inc.*, 2008 UT 81, ¶ 18, 199 P.3d 929, 933 (2008).

First, Plaintiffs have not pled the elements necessary for a claim for *quantum meruit*. GEICO itself did not "receive a benefit" within the terms of the first and second elements of a claim for unjust enrichment. Plaintiffs allegedly provided services to individual vehicle owners insured by the Defendants, not directly to GEICO or any other Defendant.[12]

Second, while the doctrine of *quantum meruit* precludes retention of a benefit "under circumstances that would make it unjust for the defendant to retain the benefit without paying for it," here, Plaintiffs allege GEICO and the other Defendants paid. This case is not about nonpayment for services, but about the amount of payment to insureds and claimants. Plaintiffs assert that, after performing services under a pre-agreed pricing structure, their services are now worth more than the price for which they originally agreed to, and did, perform the work. This is not how free-market economics work, and *quantum meruit* claims cannot be used to secure a better bargain than what the parties originally negotiated.

---

[12] In a portion of the *Alpine* R&R GEICO previously objected to, the R&R suggested that GEICO received a benefit from body shops performing repairs for GEICO's insureds because such repairs would relieve GEICO of a duty to repair vehicles. However, no such duty exists. An insurer's duty is to pay its insured for the reasonable amount of the cost of repairs, regardless of whether such repairs are actually performed. *See, e.g.*, Utah Admin. Code R590-190-12(1).

- 23 -

Third, Plaintiffs' allegatons do not plead circumstances under which it would be unjust to allow Defendants to retain any benefit Plaintiffs claim to have conferred because Plaintiffs could have (but did not) bargain for the prices they believe to be fair. Plaintiffs have not pled facts sufficient to support a conclusion that their failure to bargain with Defendants before performing repairs was somehow justified. Plaintiffs make the conclusory statement that "before an authorized repair begins there is no negotiation, or even an opportunity for any legitimate negotiation," but do not state *why* they fail to negotiate for more favorable pricing. SAC ¶ 365. Plaintiffs cannot use the theory of *quantum meruit* as a pretext to obtain more favorable pricing than they obtained in a market transaction.

Plaintiffs' *quantum meruit* claim also fails as a matter of law because the Plaintiffs allege the existence of express contracts. Specifically, Plaintiffs allege or at least imply the existence of contracts covering the same subject with their individual customers. The SAC describes a process in which customers obtain estimates for repairs, and Plaintiffs are paid by customers' insurers under those estimates. *See* SAC ¶ 34 (noting Plaintiffs do business "with Defendants' policyholders"), ¶ 182 (describing estimate preparation process). Each repair performed by Plaintiffs constitutes an individual transaction with a negotiated price. Because express agreements governing the subject of the Plaintiffs' claims are alleged (*i.e.*, the amount of payment which Plaintiffs should receive for their services for Defendants' insureds) Plaintiffs have a remedy and there can be no claim for *quantum meruit*. Under Utah law, a cause of action based on *quantum meruit* cannot exist when there is a valid contract between the parties.[13] *Davies v. Olson*, 746 P.2d 264, 268 (Utah Ct. App. 1987) ("Recovery under *quantum meruit* presupposes that no enforceable written or oral contract exists").

---

[13] *See, e.g.*, *Davies*, 746 P.2d at 268 ("Recovery under quantum meruit presupposes that no enforceable written or oral contract exists").

## VII.   PLAINTIFFS' CONVERSION CLAIM (COUNT THREE) FAILS

Plaintiffs previously pled a defective claim for conversion, which was soundly rejected and dismissed by the Court for failure to plead a cognizable cause of action under Utah law.  Magistrate Judge Smith noted that "Ordinarily, 'money cannot be the subject of an action for conversion.'"  *Alpine* R&R at 11 (quoting *In re Ogden*, 314 F.3d 1190, 1200 (10th Cir. 2002).  The R&R noted a narrow exception in which "Utah courts recognize claims for conversion of money where it is wrongfully received or where funds obtained for definite application are misappropriated."  *Id.* (citing *Ogden*, 314 F.3d at 1200).  However, the R&R concluded that "Plaintiffs' conversion claim fails because they have not pled facts demonstrating a right to possess any money held by Defendants."  *Id.*

Plaintiffs have made no effort at all to cure the defects in their earlier FAC.  Plaintiffs have still not alleged any misappropriation of funds by GEICO.  Instead they generally allege that they have not been paid enough by the Defendants.  This is not conversion, and the Court should dismiss the claim with prejudice for the same reason it dismissed the FAC.

## VIII.   CONCLUSION

Because Plaintiffs have had ample time and opportunity to properly plead their claims, and substantial instruction from this Court on what Plaintiffs must do to fix their claims, and have still failed to do so, GEICO requests that Plaintiffs' SAC be dismissed with prejudice, with such further relief as this Court deems proper.

DATED this 8th day of June, 2015.

Respectfully submitted,

*/s/ Dan W. Goldfine*

21743132

Dan W. Goldfine (*admitted pro hac vice*)
Joshua Grabel (*admitted pro hac vice*)
Jamie L. Halavais (*admitted pro hac vice*)
Ian Fischer (*admitted pro hac vice*)
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
Telephone: 602-382-6000
Facsimile:  602-382-6070
Email:  dgoldfine@swlaw.com
      jgrabel@swlaw.com
      jhalavais@swlaw.com
      ifischer@swlaw.com


Amy F. Sorenson
Jared C. Fields
SNELL & WILMER, L.L.P.
15 West South Temple
Suite 1200
Salt Lake City, Utah  84101
Telephone: 801-257-1900
Facsimile:  801-257-1800
Email:  asorenson@swlaw.com
      jfields@swlaw.com

*Attorneys for Defendant GEICO General
Insurance Company*

21743132

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

                                      */s/ Dan W. Goldfine*
                                       Dan W. Goldfine

21743132