**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

| | |
|---|---|
| ALPINE STRAIGHTENING SYSTEMS, INC., *et al.*, | * <br> * <br> * |
| PLAINTIFFS, | * MDL Docket No. 2557 <br> * |
| v. | * Case No. 6:14-cv-06003-GAP-TBS <br> * |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, *et al.*, | * Originally filed in the <br> * District of Utah <br> * |
| DEFENDANTS. | * **DISPOSITIVE MOTION** |

**CERTAIN DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

The  Defendants listed in **Exhibit A** ("Defendants") move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice.[1]

**MEMORANDUM OF LAW**

I.      **INTRODUCTION**

The Utah Plaintiffs' allegations in support of their federal antitrust claims fail for the same reasons as the antitrust claims in the second amended Florida, Indiana and Mississippi complaints.  Unlike the Utah First Amended Complaint ("FAC"), the SAC offers some detailed allegations.  However, the detail cannot salvage the implausible conspiracy and boycott theories Plaintiffs repeat in every complaint.  The SAC (i) continues to rely on allegations of unilateral conduct and conscious parallelism that cannot give rise to claims under Section 1 of the Sherman Act, 15 U.S.C. § 1; (ii) fails to correct the legal deficiencies identified by this Court in its March 5 Order in this case (Doc. 95, *adopted* Doc. 101) and in its January 22,

---

[1] The SAC was filed May 20, 2015, after expiration of the Court's May 18 deadline.  (Doc. 101 at 3.)

2015 Order dismissing the FAC in the companion *A&E* case (*see A&E*, Doc. 293, adopted in

this action at Doc. 95 at 2-3, 12 and Doc. 101 at 3); and (iii) continues Plaintiffs' pattern of

impermissible group pleading.  The key features of the SAC are summarized below:

- Plaintiffs have never alleged an express agreement among Defendants to set body shop reimbursement rates.

- The SAC relies on allegations that various Defendants, at different times, chose to follow some State Farm labor and material rate <u>increases</u>. Those allegations underscore State Farm's unilateral conduct followed by some parallel reimbursement conduct on the part of some Defendants in some periods of time.

- The SAC purports to allege "plus factors," such as opportunities to conspire at unspecified trade association meetings and seeking common motive to conspire to increase profits, but these allegations are substantively indistinguishable from the same conclusory and insufficient allegations previously rejected by the Court.

- To support their group boycott claim, some Plaintiffs have added a handful of allegations of purported steering conduct by a few Defendants.  Plaintiffs assert that these allegations of steering, which purportedly began ten years ago, support their sweeping claim that all Defendants have engaged in an unlawful boycott.  There are, however, no factual allegations to support the claim that all Defendants conspired to refuse to deal with Plaintiff shops.  The SAC fails even to allege conduct that could fairly be described as parallel.  Moreover, the SAC does not state a boycott claim for the same fundamental reason that the previous iterations fell short – vaguely asserted isolated examples of purported steering by individual insurers are not equivalent to a concerted refusal to deal.  Indeed, the allegations make clear that these Plaintiffs continue to do business with Defendants, so there has clearly been no "boycott" at all.

- Plaintiffs have larded the SAC with apparent new claims that Defendants have conspired to fix the prices of replacement parts and to require shops to use aftermarket, salvaged, or recycled parts.  Plaintiffs do not tie any of these allegations to any agreement among Defendants regarding reimbursement rates or otherwise; they fail even to allege parallel conduct.  These allegations also employ the same collective pleading technique which the Court has previously rejected.

This is the most recent of numerous iterations of essentially identical conspiracy

claims filed in this and other actions in this MDL brought by the same counsel as in this case.

Each iteration attempts to build on, add to, revise, or delete allegations in prior iterations to

101229977.1

attempt to remedy failings identified by the Court or to respond to or evade arguments raised by Defendants in their prior motions to dismiss. Yet, after more than a year of trying, Plaintiffs continue to fall far short of "nudg[ing]" their antitrust conspiracy claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). It is clear now that, no matter how many tries they get and no matter how many pages of allegations they draft, Plaintiffs cannot state a claim for antitrust conspiracy against Defendants. Plaintiffs' Sherman Act claims therefore should be dismissed with prejudice.

Plaintiffs' state law claims should likewise be dismissed with prejudice:

- Plaintiffs' third attempt to plead a quantum meruit claim fails because there is no alleged inequity here as Plaintiffs had no reasonable expectation of higher payments from Defendants and because Plaintiffs have not conferred a benefit upon Defendants.

- Plaintiffs' third attempt to state a claim for tortious interference with economic relations fails to remedy the previous deficiencies. Plaintiffs continue to rely primarily on conclusory and generalized group pleading. As this Court has recognized, such collective pleading is insufficient to state a claim. No specific allegations of tortious interference are made against most of the Defendants. Moreover, Plaintiffs' limited allegations regarding specific transactions simply demonstrate Plaintiffs' inability to allege key elements of tortious interference, including improper means.

- Plaintiffs' conversion claim in the SAC is identical to the conversion claim in the FAC that the Court dismissed (Doc. 95 at 11-12) and should likewise be rejected.

## II. PLAINTIFFS' ANTITRUST CLAIMS (COUNTS FOUR AND FIVE) SHOULD BE DISMISSED[2]

### A. Plaintiffs' New Conspiracy Allegations Fail to Overcome the Shortcomings of Their FAC

To survive a motion to dismiss, a plaintiff alleging an antitrust conspiracy must adequately plead that the defendants "(1) entered into 'a contract, combination or

---

[2] Defendants hereby adopt and incorporate the legal standards for a Rule 12(b)(6) motion set out in the Court's March 5, 2015 Report and Recommendation (Doc. 95 at 4-5, *adopted* Doc. 101).

conspiracy,' which was (2) 'in restraint of trade or commerce' and (3) that [the plaintiff] was damaged by the violation." *Moecker v. Honeywell Int'l, Inc.*, 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001) (citation omitted). Plaintiffs still fail to satisfy the first prong of this test because they have not alleged a plausible conspiracy among all or any Defendants.

The SAC must, but does not, contain "'allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557), and must, but does not, offer "'enough factual matter (taken as true) to suggest that an agreement was made.'" *A&E*, Doc. 293 at 17 (quoting *Twombly*, 550 U.S. at 556). Allegations "that are 'consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy' are insufficient." *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1308 (S.D. Fla. 2010) (quoting *Twombly*, 550 U.S. at 554). "'[F]ormulaic recitations' of a conspiracy claim" are insufficient, and "'a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557).

1. **The SAC's Allegations of Conscious Parallelism Do Not Suggest a Conspiracy to Fix Reimbursement Rates**

Plaintiffs allege that Defendants imposed maximum labor rates for automobile repair services.[3] The "crucial question," however, remains "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553; *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287,

---

[3] Defendants also respectfully refer the Court to the arguments set out in the Motion of Moving Defendants To Dismiss The Second Amended Complaint.

101229977.1

1298-99 (11th Cir. 2003) ("[I]t is important to distinguish at the outset between collusive price fixing, i.e., a 'meeting of the minds' to collusively control prices, which is prohibited under the Sherman and Clayton Acts, and 'conscious parallelism,' which is not.").

Like its predecessor, and the companion *A&E*, *Indiana AutoBody*, and *Capitol Body* second amended complaints, the SAC fails to meet the standards set by the Supreme Court and the Eleventh Circuit for pleading an antitrust conspiracy. The rate-fixing conspiracy alleged in the FAC was based entirely on Plaintiffs' general characterization of Defendants' conduct as conscious parallelism, without so much as a single factual allegation that there were parallel rate reimbursement levels set by any Defendants. The SAC adds some allegations of episodic instances in which some, but not all, Defendants paid similar prices for repairs. This Court has already explained, however, that such parallel conduct "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." *A&E*, Doc. 293 at 16. In dismissing the antitrust conspiracy claims in the *A&E* case, this Court noted that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when." *Id.* at 17.

Plaintiffs have not cured these defects. They still do not offer any factual allegations to support the conclusion that there was a conspiracy among the Defendants. There are no allegations as to who reached an agreement with whom, what that agreement entailed, or when it began or ended. Their allegation that the supposed parallel conduct has been going on for at least 20 years (SAC ¶ 145) merely underscores the implausibility of their conspiracy theory. None of the newly added allegations in the SAC, separately or in context, raise a

101229977.1

suggestion of a preceding agreement among Defendants to fix reimbursement rates. There is no factual context to suggest that Defendants agreed with State Farm or among themselves to adopt State Farm's rate reimbursement levels. Indeed, Plaintiffs' core allegation remains the self-defeating generalization that after State Farm, the alleged market leader, unilaterally developed and adopted a price structure for labor rates, other Defendants at some point thereafter individually refused to pay any more than State Farm.

Plaintiffs do not allege sufficient factual matter to place this conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Thus, there are no factual allegations supporting an inference that the parallel reimbursement rates resulted from a preceding agreement among the Defendants. Because conclusory allegations and recitals of the elements of a cause of action are not presumed true at the pleading stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), Plaintiffs have not, and plainly cannot, set forth factual allegations plausibly establishing an antitrust conspiracy.

On examination, even Plaintiffs' allegations of supposed parallel business conduct reflect inconsistent behavior among Defendants. For instance, Plaintiffs allege that "other Defendants," at different times, raised their reimbursement rates within 30 days of State Farm changing its rates (in at least one instance, after the Defendant had observed that the other insurance companies also had raised their rates). (SAC ¶ 144.) (Other Defendants, apparently, did not follow State Farm's rate changes at all.)

Flunking basic deductive logic, Plaintiffs surmise from this inconsistent instance of parallelism that the rates paid by State Farm "could only have been provided by State Farm's

6

internal and unpublished numbers to the other Defendants." (*Id.* ¶ 144.) Plaintiffs do not account for why, in service of a purported scheme to suppress reimbursement rates, Defendants would gradually raise their rates, over a period of weeks, in response to State Farm's announcement of its own independent rate increase. They also do not allege when, how, by what means or to whom State Farm provided such information to the other Defendants or that other Defendants agreed to use the same rates, nor do they allege that any Defendants possessed this information before State Farm raised the rates it paid to shops.

State Farm is alleged to be the market leader (SAC ¶ 44) and to unilaterally set the prices it will pay for repairs based on its regularly conducted survey (*see id.* ¶¶ 113-24). Merely following a price leader is common within different industries and does not suggest the existence of an agreement. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009) (explaining that, "'as will often be the case, the leader's price increase is likely to be followed'" and concluding that "each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision" (citation omitted)); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act"); *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981) (conspiracy not inferable from Defendants' "adherence to a 'common formula' for calculating damage estimates" for automobile repairs).

Plaintiffs focus many allegations on State Farm's surveys, but they do not allege that State Farm's surveys involved anything other than State Farm's unilateral conduct or that any Defendant implemented a price change before State Farm implemented its survey results.

7

(SAC ¶ 113.)  Plaintiffs affirmatively allege that State Farm took measures to protect the confidentiality of its surveys (*id.* ¶¶ 129-30), not that it used the surveys to communicate with other Defendants about rates.  In any event, the other Defendants did not need to know any of that information or to conduct their own surveys to know what State Farm and other insurers actually paid body shops.

As in *Twombly*, there are obvious explanations for why rational and self-interested insurers would know the rates paid by their competitors.  Plaintiffs allege that Defendants engage with Plaintiffs and with other body shops in hundreds of transactions every day.  The rates body shops are paid are an integral part of these transactions.  Body shops doing business with State Farm across Utah, including Plaintiffs, all would learn in the ordinary course of business what rates State Farm was willing to pay them, just as they would know the rates paid by other insurers with whom they do business.  Moreover, these rates allegedly are static for years at a time.  (SAC ¶ 341.)  Thus, it is both obvious and entirely reasonable that State Farm's rates were well known among both body shops and the insurers with whom they regularly transact, and that alleged knowledge does not suggest a conspiracy.

Plaintiffs' contention that the other Defendants "are not supposed to have access to State Farm's information" regarding rate increases and that these rates "could only have been provided by State Farm to its ostensible competitors" is plainly wrong.  (*Id.* ¶¶ 142, 388.)  Shops would have been told the rates resulting from the State Farm survey, if not the methodology, when State Farm told them what rates it was willing to pay.  (*See, e.g.*, *id.* ¶¶ 124, 137-41, 144.)  Plaintiffs' allegations also suggest that insurers would learn competitive pricing information in the implementation of DRP agreements, which purportedly require pricing

concessions or most favored nations provisions that oblige shops to charge no more than what other insurers pay for the same services. (SAC ¶¶ 87, 92.) Thus, it is likely if not inevitable that State Farm's rates would be known among both body shops and the insurers with whom those shops did business. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate); similar contract language can reflect the copying of documents that may not be secret; similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy . . . . ").

Moreover, in a case purporting to be about a conspiracy to suppress rates, the SAC's sole factual allegation of a parallel price moment involves Defendants <u>increasing</u> rates, to the benefit of body shops, not decreasing them. (*Id.* ¶ 144.) The body shops themselves obviously knew what rates State Farm was paying them and almost certainly would have been eager to tell other insurers refusing to pay more than the market leader that the market leader had increased the rates it was willing to pay. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 329 (3d Cir. 2010) ("The details of commission agreements with other insurers, for example, could be a powerful tool for a broker attempting to negotiate a more favorable agreement with a particular insurer-partner."). The decisions of those insurers to increase their own rates after State Farm had increased its own market rate hardly indicate the presence of an agreement to suppress the rates (and in any event certainly did not prejudice Plaintiffs). *See In re Travel Agent*, 583 F.3d at 907 (refusing to infer conspiracy where Defendants were not alleged to have received information about rate reductions before they were implemented). If anything, this example tends to show that pricing movements in the market

9

are the result of independent rather than concerted action.

As the Seventh Circuit has stated, "'the practice of the insurance companies to calculate the reimbursement for its insured based upon the lowest prevailing price in the market place (and to insure the integrity of that estimate by having an open list of competing shops which will generally accept it) is the very essence of competition.'" *Quality Auto*, 660 F.2d at 1205 (citation omitted); *see In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitor behavior."); *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) ("There are many legal ways in which Cargill could have obtained pricing information on competitors.").

In short, Plaintiffs' factual allegations of quasi-parallel conduct permit no inference other than that it was in the rational, independent business interests of State Farm to demand lower prices and of the other Defendant insurers to refuse to permit a body shop to charge them more than the shop was charging State Farm. *See Twombly*, 550 U.S. at 554 (allegations that are "consistent with conspiracy, but just as much in line with . . . rational and competitive business strategy" do not suffice). In dismissing the FAC, this Court adopted its analysis of the factually indistinguishable allegations in the *A&E Auto Body* case, where it ruled that Plaintiffs' allegations of purported statements by insurers that they would pay no more than State Farm did not give rise to an inference of a prior agreement:

> It is not illegal for a party to decide it is unwilling to pay a higher hourly rate than its competitors have to pay, and the fact that a number of the Defendants made statements to that effect does not tip the scales toward illegality. . . . Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1. . . . Plaintiffs themselves suggest that the Defendants might have been acting in response to perfectly lawful motivations.

*A&E*, Doc. 293 at 18.  Plaintiffs have not provided any new allegations in the SAC that would alter this conclusion in the present case.[4]

### 2. The SAC Does Not Allege Any Factual Plus Factors Supporting a Plausible Inference of Conspiracy

The SAC provides no details regarding the supposed agreement or any "specific time, place, or person involved in the alleged conspiracies."  *See Twombly*, 550 U.S. at 565 n.10. Plaintiffs also do not offer any "plus factors" that might make it plausible to infer a conspiracy from the alleged parallel conduct.  *See id.* at 556 n.4 (discussing examples of plus factor allegations that might suffice to plead conspiracy); *Williamson Oil Co.*, 346 F.3d at 1301 ("[P]rice fixing Plaintiffs must demonstrate the existence of 'plus factors' that remove their evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism.").  Plaintiffs simply recycle, at somewhat greater length, the conclusory allegations this Court previously rejected.

### a. Opportunities to Conspire (SAC ¶¶ 300-23)

In support of their theory that 20 different insurers conspired to fix the prices they would agree to pay for auto repairs throughout Utah, Plaintiffs point to Defendants' membership in various trade associations and standard-setting organizations.  (*See* SAC ¶¶ 301-23.)

---

[4] Plaintiffs now allege that an unidentified "State Farm employee" stated to a plaintiff in the Tennessee action that "'every iota'" of the Louisiana Attorney General's action against State Farm "'is the truth . . . . when you read [the complaint], it's like, that "that's us."'"  (SAC ¶ 125.)  This purported recitation of the employee's personal opinion is too vague to provide any indication of which allegations this unspecified employee supposedly thinks are accurate or why the employee should be supposed to have any knowledge of the truth or falsity of any particular allegations. Moreover, the action brought by the Attorney General of Louisiana alleges unilateral conduct by State Farm and asserts only unfair trade practices and an intra-corporate conspiracy among State Farm entities (which is not a cognizable conspiracy under federal antitrust law, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)), not a conspiracy between State Farm and any outside insurance companies.  This supposed admission thus gets Plaintiffs no closer to satisfying their pleading obligations than they were before.

101229977.1

Unspecified meetings of these associations, Plaintiffs speculate, could have served as opportunities for high-level executives and officers of Defendants to get together and form a conspiracy. (*See id.* ¶¶ 304, 307-08, 312-13, 318.)

Contrary to Plaintiffs' claims, mere opportunities to conspire at trade association meetings do not plausibly suggest an agreement, particularly where the Defendants had an independent, rational reason to be at the alleged meeting place. *See Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349 (affirming dismissal where "neither defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *In re Travel Agent*, 583 F.3d at 911 ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [Defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior."). As this Court has explained, the fact that "State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement." *A&E*, Doc. 293 at 17 n.11.

Moreover, Plaintiffs have not alleged facts that could have created an opportunity to conspire in the first place. They do not list or describe a single meeting of any of these associations, who attended, when it occurred, what contacts or communications occurred, or how any of these unspecified contacts or communications might be substantively, temporally, or causally related to any of the purported parallel conduct that Plaintiffs allege. *See In re Travel Agent*, 583 F.3d at 910 (affirming dismissal where complaints did "not cite any specif-

ic meetings that involved both [Defendants]").[5]

b.    Common Motive to Conspire (SAC ¶¶ 324-31)

As before, the only motive Plaintiffs offer for the alleged price-fixing conspiracy is that it would be profitable for Defendants to pay less for repairs.  (*See* SAC ¶ 324.)  A profit motive is not sufficient to articulate a common motive to conspire.  *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) ("Taking as a given that all of the defendants had motive to conspire with one another to earn high profits, all such a motive shows is that the defendants could reasonably expect to earn higher profits by keeping prices at a su-pracompetitive level through parallel pricing practices.").

As this Court noted in dismissing the FAC, the parallel pricing conduct alleged by Plaintiffs is in the independent, profit-maximizing self-interest of each Defendant insurer, which renders Plaintiffs' conspiracy claim implausible.  *See A&E*, Doc. 293 at 18; *see also Jacobs*, 626 F.3d at 1342 ("Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors—assuming they are rational actors acting in their economic self-interest—would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior.").

---

[5] Only four Defendants are alleged to be members of the American Insurance Association (SAC ¶ 301), and only four are alleged to be members of the Property Casualty Insurers Association of America (*id.* ¶ 302).  Only four are alleged to be members of the Certified Automotive Parts Association ("CAPA") (*id.* ¶ 317), which also includes body shop members – making its attractiveness as a conspiracy-planning location doubtful at best.  Only State Farm is alleged to be a member of the National Association of Mutual Insurance Companies ("NAMIC").  (*Id.* ¶ 303.)  State Farm, which purportedly plays "a leading role" in the conspiracy (*id.* ¶ 45), belongs only to CAPA, NAMIC, and the Insurance Institute for Highway Safety ("IIHS").  (*Id.* ¶¶ 303, 311, 317.)

101229977.1

c.      Action Against Self-Interest (SAC ¶¶ 332-36)

The SAC adds no coherent allegations that would show why, absent an agreement, it would be irrational for an insurer to ask body shops to lower their labor rates to the levels they charge a different insurer. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("buyers try to bargain for low prices, by getting the seller to agree to treat them as favorably as any of their other customers" and "that is the sort of conduct that the antitrust laws seek to encourage"). Defendants set the amounts they will pay to reimburse for repairs regardless of which body shop their policyholders choose, and Plaintiffs concede that even when a shop wants to charge higher rates, Defendants simply refuse to reimburse for the higher charges. (*See, e.g.*, SAC ¶¶ 94, 100, 107, 146, 201.) Plaintiffs offer nothing to suggest that the ability or decision of a Defendant to refuse to pay these higher prices depended on the actions of other insurers.

3.      **Plaintiffs' New Allegations Regarding Prices of Replacement Parts, Types of Parts Used, and Reimbursement Policies for Various Repair Procedures Do Not Set Forth a Price-Fixing Claim**

Plaintiffs have added or expanded a number of allegations concerning Defendants' payments for replacement parts (as distinguished from body labor or paint and materials rates), certain repair processes and procedures, and requirements for use of allegedly "substandard and thus dangerous" replacement parts. (SAC ¶¶ 37, 159.)[6] The SAC does not tie any of these allegations to any agreement by Defendants regarding parts reimbursement rates

---

[6] The SAC is also replete with a catalog of other body shop grievances and accusations concerning matters having no apparent logical relationship to Plaintiffs' claims. Examples include DRP indemnity agreements (SAC ¶¶ 94, 96, 108-09), "desk review" claims processes (*id.* ¶ 180), and disclosures of aftermarket parts. (*Id.* ¶¶ 212-17). These irrelevant allegations of various supposed practices by different insurers also are inconsistent with any notion of parallel conduct by Defendants.

14

or policies. To the contrary, these new allegations only underscore differences among the alleged reimbursement practices and parts replacement decisions of Defendants, rendering any alleged conspiracy or agreement implausible.[7] *See In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (affirming dismissal of claim that Defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).

Plaintiffs' suggestion that their allegations entitle them to discovery that will enable them to repair the deficiencies in their claim (SAC ¶ 148) is wholly unwarranted. In the absence of "allegations that reach the level suggesting conspiracy" and of any "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim," allowing this case to proceed to enormously expensive antitrust discovery would contravene the dictates of *Twombly*. 550 U.S. at 559-60 (alteration in original) (citation omitted). Indeed, given Plaintiffs' "repeated failure to cure deficiencies by amendments previously allowed," *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003), Plaintiffs' antitrust conspiracy claims should be dismissed with prejudice as a matter of law.

**B.     The SAC's Boycott Allegations Are Insufficient As a Matter of Law**

Count Two should be dismissed for the independent reason that Defendants' alleged

---

[7] With respect to the type of replacement parts the shops are required to use, some Defendants write estimates specifying the use of "aftermarket" (non-OEM) parts. (SAC ¶ 65.) Other Defendants allegedly specify salvage parts. (*Id.*) Yet other Defendants are "exceptions." (*Id.*) With respect to parts procurement, some Defendants require parts to be ordered through the Parts Trader electronic marketplace. (*Id.* ¶¶ 66-67.) Other Defendants order the parts themselves and ship them to the body shop. (*Id.* ¶ 70.) Still others tell the body shop which part to order from which vendor. (*Id.*) With respect to reimbursement practices, Plaintiffs allege that Defendants base their estimates on different estimating software programs or independent appraisers. (*Id.* ¶¶ 168-70.) Defendants' decisions to reimburse for certain procedures also are based on different methods and appear to vary depending on the circumstances. (*See id.* ¶¶ 174, 176-78, 180-90.) Such pervasive variations hardly support even the SAC's general allegations of parallel conduct, much less give rise to a plausible inference of conspiracy or agreement.

101229977.1

conduct does not constitute a group boycott as a matter of law. A group boycott under the antitrust laws requires proof of a "concerted *refusal*" to deal. *Quality Auto Body*, 660 F.2d at 1206 (emphasis added); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 577 (5th Cir. 1982). The conduct that Plaintiffs allege in apparent support of their boycott claim includes a smattering of allegations that a few Defendants attempted to steer policyholders to non-plaintiff shops or told certain of their policyholders not to take their cars to certain body shops. Steering is not equivalent to a refusal to deal and, accordingly, cannot support a boycott claim.[8] Allegations concerning the purported impact of the alleged misconduct – for example, that Plaintiff Dave's Body Shop's revenue from Liberty Mutual business declined from 2014 to 2015 (SAC ¶ 284) – contradict the notion that even individual Defendants refused to deal with Plaintiffs. Moreover, the allegations concerning Dave's Body Shop clearly suggest why its volume of business declined: That shop left Liberty Mutual's DRP program in 2014 and was no longer a "preferred provider" receiving referrals. (*Id.* ¶ 280.)

In addition, as discussed above, there is no legally cognizable allegation of concerted action with respect to the alleged steering. *See A&E*, Doc. 293 at 21 ("Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices."). The

---

[8] *See also Quality Auto Body*, 660 F.2d at 1206 (even if two insurers agreed to refuse to pay more than competitive price for automobile repairs, that agreement did not constitute a boycott); *Custom Auto Body, Inc. v. Aetna Cas. & Sur. Co.*, 1983 WL 1873, at *19 (D.R.I. Aug. 3, 1983) (body shop "at all times has been free to compete for the business of the defendant and its insureds by offering lower prices or higher quality services"); *Nationwide Mut. Ins. Co. v. Auto. Serv. Councils of Del., Inc.*, 1981 WL 2053, at *2-4 (D. Del. Apr. 10, 1981) (discouraging insureds from using body shops "by telling them that their prices were too high, and by notifying the owners that Nationwide would not guarantee full reimbursement" did not constitute refusal to deal; there was "no suggestion of an outright refusal of Nationwide to deal with any repair shop," rather Nationwide had "simply refused to accede to what it considers to be defendants' excessive prices"). Plaintiffs cannot cure the deficiencies of their boycott claim by invoking the word "coerce." (SAC ¶ 400.) None of the alleged conduct comes close to coercion. *See Nationwide Mut.*, 1981 WL 2053, at *3 ("driving a hard bargain . . . hardly constitutes a form of 'coercion' cognizable under the antitrust laws").

101229977.1

SAC offers no facts to support the claim that 20 different insurers agreed to refuse to deal with Plaintiffs in hundreds or thousands of transactions, much less any detail about when, how, or with whom agreements were or could have been made. Their only "evidence" to support the existence of such an agreement – that other Defendants allegedly steered business away from some Plaintiffs in the months or years after those Plaintiffs dissociated from other insurers' direct repair programs and therefore must have engaged in the steering to punish the shops – is a speculative interpretation of clearly insufficient allegations of parallel conduct.

## III. PLAINTIFFS' CLAIM FOR QUANTUM MERUIT (COUNT ONE) SHOULD BE DISMISSED

Plaintiffs' third attempt to plead a quantum meruit claim is as legally insufficient as their prior attempts. Count One of the SAC purports to assert a claim for "quantum meruit: contract implied in law, quasi-contract and unjust enrichment," which are collectively regarded as the unjust enrichment branch of quantum meruit. *See Davies v. Olson*, 746 P.2d 264, 269 (Utah Ct. App. 1987). The elements of unjust enrichment are "(1) a benefit conferred on one person by another, (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[9] *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1162 (Utah 2003). The SAC fails to support these required elements with sufficient factual allegations.

---

[9] The elements of quasi-contract or a contract implied in law are substantially similar: "(1) the defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Davies*, 746 P.2d at 269.

101229977.1

## A. By Their Own Allegations, Plaintiffs' Quantum Meruit Claim Fails Because There Is No Purported Inequity Here

Under the guise of group pleading, Plaintiffs base their quantum meruit claim on the allegation that "Plaintiffs are equitably entitled to receive *full* payment for all materials and services rendered" to Defendants' insureds and claimants.[10] (SAC ¶ 370 (emphasis added).) However, because, under the facts alleged by Plaintiffs, they had no reasonable expectation that Defendants would pay them in full whatever amounts they believed their services were worth, there is no purported inequity here, and their quantum meruit claim should be dismissed. *See Smith*, 84 P.3d at 1162 (unjust enrichment claim requires that it would be "inequitable for [the defendant] to retain the benefit").

According to the SAC itself, Defendants made clear to auto body shops the amounts they were willing to pay for the services to be rendered. (*See, e.g.*, SAC ¶¶ 94-97, 99-101, 107, 145, 159, 341.) Moreover, Plaintiffs' allegations make clear that the same or similar DRP agreements and pricing practices have existed for many years and have been well known to body shops. (*See, e.g.*, *id.* ¶¶ 86-98, 145, 346-54.) There can be no plausible claim that, when Plaintiffs took on the work, they expected higher payments than they received.

As the Court held in dismissing the Plaintiffs' quantum meruit claim in *Indiana AutoBody*, "[a]ccepting as true the facts alleged here by the Plaintiffs – essentially that they agreed to perform repairs at certain prices, and that they knew that the Defendants had

---

[10] Plaintiffs' reliance on impermissible group pleading flatly contravenes the Court's Orders directing Plaintiffs to provide "individualized allegations" to support their state law claims such as quantum meruit. (*See A&E*, Doc. 110 ¶ 4; *A&E*, Doc. 293 at 6 & n.8.) In their SAC, Plaintiffs entirely fail to provide the individualized factual allegations necessary to show that the elements of their quantum meruit claim are met with respect to any of the individual repair transactions at issue. Plaintiffs' continued failure to plead with the required specificity warrants dismissal of their quantum meruit claim for this reason alone.

always refused to pay more than those prices – the Plaintiffs could not, under any level of reasonableness, have expected to be paid more than what they received." (*Indiana AutoBody*, No. 6:14-cv-06001, Doc. 150 at 2.) Thus, "[i]f Plaintiffs were unhappy with the prices Defendants were paying, they could have negotiated higher prices before performing the repairs or failing that, refused to perform repairs for Defendants' insureds." (*Capitol Body*, No. 6:14-cv-06000, Doc. 82 at 10, *adopted*, Doc. 83.) Nonetheless, Plaintiffs chose to keep performing repairs for Defendants' insureds despite "kn[owing] Defendants would not pay what they were asking for." (*In re: Auto Body Shop Antitrust Litig.*, No. 6:14-md-2557, Doc. 192 (Report & Recommendations) at 26.) Accordingly, since Plaintiffs had no reasonable expectation of higher payments from Defendants, there is no alleged inequity, and their quantum meruit claim should be dismissed. *See Concrete Prods. Co., a Div. of Gibbons & Reed v. Salt Lake Cnty.*, 734 P.2d 910, 912 (Utah 1987) (dismissing unjust enrichment claim where "it [was] not inequitable for [defendant] to retain whatever benefit it may have received from the materials delivered by [plaintiff]").

### B.    Plaintiffs Did Not Confer a Benefit on Defendants

Plaintiffs' quantum meruit claim also fails because Plaintiffs have not conferred a benefit upon the Defendants. *See Smith*, 84 P.3d at 1162 (unjust enrichment claim requires that the plaintiffs have conferred a "benefit" on the defendants). Utilizing group pleading, the SAC alleges in a conclusory fashion that the repairs Plaintiffs perform "benefit Defendants by allowing them to reap massive customer and business advantages and fool customers into believing they fully pay the repairs when they do not." (SAC ¶ 359.) However, the SAC makes clear that the purported benefit – repairs to damaged motor vehicles – is actually

furnished by Plaintiffs not to Defendants but rather to their insureds by "restor[ing] vehicles of insureds and claimants to safe pre-accident conditions." (*Id.* ¶ 357.) As this Court has stated, the repairs of insureds' vehicles at issue "obviously provided a benefit to the owners of the vehicles. But so far as the . . . Complaint discloses, the only effect of such a repair on the insurance company is the incurring of an obligation to pay for it." (*A&E*, Doc. 293 at 9.) As the Court recognized, that is hardly a benefit to the insurers. (*Id.*) Moreover, even to the extent that an obligation to pay could be construed as a "benefit," it is "certainly not something that has been conferred . . . by the repair shop." (*Id.* at 10.)[11] Therefore, Plaintiffs' quantum meruit claim should be dismissed as a matter of law.

## IV. PLAINTIFFS' CLAIM FOR TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS (COUNT TWO) SHOULD BE DISMISSED

Plaintiffs' tortious interference claim also fails as a matter of law. As the Court has stated, "[t]o establish a claim for tortious interference with economic relations under Utah law, a plaintiff must show "'(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the

---

[11] In his Report and Recommendation, Magistrate Judge Smith indicated that *Emergency Physicians Integrated Care v. Salt Lake County*, 167 P.3d 1080 (Utah 2007) ("*EPIC*"), might support the element of conferral of a benefit in this case. (Doc. 95 at 5-7.) However, the Court did not reach that issue because Plaintiffs' quantum meruit claim in the FAC was (as it is in the SAC) legally deficient for other reasons. (Doc. 101 at 1 n.2.) It is respectfully submitted that *EPIC* is inapposite. The defendant in *EPIC*, Salt Lake County, was not in the position of an insurer whose obligation is to reimburse its insureds for car repairs to the extent provided for in its insurance policies. The County, in contrast, was found to have a legal obligation to provide medical care to inmates in its custody and to pay for that care. *EPIC*, 167 P.3d at 1083-86. The County's obligation was not limited by a contract between the County and its inmates. Likewise, the emergency physicians in *EPIC* were not in a position analogous to car repair shops. The physicians presumably could not charge the inmates for amounts not paid by the County, unlike car repair shops that can charge insureds for amounts not paid by insurance companies. *See Quality Auto Body*, 660 F.2d at 1204.

plaintiff.""" (Doc. 95 at 9 (quoting *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015)).[12]

In dismissing the tortious interference claim in Plaintiffs' FAC, the Court rejected Plaintiffs' allegations "'that every Defendant tortiously interfered in the business of every Plaintiff.'" (*Id.* at 10 (citation omitted).) The Court made clear that "this is not an acceptable manner of pleading" and instructed Plaintiffs to "identify specifically which Defendants interfered with which Plaintiffs." (*Id.* at 10-11.) In the SAC, Plaintiffs have attempted to remedy that deficiency by including allegations regarding "specific examples" of purported tortious interference. (SAC ¶¶ 237-49.) As a threshold matter, Plaintiffs' alleged specific instances of purported interference include only 6 of the 20 Defendants and only 6 of the 9 Plaintiffs. (*See* Exhibit B hereto.) Given the Court's requirement of specific pleading by each Plaintiff against each Defendant, the majority of Plaintiffs' tortious interference claims fail as a matter of law. (*See id.*)

Moreover, at least 10 of Plaintiffs' 13 purported examples of tortious interference were *unsuccessful* in that the customer chose to patronize a Plaintiff's shop despite the alleged conduct and/or there is no allegation that the customer took his or her motor vehicle to a different repair shop. (*See id.*; *see also* SAC ¶¶ 237, 240, 242, 243, 244, 245, 246, 247, 248, 249.) These allegations on their face do not support claims of tortious interference because there is no actual interference with a customer relationship and there is no injury. *See Eldridge*, 345 P.3d at 565. The only purported instances of tortious interference included in the SAC where a specific, identified insured is alleged to have been "steered" to another shop are also deficient as a matter of law. (*See* SAC ¶¶ 238, 239, 241.) In one purported example,

---

[12] Although Plaintiffs continue to allege "improper purpose" (SAC ¶¶ 372-74), "improper purpose" is no longer an element of tortious interference. *See Eldridge*, 345 P.3d at 561; Doc. 95 at 9 n.1.

Plaintiffs allege that customer Marlow Mitchell was advised by Defendant GEICO that she had to take her car for appraisal to a GEICO DRP shop and that, instead of calling her when the appraisal was done, the shop went ahead and repaired it. Plaintiffs allege no fact that would indicate that this was not simply a mistake, rather than intentional tortious interference. Moreover, Plaintiffs do not specify what shop Ms. Mitchell originally intended to go to and whether the shop in question was a Plaintiff in this case. Nor do Plaintiffs allege disparagement of that unidentified shop. Plaintiffs' further allegations regarding this incident concern a subsequent repair at Plaintiff Chris', where improperly repaired damage from the first repair was discovered and, by Plaintiffs' own allegations, paid for by GEICO, illustrating that the GEICO guarantee was honored.[13] (*See id.* ¶ 238.)

In another purported example, State Farm is merely alleged to have "coerced and pressured [Mr. Black] into taking his car for repairs to a State Farm DRP shop instead of Chris' which Mr. Black trusted." (*Id.* ¶ 241) Plaintiffs allege that Mr. Black "didn't take it to Chris' where he wanted to because he was told that Chris' was not on their preferred list, wouldn't agree with their appraiser, he would have to pay more there, and State Farm wouldn't warranty the repair." (*Id.*) In fact, these alleged statements are accurate, are not disparagement, and do not show improper means. Plaintiffs' own allegations show that Chris' is not on State Farm's "preferred list" of DRP shops. (*See id.*) It is also accurate to point out that insurance policies may not cover all work that a repair shop recommends and that in such instances the insured may be required to pay more. *See Quality Auto Body*, 660

---

[13] For another example of a Defendant's guarantee being honored, *see* SAC ¶ 242 (alleging that USAA DRP shop ABRA paid $5200 for additional repairs performed by Plaintiff Alpine on the car of USAA insured Kim Casper).

101229977.1

F.2d at 1204. Moreover, as the SAC indicates, State Farm requires its DRP shops to warranty their repairs. (*See* SAC ¶ 253.) Furthermore, Plaintiffs' allegations that State Farm told Mr. Black that Plaintiff Chris' is "hard" to work with and "wouldn't agree with [State Farm's] appraiser" do not establish improper means. (*See id.* ¶ 241.) To the contrary, the entire SAC demonstrates that Plaintiffs, including Chris', do not agree with Defendants' car repair appraisals, and Plaintiffs' allegation shows only genuine disagreement over prices and repair procedures, not improper means. In the third example, Plaintiffs allege that "Dennis Turner ended up taking his vehicle to the shop American Family told him to take it to instead of the shop he had experience with and trusted, Chris' Body and Paint." (*Id.* ¶ 239.) Plaintiffs do not allege any disparagement or other improper means with respect to this transaction.

In addition, Plaintiffs allege that "Defendants have employed improper means since steering is contrary to Utah statutory, regulatory and/or common laws." (*Id.* ¶ 375.) Plaintiffs incorrectly contend that Defendants' purported practices are in "direct violation" of Utah Code Section 31A-26-303 and Utah Administrative Code Rule 590-190-11(4). (*Id.* ¶ 371.) However, Section 31A-26-303, "Unfair Claim Settlement Practices," expressly provides that it "does not create any private cause of action."[14] Utah Code Ann. § 31A-26-303(5). Similarly, in *Cannon v. Travelers Indemnity Co.*, 994 P.2d 824, 828 (Utah Ct. App. 2000), the court held that Utah's Unfair Claim Settlement Practices "statutes and rules do not create a private cause of action." Significantly, Utah courts have precluded plaintiffs from pursuing tort claims premised on alleged violations of statutes and rules as to which there is

---

[14] Moreover, Rule 590-190-11(4) does not prohibit steering or requiring insureds to obtain an estimate from a specific facility. It only prohibits requiring a claimant to "travel an unreasonable distance . . . to obtain a repair estimate or to have the automobile repaired at a specific repair shop."

101229977.1

no private right of action.  *See, e.g.*, *Espinoza v. Gold Cross Servs., Inc.*, 234 P.3d 156, 158-60 (Utah Ct. App. 2010) (rejecting unjust enrichment claim premised on purported HIPAA violation because plaintiffs had "no independent private right of action under HIPAA"); *Gunnell v. Fannie Mae*,  2013 WL 588901, at *2 (D. Utah Feb. 13, 2013) (dismissing state tort law claims because "there is no private right of action under HAMP and . . . parties may not bring other claims that merely disguise HAMP-based claims").  Plaintiffs may not use their tortious interference claim to evade these settled principles of Utah law.

Finally, Plaintiffs set forth generalized, conclusory allegations (SAC ¶¶ 255-73) that are similar to those in the FAC and do not remedy the manifest pleading deficiencies of the SAC.  Most of these allegations do not name any specific Defendants, but instead refer to "Defendants" generically.  As such, they are insufficient as a matter of law.  (*See* Doc. 95 at 10-11.)  For example, Plaintiffs assert that "[i]n each instance, the Defendant insurer refused to pay the full cost of repairs, either by refusing to pay the posted labor rates, refusing to pay for necessary procedures or processes, utilizing salvaged parts or aftermarket parts instead of OEM parts designed to fit a particular vehicle, capping paint and materials or similar activities or a combination of these or similar actions."  (SAC ¶ 255.)  This allegation, framed in the disjunctive, does not permit any particular Defendant to know which of the alleged acts it is supposed to have engaged in.  Moreover, this allegation describes conduct in repair transactions with Plaintiffs, not conduct attempting to prevent insureds from dealing with Plaintiffs.  In addition, the allegation clearly describes conduct aimed at reducing Defendants' costs for repairs.  Such legitimate, profit-related conduct does not support a tortious interference claim under Utah law. *Cf. Eldridge*, 345 P.3d at 561 (tortious interference claim should

not be used to chill "legitimate, socially beneficial competitive practices").

Plaintiffs further allege that Defendants' purported "steering" of their insureds to DRP shops is a "financially pointless endeavor" and "does not benefit a legitimate interest of Defendants" because Defendants pay non-DRP shops the same rates that they pay DRP shops. (SAC ¶ 257.) Therefore, according to Plaintiffs, the practice must be improper. (*Id.*) Plaintiffs' conclusory assertion is inconsistent with their own allegations that Defendants have established DRP programs to control costs and prices throughout the car repair industry. (*Id.* ¶¶ 86-98 (describing "Role of Direct Repair Programs"); *id.* ¶ 36 (Defendants "control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants").) It is also inconsistent with Plaintiffs' own characterization of themselves as "non-compliant" and as "shops who refused to comply with Defendants' fixed pricing structures [and] parts procurement rules designed to minimize cost." (*Id.* ¶ 296.)

For all these reasons, Plaintiffs' claim for tortious interference with economic relations fails as a matter of Utah law and should be dismissed with prejudice.

## V. PLAINTIFFS' CLAIM FOR CONVERSION (COUNT THREE) SHOULD BE DISMISSED

Plaintiffs' allegations in their conversion claim in the SAC are identical to those in the FAC. (*See* SAC ¶¶ 377-80; FAC ¶¶ 120-23 (identical).) This claim should be dismissed for the same reasons previously identified by the Court. (Doc. 95 at 11-12.)

## VI. CONCLUSION

After three tries, it is apparent that any further amendment of Plaintiffs' Complaint would be futile. The Court should dismiss all of Plaintiffs' claims against Defendants with prejudice. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

25

Dated: June 8, 2015

Respectfully submitted,

*/s/ Johanna W. Clark*

Johanna W. Clark
CARLTON FIELDS JORDEN BURT, P.A.
450 S. Orange Ave., Suite 500
Orlando, Florida 32801
Telephone: (407) 849-0300
Facsimile: (407) 648-9099
Email: jclark@cfjblaw.com

Michael L. McCluggage
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
E-mail: mmcluggage@eimerstahl.com

Michael P. Kenny
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777
Email: mike.kenny@alston.com

*Attorneys for Defendant State Farm Mutual*
*Automobile Insurance Company*

*/s/ Richard L. Fenton*

Richard L. Fenton (admitted pro hac vice)
Mark L. Hanover (admitted pro hac vice)
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Tel:  (312) 876-8000
Fax: (312) 876-7934
Email: richard.fenton@dentons.com
Email: mark.hanover@dentons.com

Bonnie Lau
Dentons US LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone:  (415) 882-5000
Facsimile:  (415) 882-0300
bonnie.lau@dentons.com

Lori J. Caldwell (Florida Bar No. 026874)
Rumberger, Kirk & Caldwell, PA
300 S Orange Ave, Suite 1400
PO Box 1873
Orlando, FL 32802-1873
Tel:  (407) 839-4511
Fax: (407) 835-2011
Email: lcaldwell@rumberger.com

*Attorneys for Defendants Allstate Property*
*and Casualty Insurance Company, Allstate*
*Fire and Casualty Insurance Company, and*
*Allstate Insurance Company*

*/s/ Lara J. Edelstein*
Lara J. Edelstein
Florida Bar No. 78591
E-mail: ledelstein@uaig.net
Paul E. Susz
Florida Bar No. 836095
Email: psusz@uaig.net
1313 N.W. 167 Street
Miami Gardens, FL 33169
Telephone: (305) 774-6160

*House Counsel for*
*United Automobile Insurance Company*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/ Johanna W. Clark*
Johanna W. Clark