# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| ALPINE STRAIGHTENING SYSTEMS, INC. d/b/a ALPINE BODY SHOP, et al., | Case No. 6:14-cv-06003-GAP-TBS (Originally filed in D. of Utah) |
| Plaintiffs, | MDL Docket No. 6:14-md-2557-GAP-TBS |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., | DISPOSITIVE MOTION |
| Defendants. | |

## MOTION OF MOVING DEFENDANTS TO DISMISS THE SECOND AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

The undersigned Defendants[1] respectfully file this Motion to Dismiss the Second Amended Complaint ("SAC" or the "Utah Action") with prejudice.[2]

## PRELIMINARY STATEMENT

The SAC, brought by certain Utah auto body repair shops ("Plaintiffs"), fails to remedy the fatal defects under Rules 8 and 12(b)(6) identified by the Court in its April 27, 2015 Order (Doc. 101) ("April 27, 2015 Order") adopting the March 5, 2015 Report and Recommendation ("Utah R&R") to dismiss the First Amended Complaint ("FAC"). The SAC reasserts all the claims that were dismissed without prejudice[3] and adds virtually the same set of allegations that have been added to the recent amended complaints in the copycat lawsuits brought by certain auto body repair shops in Florida, Indiana, Mississippi, and Tennessee.[4] As set forth below, the

---

[1] The Defendants who have joined in this Motion are listed in Exhibit A, attached hereto.

[2] Second Amended Complaint, *Alpine Straightening Systems, Inc. d/b/a Alpine Body Shop, et al., v. State Farm Mut. Auto. Ins. Co., et al.,* No. 6:14-cv-06003-GAP-TBS, Doc. 102 (M.D. Fla. May 20, 2015).

[3] The quasi-estoppel claim was dismissed with prejudice. *See* April 27, 2015 Order at 3.

[4] Second Amended Complaint, *A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co.,* No. 6:14-cv-00310-GAP-TBS ("Florida Action") (M.D. Fla. Feb. 11, 2015) (Doc. 296); Second Amended Complaint,

prolix allegations added by Plaintiffs to the SAC similarly fail to provide fair notice to Defendants or state a plausible claim for relief and, if anything, further undermine Plaintiffs' claims.

As for the federal antitrust claims, Plaintiffs again fail to come forward in the SAC with any allegations of an express agreement among Defendants to fix prices or boycott Plaintiffs. Instead, Plaintiffs continue to rely primarily on conclusory allegations of uniform behavior and alleged conscious parallelism with respect to reimbursement rates and purported "steering" which, without more, fail to give rise to a price-fixing or boycott claim under Section 1 of the Sherman Act.  The few factual allegations that Plaintiffs have come forward with in the SAC also are insufficient to place otherwise lawful behavior in the context of a plausible antitrust claim because, *inter alia,* they: (1) show that reimbursement rates allegedly *increased* from 2013 to 2014, which is inconsistent with conspiratorial behavior to lower reimbursement rates; (2) describe auto repair claims handling and processing procedures that differ among Defendants, which is completely consistent with independent behavior; and (3) allege, at most, that unidentified representatives of some Defendants individually spoke to certain third party insureds about a given repair, but not in any way that shows communications between or among Defendants, let alone reflecting concerted action to boycott Plaintiffs by all Defendants.  As a result, Plaintiffs' claims under Section 1 of the Sherman Act remain patently defective.

As for the three remaining state law claims, the SAC still fails to allege facts giving rise to a cognizable claim under Utah law.  First, Plaintiffs' conversion claim added no new

---

*Capitol Body Shop, Inc. v. State Farm Mutual, et al.*, No. 14-cv-6000 (S.D. Miss.); 6:14-cv-06000-GAP-TBS ("Mississippi Action") (M.D. Fla. Mar. 21, 2015) (Doc. 87); Second Amended Complaint, *Indiana AutoBody Assoc., Inc.  v. State Farm Mutual, et al.*, No. 6:14-cv-6001 (S.D. Ind.) ("Indiana Action") (M.D. Fla. Apr. 14, 2015) (Doc. 151); First Amended Complaint, *Brewer Body Shop, LLC et al. v. State Farm Mut. Auto. Ins. Co. et al.,* 6:14-cv-6002-GAP-TBS (M.D. Fla. May 18, 2015) (Doc. 85).

allegations demonstrating that Defendants wrongfully received money from Plaintiffs or that Defendants somehow misappropriated monies from Plaintiffs. Tellingly, all other auto body repair shops in other actions in this MDL have dropped this conversion claim in their amended pleadings because, as in this case, there is no basis for such a claim. Second, Plaintiffs' restated quantum meruit claim fares no better because, *inter alia*, the SAC still lacks any allegations that Plaintiffs had or could possibly have had any reasonable expectation of full payment (*i.e.*, 100 cents on the dollar) from Defendants. Finally, Plaintiffs' tortious interference claim still fails because, *inter alia*, the SAC again attributes allegations of wrongdoing collectively to all Defendants and does not allege any non-conclusory "improper means" in violation of Utah law (which no longer recognizes an "improper purpose" that Plaintiffs continue to rely on).

Thus, Defendants respectfully submit that the SAC should be dismissed with prejudice.

## ARGUMENT[5]

### I.   THE ANTITRUST CLAIMS (COUNTS FOUR AND FIVE) STILL FAIL TO ALLEGE ANY AGREEMENT TO FIX PRICES OR BOYCOTT PLAINTIFFS[6]

In dismissing the Plaintiffs' claims in the FAC under Section 1 of the Sherman Act, Magistrate Judge Smith found, and this Court adopted, that these claims were "indistinguishable" from the antitrust claims asserted in the Florida Action. Utah R&R at 12; April 27, 2015 Order at 3.[7] This Court dismissed the antitrust claims in the Florida Action for failing to state a claim.

---

[5] Defendants hereby adopt and incorporate the legal standards for a motion under Rules 8 and 12(b)(6) discussed by the Court in prior rulings. *See* Order, No. 6:14-cv-00310-GAP-TBS (M.D. Fla. June 11, 2014) Doc. 110 at 1; *see also* Jan. 22, 2015 Order at 7-8.

[6] Defendants also incorporate by reference the standards on which the Court relied in support of its dismissal of the antitrust claims in the Florida Action. *See* Jan. 22, 2015 Order at 7-8.

[7] Magistrate Judge Smith recently recommended the dismissal of similar "indistinguishable" antitrust claims in 12 copycat lawsuits brought by auto body repair shops in other states. Report and Recommendations ("Multi-State R&R"), *In re Auto Body Shop Antitrust Litig.*, 6:14-md-02557 at 13 (M.D. Fla. Jun. 3, 2015).

*See* Jan. 22, 2015 Order at 15-21.  Despite adding a number of (mostly irrelevant) allegations, the SAC similarly fails as it comes up far short of stating a plausible price-fixing or boycott claim.

### A.  The SAC Still Fails To Allege An Express Agreement To Fix Prices

Plaintiffs continue to assert in sweeping fashion that "all Defendants have agreed to *and/or consciously parallel* … compensation ceilings established by State Farm."  SAC ¶ 228 (emphasis added); *see also id*. ¶ 383.  According to Plaintiffs, "Defendants have engaged in an ongoing, concerted and combined intentional course of action and conduct to improperly and illegally control and depress automobile damage repair costs" with this conduct dating back "[o]ver the course of several years."  *Id.* ¶ 36; *see also id.* ¶ 145 (alleging that Defendants have "manufactur[ed] a 'market rate' going back "[o]ver the last twenty years").

Despite Plaintiffs' conclusory use of labels and buzz phrases, such as "agreement" and "concerted … course of action," which are not credited under this Court's prior rulings and controlling Supreme Court precedent, the SAC contains no facts whatsoever of this alleged behavior.  *See* Jan. 22, 2015 Order at 20 ("Plaintiffs cite, as evidence of the conspiracy, 'uniformity of action by all Defendants.'  The Amended Complaint contains no further explanation regarding this 'uniformity of action.'  This conclusory statement does nothing to aid the Plaintiffs' cause.") (internal citations omitted).  Nowhere does the SAC contain any allegations of the "who," "what," "where," "when" and "how" numerous Defendants supposedly entered into a price-fixing agreement covering at least the entire State of Utah going back a number of years.  *See id.* ("[A]side from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when.").

4

Thus, the SAC, like Plaintiffs' predecessor pleadings, does not contain facts alleging an express agreement by Defendants to fix prices.

### B. The SAC Still Challenges Parallel Conduct That Is Insufficient To Infer An Agreement To Fix Prices

Stripped of the conclusory assertions of "agreement," Plaintiffs are left attempting to plead a massive alleged conspiracy based on circumstantial allegations of "parallel" behavior in the marketplace. Here, too, this Court's prior ruling in the Florida Action, based on binding precedent from the Supreme Court and Eleventh Circuit, made clear that "consciously parallel behavior," standing alone, "falls short of conclusively establishing agreement or itself constituting a Sherman Act offense." Jan. 22, 2015 Order at 16.

But, for the most part, the SAC merely reasserts the same conclusory allegations of parallel behavior, allegedly led by State Farm as the "dominant market shareholder," that has been alleged in various prior pleadings and which this Court has already rejected as insufficient. SAC ¶ 228; *see also id.* ¶ 44. As a result, unless the SAC pleads additional facts of a plausible price-fixing agreement, dismissal is warranted again. As demonstrated below, Plaintiffs have not come forward with the requisite additional factual allegations and the price-fixing claim fails.

### C. The Few Specific "Price Fixing" Examples Add Nothing To The Insufficient Allegations of Parallel Conduct

To support the allegations of price-fixing, Plaintiffs have a collection of supposed statements by unidentified representatives of some Defendants. These statements are not alleged to, and do not suggest, that they are the product of any *agreement*. Rather, the alleged statements themselves reflect, at most, individual decisions by Defendants. *See, e.g.,* SAC ¶ 132 (alleging that a single unidentified Farmers agent represented to one Plaintiff: "*our* prevailing rate in your area $42.00," "*we* do a survey," and "that's all *our* manager will approve") (emphasis added). Plaintiffs cannot create an agreement out of whole cloth by attributing statements, that

themselves add nothing, to all 20 Defendants.  *Id.*  Tellingly, though Plaintiffs allege that all Defendants somehow "parrot State Farm," none of the few, specific, alleged representations regarding prices include any statement that the individual insurer will "pay only what State Farm pays."  *Compare id.* ¶ 131, *with, id.* ¶¶ 132, 138-41.

In any event, this Court has already determined that "[t]he Defendants' statements about paying no more than State Farm pays for labor do nothing to demonstrate that the Plaintiffs are entitled to relief [. . . .] Without more, statements such as these suggest that the party is acting out of its own economic self-interest rather than because of an agreement to fix prices, as required to violate § 1."  Jan. 22, 2015 Order at 18.  *See also* R&R at 12; *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, *as well as the prices, terms, and conditions* of that dealing."); *Quality Auto Body, Inc. v. Allstate Ins. Co.,* 660 F.2d 1195, 1205 (7th Cir. 1981) ("Section 1 of the Sherman Act does not preclude a party from unilaterally determining the parties with whom it will deal *and the terms on which it will transact business*.") (emphases added in both).

With respect to the allegations regarding certain Defendants' refusal to pay some of the Plaintiffs' "posted prices" in 2013 (SAC ¶¶ 138-41), Plaintiffs also do not allege any facts showing that this alleged conduct is the product of any *agreement* among all Defendants.  For example, the Plaintiffs assert in sweeping fashion that all Defendants reimbursed some of them at the same amount paid by State Farm, but they omit if Defendants did so at the same time, over a span of months or the entire year, and there are no allegations of communications between Defendants or otherwise claiming that Defendants' coordinated among themselves as opposed to simply following the "market rate" established by the acknowledged market leader.[8]  *See id.*

---

[8] The infirm nature of Plaintiffs' allegations is underscored by the sweeping assertion, on the one hand, that there are "demonstrable differences in the rates charged throughout the state" (*id.* ¶ 142) and, on the

Furthermore, Plaintiffs elsewhere allege that all Defendants followed State Farm in 2014 and *raised* their reimbursement rates.  *Id.* ¶ 144.  But that allegation is totally inconsistent with Plaintiffs' claim that Defendants agreed to fix reimbursement rates at a *lower* rate.  *See, e.g., id.* ¶ 386.  Thus, Plaintiffs' few allegations of "price-fixing" behavior are not actionable because, at most, they are equally consistent with independent behavior, *i.e.*, Defendants' "economic self-interest" in controlling costs, which does not give rise to a Sherman Act violation.  Jan. 22, 2015 Order at 18-19.

### D. The Alleged Repair Processes Criticized By Plaintiffs Are Not Connected To Any Agreement And, In Any Event, Are Inconsistent With Any Agreement

In the SAC, Plaintiffs add several allegations concerning the prices of replacement parts, certain repair processes and procedures, and the use of allegedly "substandard and … dangerous" replacement parts.  SAC ¶¶ 37, 159.  However, the SAC does not tether these allegations to any *agreement* by Defendants or any other elements relevant to an antitrust claim.  Instead, these new allegations only underscore the differences in alleged reimbursement practices and parts requirements by Defendants.

For instance, with respect to the type of replacement parts the shops are required to use, Plaintiffs allege (without identification) that some Defendants write estimates requiring the use of "aftermarket" (non-OEM) parts, and some Defendants write estimates requiring salvage parts. *Id.* ¶ 65.  Some Defendants (the "exceptions"), allegedly do not write either of these estimates. *Id.*  With respect to procurement, "[s]ome" Defendants require parts to be ordered through PartsTrader electronic marketplace, while some others require the use of TheShopofChoice.com or HyperQuest.  *Id.* ¶¶ 66, 70.  Other Defendants allegedly order the parts themselves and ship

---

other hand, that three of the four Plaintiffs in the only examples provided charged the *same* posted rate for "paint and materials" in 2013 despite the "thousands of square miles" between them (*id.* ¶¶ 139-42). Under their own allegations, three of the Plaintiffs themselves have supposedly colluded.

them to the body shop.  *Id.* ¶ 70.  Another Defendant allegedly utilizes the new "NuGen IT software" to prepare estimates, which Plaintiffs concede is in that Defendant's interest to cut costs.  *Id.* at ¶¶ 181, 183 (acknowledging that this system "seems efficient on the surface").

Similarly, the SAC again does not allege that Defendants use the same databases for procuring parts or writing estimates.  *See* SAC ¶¶ 168-70.  Further, other allegations in the SAC that "Defendants *selectively* follow collision auto repair industry standards," and that "*some* defendants use independent adjusters from time to time" only emphasize individual *differences* within the group, and undermine any inference of collusion.  SAC ¶¶ 160, 171 (emphasis added).

These various allegations concerning the individual differences in the way Defendants' handle and process auto repair claims do nothing to state a conspiracy claim.  *See* Jan. 22, 2015 Order at 11 ("It is not even clear that the Defendants' actions in regard to the databases could even be described as parallel behavior. The Defendants are not alleged to have acted uniformly, such as by only agreeing to pay the same fraction of the estimate provided by a database."); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (affirming dismissal of claim that defendants conspired to fix the various terms of elevator repair parts and services for failure to show any parallel conduct in the first place).[9]

---

[9] *Accord In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a §1 claim, he must first demonstrate that the defendants' actions were parallel .... The cattlemen have not done this."); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (defendants' many price differences "support[ed] the inference that the similarity of price lists reflects individual decisions to copy, rather than any more formal pricing agreement"); *Aviation Specialties, Inc. v. United Techn. Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978) (affirming dismissal because plaintiff "brought forth no evidence of parallel behavior suggesting an unlawful agreement"); *LaFlamme v. Société Air France*, 702 F. Supp. 2d 136, 151-153 (E.D.N.Y. 2010) (stating that although "the illegal price fixing need not be exactly simultaneous and identical," the "questionable allegations of parallel conduct here do not match the brazen parallel pricing, price floors, lockstep price increases ..." found in cases surviving a motion to dismiss); *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing claim because "the defendants' fee levels have all followed different pricing paths at different times, not even roughly in parallel"), *aff'd*, 741 F.3d 1022 (9th Cir. 2014), *cert. denied sub nom. Pinon v. Bank of Am., NA*, 134 S. Ct. 2878 (2014).

### E. That Some Defendants Are Members Of Trade Associations Is Unremarkable And Insufficient As A Matter Of Law To Infer An Agreement

In the SAC, Plaintiffs have added a number of allegations about some Defendants being members of trade organizations and they have identified some representatives of Defendants who allegedly participate in such organizations. *See, e.g.,* ¶¶ 301-23. However, other than providing, in effect, a list of alleged trade association memberships for some Defendants, Plaintiffs allege nothing else. In particular, Plaintiffs fail to allege that Defendants communicated about reimbursement rates or boycotting auto repair shops that would not agree to lower rates, let alone that Defendants entered into any *agreement* about these subjects, at any of these meetings.

This Court already concluded that a mere alleged "opportunity to conspire" is insufficient to infer a conspiracy. *See* Jan. 22, 2015 Order at 17 n. 11 (concluding that allegations regarding "insurance industry meetings" failed to support Plaintiffs' price-fixing claim since "[t]he fact that State Farm and unnamed members of the 'insurance industry' meet regularly does not suggest that any Defendant insurance company entered into a price-fixing agreement). The Eleventh Circuit has similarly held that mere opportunities to conspire do not alone permit the inference of a conspiracy. *See Williamson Oil Co., Inc. v. Philip Morris USA,* 346 F.3d 1287, 1319 (11th Cir. 2003) ("'[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.' Indeed, the opportunity to fix prices without any showing that appellees actually conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire. Appellants may not rely on this proposition to support their allegations in this case.") (citing *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1456 (11th Cir. 1991)). The result should be the same here.[10]

---

[10] Plaintiffs also do not "nudge" their price-fixing claim "across the line from conceivable to plausible," with their few allegations about Defendants' alleged "motive to conspire". *See* SAC ¶¶ 324-36. This

### F.  The SAC's Boycott Allegations Still Are Insufficient As A Matter of Law

This Court has previously dismissed Plaintiffs' boycott claim because there were no allegations of concerted refusal to deal.  *See* Jan. 22, 2015 Order at 21 ("The Plaintiffs offer even less 'evidence' of an agreement to boycott than they did of an agreement to fix prices.").  The SAC similarly fails to allege any agreement to boycott Plaintiffs by all 20 Defendants.

For example, Plaintiffs assert in blunderbuss fashion that there is a "Unity of Action by Defendants" and that Defendants "share … information amongst and between themselves and steer business away from noncompliant shops as a group."  SAC ¶ 288.  Yet nowhere in the SAC do Plaintiffs plead even a *single* example of a communication between Defendants.  Tellingly, Plaintiffs allege that the "hard core steering used by the Defendants against the Plaintiffs" began over 10 years ago in 2004 (*id.* ¶ 233), yet they have nothing but a threadbare assertion of concerted action.

At most, Plaintiffs are alleging that *some* Defendants at *some* point in time have each *individually* made similar generic statements to some "customers" that Plaintiffs were no longer DRP shops, their "cars would have to be taken elsewhere," and that there was "group silence and group failure to point out the shops to which the Defendants were steering customers had significant complaints lodged against them."  *Id.* ¶ 289-90.  But Plaintiffs cannot rely on conclusory labels of "group" conduct to allege concerted action conjured out of whole cloth, which is what they are trying to do (again) and this Court has already rejected.  *See* Jan. 22, 2015 Order at 20 ("Plaintiffs cite, as evidence of the conspiracy, 'uniformity of action by all Defendants.'  The Amended Complaint contains no further explanation regarding this

---

Court has already concluded that these allegations are equally consistent with the independent profit-maximizing self-interest of each Defendant insurer.  *See* Jan. 22, 2015 Order at 18.

"uniformity of action."  This conclusory statement does nothing to aid the Plaintiffs' cause.") (internal citations omitted).

Furthermore, the allegations in the SAC about Defendants' alleged "steering" only highlight the various non-uniform and different ways that *each* Defendant deals with its customers when it handles and processes auto repair claims.  *See, e.g.,* SAC ¶ 265 ("Defendant State Farm routinely waits two to three days to send a representative to perform an initial estimate" while "Defendant GEICO routinely waits at least three to four days"); *id.* ¶ 280 (describing the multiple reasons why one of the Plaintiffs "voluntarily removed his shop from Liberty Mutual [DRP] program in May 2014").  Plaintiffs' dislike of these alleged procedures does not give rise to a plausible boycott claim against Defendants.

Accordingly, Plaintiffs' boycott claim remains deficient and should be dismissed.

## II.  THE CONVERSION CLAIM (COUNT THREE) STILL FAILS TO ALLEGE THAT DEFENDANTS WRONGFULLY POSSESSED ANY CHATTEL OVER WHICH PLAINTIFFS HAVE A RIGHTFUL CLAIM

This Court previously dismissed Plaintiffs' conversion claim for failure to allege *any* facts demonstrating that Plaintiffs had a right to any money held by Defendants.  *See* Utah R&R at 11.[11]  Plaintiffs' conversion claim asserted in the SAC must fail because the SAC fails to add a single allegation to support this restated claim.  *Compare* SAC ¶¶ 377-80, *with* FAC ¶¶ 120-23 (same).  On this basis alone, the conversion claim can be dismissed.

This Court also previously admonished Plaintiffs' failure "to cite any Utah case or statute supporting the notion that a repair shop's expenditure of time and money repairing an insured's or claimant's automobile gives the shop a property interest in money in the insurer's bank

---

[11] Magistrate Judge Smith recently recommended the dismissal of similar conversion claims in nine other copycat lawsuits brought by auto body repair shops in other states.  *See* Multi-State R&R at 43-45.

account." Utah R&R at 11. *See also* April 27, 2015 Order at 3. This defect was not remedied in the SAC. Dismissal is proper on this basis as well.

Plaintiffs merely assert (yet again) that Defendants' refusal to pay Plaintiffs the full amount Plaintiffs unilaterally decide they want constitutes conversion of Plaintiff's money. *See* SAC ¶¶ 377-80. But Plaintiffs do not and have not identified any specific and identifiable property over which they claim ownership; rather, Plaintiffs allege only that they have not been paid enough by the Defendants. *See id.*

As this Court has concluded, a conversion claim under Utah law requires "an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." Utah R&R at 11 (quoting *State v. Twitchell*, 832 P.2d 866, 870 (Utah App. 1992). *See also* April 27, 2015 Order at 3. Also, as this Court explained, "a party alleging conversion must show that he or she is entitled to *immediate* possession of the property at the time of the alleged conversion." Utah R&R at 11 (citing *Fibro Trust, Inc. v. Brahman Financial, Inc.*, 974 P.2d 288 (Utah 1999)) (emphasis added). *See also* April 27, 2015 Order at 3. Finally, as this Court concluded, "money cannot be the subject of an action for conversion," under Utah law. *See id.* (citing *In re Ogden*, 314 F.3d 1190, 1200 (10th Cir. 2002)).

Because the SAC did not allege facts to cure the deficiencies in the dismissed conversion claim, the result should be the same here.[12]

---

[12] Apparently recognizing the lack of any cognizable conversion claim on these allegations, all other auto body repair shops in this MDL whose original conversion claims (under their respective state laws) were dismissed by this Court have since dropped those claims in their amended pleadings. *See supra* n. 4

III.   **THE QUANTUM MERUIT CLAIM (COUNT ONE) STILL FAILS BECAUSE OF THE EXISTENCE OF THE DRP CONTRACTS, NO BENEFIT WAS PROVIDED TO DEFENDANTS, AND PLAINTIFFS WERE PAID THE AMOUNTS DEFENDANTS TOLD THEM WOULD BE PAID**

Plaintiffs' quantum meruit claim (consisting of contract implied in law, quasi-contract and unjust enrichment, *see* SAC p. 78) again boils down to the assertion that "Plaintiffs are equitably entitled to receive *full* payment for all materials and services rendered" to third-party insureds of Defendants.  *Id.* ¶ 370 (emphasis added).  The elements of an unjust enrichment claim under Utah law are: "(1) a benefit conferred on one person by another, (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[13]  *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1162 (Utah 2003).  For at least three separate reasons, Plaintiffs fail to state a cognizable claim for quantum meruit under Utah law.

First, it is black letter law that recovery under "[c]ontract implied in law, also known as quasi-contract or unjust enrichment, … one branch of *quantum meruit*" "presupposes that no enforceable written or oral contract exists." *Davies v. Olson*, 746 P.2d at 268-69; *Wood v. Utah Farm Bureau Ins. Co.*, 19 P.3d 392, 396 (Utah Ct. App. 2001) (dismissing plaintiff's unjust enrichment claim because "recovery under an unjust enrichment theory is available only when 'no *enforceable* written or oral contract exists'") (emphasis in original) (citations omitted); *see also Selvig v. Blockbuster Enters.*, 266 P.3d 691, 698 (Utah 2011) (the existence of an "express contract" precluded unjust enrichment claim).

---

[13] The elements of a quasi-contract, or a contract implied in law, claim are substantially similar: "(1) the defendants received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Davies v. Olson*, 746 P.2d 264, 268-69 (Utah Ct. App. 1987).

In the SAC, an overwhelming majority of the Plaintiffs – *seven* of the nine auto body repair shops – fully admit that they had or have DRP agreements with a number of the Defendants.  SAC ¶ 98.  Moreover, DRP agreements and their terms are central to Plaintiffs' theory; indeed, they devote an entire section to DRPs entitled: "Role of Direct Repair Programs in Defendants' Violations of Federal and *State* Laws."  *Id.* ¶¶ 86-111 (emphasis added).  That is why this Court correctly dismissed Plaintiffs' quantum meruit claim on this basis.  *See* April 27, 2015 Order at 2; R&R at 7-8.  Notwithstanding Plaintiffs' self-serving attempt to downplay the significance of these DRP agreements (*see* SAC ¶ 357), the result should be the same here for those Plaintiffs who admittedly had or have DRP agreements with Defendants.

Second, Plaintiffs' quantum meruit claim also fails completely as to all Defendants because there is no alleged inequity here.  Plaintiffs cannot allege facts showing a reasonable expectation to be reimbursed by Defendants based on whatever amount they claim was proper.  *See Concrete Products Co., a Div. of Gibbons & Reed v. Salt Lake Cnty.,* 734 P.2d 910, 912 (Utah 1987) (dismissing unjust enrichment claim where "it is not inequitable for [Defendant] to retain whatever benefit it may have received from the materials delivered by Concrete Products"); *see also Nickerson Co. v. Energy W. Mining Co.,* 2009 WL 4681778, at *2 (Utah Ct. App. Dec. 10, 2009) (unpublished) (affirming summary judgment on unjust enrichment claim where defendant did not receive or retain any benefit for which it did not pay and because '[t]he mere fact that a third person benefits from a contract between two others does not make such third person liable in ... unjust enrichment...'") (internal citations omitted).

Here, Plaintiffs admittedly knew the terms of the transactions prior to performing the services on the automobiles, and thus had no reasonable expectation of allegedly full reimbursement.  According to Plaintiffs, Defendants have, "[o]ver the course of several years,"

been engaged in conduct to "depress automobile damage repair costs."  SAC ¶ 36; *see also id.*

¶ 145 (alleging that Defendants have "manufactur[ed] a 'market rate" going back "[o]ver the last

twenty years").  Further, "[e]ach Plaintiff has done business at various times over the course of

years with Defendants' policyholders and claimants."  *Id.* ¶ 34; *see also id.* ¶ 43 (stating that the

"vast majority" of Plaintiffs' business is with "insurance-paying customers").  As discussed

above, Plaintiffs claim that Defendants have engaged in alleged price-fixing because they pay

*less* than "posted" rates.  *Id.* ¶ 133 ("Defendants … all *consistently* refuse to pay any rate

different from …[the] "market rate" in Utah communities) (emphasis added); ¶¶ 138-41

(examples of Defendants paying a "market rate" less than the Plaintiffs' posted rates); ¶ 341

("Defendants fix price ceilings for the Plaintiffs"; "generally leave a particularly fixed price

structure in place for several years"; "the determined 'market' rate … for Utah was $42.00 per

hour body labor for at least three years").  Thus, Plaintiffs were, and always have been, fully

aware that Defendants would not provide the allegedly *full* reimbursement they are seeking here.

As Magistrate Judge Smith explained, and the Court adopted, in recommending dismissal

of identical quantum meruit claims brought by certain auto repair shops located in Mississippi,

"the allegations in Plaintiffs' amended complaint about the longstanding nature of Defendants'

efforts to suppress prices renders implausible Plaintiffs' claim that they reasonably expected

'full' payment …. Defendants' repeated and persistent refusal to pay the amounts demanded by

Plaintiffs makes unreasonable any expectation on the part of Plaintiffs that Defendants would

abruptly begin paying the amounts Plaintiffs believe their services are worth."  R&R, Mississippi

Action, at 9-10; *see also* R&R, Indiana Action, at 2 ("It is not enough for the Plaintiffs to

demonstrate that they expected some payment, because they received some payment. They must

demonstrate that they expected more.").[14]  Further, as Magistrate Judge Smith recently explained in recommending dismissal of similar unjust enrichment and quantum meruit claims brought by certain auto body repair shops in twelve other states, no such claims are plausible where, as here, Plaintiffs do not and could not allege that they had any expectation of full payment, or performed under any "mistake of fact."  Multi-State R&R at 26.[15]  This Court's reasoning applies equally here to reject Plaintiffs' quantum meruit claim again.

Third, Plaintiffs' quantum meruit claim fails in its entirety under Utah law as to all Defendants because the SAC lacks any coherent allegation regarding the conferral of an identifiable benefit by Plaintiffs on the Defendants, as opposed to a benefit by Plaintiffs on third-parties.  *See, e.g., Davies,* 746 P.2d at 270 (remanding quantum meruit claim for findings as to whether Defendant received any unjust benefits as a result of Plaintiffs' efforts, as being necessary to state a quantum meruit claim).  Specifically, Plaintiffs admit (as they must) that they "restore vehicles of *insureds and claimants* to safe pre-accident conditions."  SAC ¶ 357 (emphasis added).  According to Plaintiffs, the "services, materials, and resources" provided by them to the third-party automobile owners "benefit Defendants by allowing them to reap massive customer and business advantages and fool consumers into believing they fully pay for repairs when they do not."  *Id.* ¶ 359.  Plaintiffs somehow claim that Defendants' "obligations are to pay amounts that restore vehicles to safe pre-accident conditions – not some lesser repair or

---

[14] In dismissing the quantum meruit claim in the FAC, this Court incorporated its reasons for dismissing the same claim asserted in the Florida, Mississippi, and Indiana Actions.  *See* April 27, 2015 Order at 2.

[15] Plaintiffs' claim also fails because they do not allege that they sought and tried to recover the difference between the amount Defendants paid and the "full" amount Plaintiffs believe they were owed.  Multi State R&R at 27-28 n. 18 (recommending dismissal of such claims: "Nowhere do Plaintiffs allege that they cannot recover the contract price for the repairs from Defendants' insureds and claimants.").  Nor do Plaintiffs allege that they made a genuine attempt to negotiate prices with the Defendants and failed because it was "impossible", or that their performance was "necessary to discharge a legal duty of their own."  *Id.* at 26.  These deficiencies provide further support for dismissal here.

amount" and, thus, "Plaintiffs serve as the means through which Defendants purportedly meet such obligations." *Id.* ¶¶ 360-61.   Nowhere, however, in the SAC do Plaintiffs allege what the terms of Defendants' contracts are with their customers to support this conclusory assertion. And, whatever Defendants' obligations are to *their customers*, those obligations are admittedly to pay those customers, not Plaintiffs.   In other words, Plaintiffs do not allege that Defendants would be relieved of their contractual obligations to their insureds if Plaintiffs performed services free of charge.   Or, an insured could take payment from Defendants and choose not to repair some or all of his or her vehicle, even under Plaintiffs' allegations.   Thus, Plaintiffs do not allegedly confer a benefit on Defendants, as opposed to insureds and claimants, when they repair vehicles.[16]

Accordingly, for all of these reasons, Plaintiffs' quantum meruit claim fails.

## IV.   PLAINTIFFS' TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS CLAIM (COUNT TWO) STILL FAILS BECAUSE IT IS AN IMPROPER GROUP PLEADING, IT DOES NOT ALLEGE IMPROPER MEANS, INTERFERENCE, OR ANY INJURY, AND VIOLATES RULES 8 AND 9

Under Utah law, to state a claim for intentional interference with economic relations, the plaintiff must allege (1) that the defendant intentionally interfered with the plaintiff's existing or

---

[16] In the Utah R&R, Magistrate Judge Smith relied on *Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 167 P.3d 1080, 1082 (Utah 2007) ("EPIC") to conclude that Plaintiffs had alleged that a benefit was conferred on Defendants.  This Court did not decide that issue because the quantum meruit claim was (as it is here) deficient on other grounds.  *See* April 27, 2015 Order at 1 n.2.  If the Court reaches this issue, Defendants respectfully submit that the factual scenario at issue in EPIC is highly distinguishable. In EPIC, a group of emergency physicians were held to have conferred a "benefit" upon Salt Lake County by providing emergency medical services to inmates that the County was obligated by state statute and the United States Constitution to provide to the inmates. 167 P.3d at 1087.  Accordingly, the services provided by the emergency physicians benefited not only the inmates, but also the County, because the physicians were fulfilling the County's legal obligation to provide medical services to inmates.  *Id.* at 1085.  For the reasons stated herein, Plaintiffs cannot and do not allege that they have somehow enabled Defendants to fulfill any legal obligation, let alone a Constitutional one, to third-parties.  Indeed, as Magistrate Judge Smith subsequently noted, auto repair shops are "under no duty to repair the vehicles belonging to Defendants' insureds and claimants" and Plaintiffs have not alleged that the "Defendants or Defendants' agents asked them to perform any repairs."  Multi-State R&R at 23 n. 14.

potential economic relations, (2) by improper means, (3) causing injury to the plaintiff. *Eldridge v. Johndrow*, 345 P.3d 553, 561 (Utah 2015). Plaintiffs still fail to sufficiently plead a tortious interference claim on a number of independent grounds.

### A.  The Tortious Interference Claim Remains An Improper Group Pleading

Under Rule 8(a)(2), a pleading must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief' so as to give the defendant *fair notice* of what the claim is and the grounds upon which it rests." Jan. 22, 2015 Order at 7 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled on other grounds*, *Bell Atl. v. Twombly*, 550 U.S. 544 (2007)) (emphasis added). Similarly, conclusory allegations and unsubstantiated inferences are insufficient to state a claim. *See* Jan. 22, 2015 Order at 7-8 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

Plaintiffs' tortious interference claim fails under these basic pleading standards because *each and every* allegation in the count is asserted against all "Defendants" collectively. SAC ¶¶ 371-76. This Court has already rejected this very pleading tactic as being insufficient in this case. April 27, 2015 Order at 2; Utah R&R at 10-11.

Without alleged concerted action by Defendants, which Plaintiffs have not pled sufficiently to state an antitrust claim as detailed above, the tortious interference claim cannot stand. As Magistrate Judge Smith recently stated, where, as here, a pleading lacks a single "well pled allegation[]" that the Defendants "joined in a conspiracy or acted in concert," then "liability for tortious interference must be established on an individualized basis." Multi-State R&R at 39. Because all Plaintiffs continue to bring is their tortious interference claim against *all* Defendants as a group, dismissal is warranted on this basis alone.

### B. Plaintiffs Mistakenly Plead Their Tortious Interference Claim Based On An Allegedly Improper Purpose And Still Fail To Allege Any Improper Means

Plaintiffs continue to base, at least in part, their tortious interference claim on Defendants' allegedly "improper purpose". *See, e.g.,* SAC ¶ 373 ("Defendants' *improper purpose* is to punish …"); *see id* ¶¶ 372, 374 (same). However, that is no longer a cognizable basis for a tortious interference claim under Utah law. Months before Plaintiffs filed the SAC, in *Eldridge v. Johndrow*, the Utah Supreme Court abandoned the "improper purpose" element of a tortious interference claim, overruling *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982).[17] The Utah Supreme Court held that an, "improper purpose, in the absence of any improper means, should not be a basis for tortious interference liability." *Eldridge*, 345 P.3d at 561. That is because, according to the Utah Supreme Court, "[i]f improper purpose liability became commonplace, it would have a chilling effect on legitimate, socially beneficial competitive practices." *Id.* at 561. That concern is particularly acute in this case where Plaintiffs are challenging conduct that admittedly results in *lower* costs. Thus, to the extent Plaintiffs' tortious interference claim is based on Defendants' interference for an alleged "improper purpose," it must be dismissed.

Further, Plaintiffs' tortious interference claim fails because the claimed basis for Defendants' alleged interference by "improper means" is Defendants' purported "steering." According to Plaintiffs, "steering" is "contrary to Utah statutory, regulatory and/or common laws." SAC ¶ 375. Plaintiffs claim that Defendants' alleged practices have (1) violated Utah Insurance Code Section 31A and Rule 590-190, and (2) violated federal antitrust laws.

---

[17] Tellingly, Magistrate Judge Smith cited *Eldridge* in recommending dismissal of the FAC and remarked that the ruling rendered "moot" the issue of "whether Plaintiffs adequately pled improper purpose." Utah R&R at 9 n.3. With "improper purpose" no longer an element of a tortious interference claim, Magistrate Judge Smith correctly reasoned that allegations of "improper purpose" can no longer give rise to a claim (even assuming the other elements are met, which they are not here).

However, Utah Insurance Code Section 31A, "Unfair Claim Settlement Practices" plainly *prohibits* any private causes of action. *See* Utah Code Ann. § 31A-26-303(5) ("This section does not create any private cause of action."); *see also Cannon v. Travelers Indem. Co.,* 994 P.2d 824, 828 (Utah Ct. App. 2000) (affirming summary judgment dismissing claim based on alleged violations of the Utah Unfair Claims Settlement Practices statutes and rules because they did not give rise to any private cause of action). Under Utah law, Plaintiffs cannot maintain a tort claim based on the same factual predicate as a claim that is expressly precluded by statute. *See, e.g., Brockbank v. JPMorgan Chase Bank, N.A.,* No. 2:11CV671DAK, 2012 WL 1142933, at *3 (D. Utah Apr. 4, 2012) (dismissing HAMP and HAMP-based claims "disguised as other claims such as breach of contract" because the federal statute does not provide a private right of action) (citing *Gale v. Aurora Loan Servs.,* 2011 WL 1897671 (D. Utah May 18, 2011)); *Espinoza v. Gold Cross Servs., Inc.,* 234 P.3d 156 (Utah Ct. App. 2010) (affirming dismissal of plaintiffs' unjust enrichment claim based upon alleged HIPAA violation because HIPAA does not create a private right of action). Thus, Plaintiffs' tortious interference claim cannot circumvent Utah law.

Similarly, Plaintiffs cannot recast an antitrust claim that is not plausible into a cognizable tortious interference claim. The SAC is replete with allegations that "steering" is part and parcel of Defendants' allegedly anticompetitive behavior. *See, e.g.,* SAC ¶ 229 ("'steering' is the term used to describe the practice of insurers…convincing a customer to withhold patronage from a disfavored repair shop for failing to comply with fixed prices"); *id.* ¶ 401 ("the common scheme "involves multiple forms of illegal boycott activity including … steering …"). As discussed above, this Court has previously held that the alleged acts of "steering" do not constitute a Sherman Act claim where, as here, no concerted refusal to deal has been alleged. *See* Jan. 22, 2015 Order at 15-21. And the SAC continues not to allege any facts of a concerted refusal to

20

deal.  Thus, Plaintiffs' tortious interference claim is a blatant attempt to plead around their failed antitrust claim and should be rejected.  *See Eldridge*, 345 P.3d at 565 ("[A] person who violates no legal duties, infringes no one's rights, and commits no wrongful action can never be held liable for malice alone.").

In sum, Plaintiffs' tortious interference claim still fails as to all Defendants for lack of any "improper means" and must be dismissed.

### C.  Plaintiffs Also Still Fail To Allege Facts Showing Any Interference Or Injury

Plaintiffs claim that "[D]efendants" interfere with their "existing and/or prospective economic relations."  SAC ¶ 371.  To the extent Plaintiffs base their claim on any "existing" economic relations that were allegedly "interfered" with, this claim fails outright on this basis. The SAC contains no allegations whatsoever of any existing, actual, contracts – as opposed to prospective, potential, contracts – between Plaintiffs and a third-party insured that Defendants allegedly interfered with.  *See id.* ¶¶ 237-49, 282, 291.  A plaintiff simply "cannot rest on conclusory allegations that it has existing or potential economic relations."  *PurCo Fleet Servs., Inc. v. Towers*, 38 F. Supp. 2d 1320, 1325 (D. Utah 1999) (internal citations omitted).

Further, Plaintiffs fail to identify the prospective "relations" with which Defendants allegedly interfered.  Plaintiffs claim that Defendants collectively steer "large amounts" of prospective business "away from them" without specifying interference by Defendants with any identifiable person or population of persons.  *See* SAC ¶ 371.  Under Utah law, a plaintiff must allege specific facts to support a claim for interference with "a potential contract or business opportunity with a third party or *identifiable* class of persons."  *In2 Networks, Inc. v. Honeywell Int'l*, 2011 WL 4842557, at *2 (D. Utah Oct. 12, 2011) (emphasis added) (citations omitted). The tortious interference claim therefore fails on this basis too.

As for the handful of examples of purported steering against certain of the Plaintiffs, they do not state a plausible tortious interference claim because the overwhelming majority of these steering instances are "failed steering instances" where Plaintiffs admittedly were not interfered with and could not possibly have been injured. *See, e.g.,* SAC ¶ 237 (no allegation that customer took her automobile to a different repair shop); *see id.* ¶¶ 238, 242-43, 245-46, 247-49 (same); *id.* ¶ 283 (alleging that Plaintiff Dave's Body Shop, Inc.'s customers "chose to have Dave's complete the repairs even after the attempted steering"). Under Utah law, these allegations fail to state a tortious interference claim because injury is a required element. *See Eldridge*, 345 P.3d at 561; *see also Anderson Dev. Co. v. Tobias,* 116 P.3d 323, 332 (Utah 2005) (reversing denial of summary judgment on intentional interference claim where plaintiff was not injured as a result of defendants' alleged interference).

In other examples, Plaintiffs' allegations are often loosely based on vague statements of claimed "interference" made *by* unidentified persons *to* unidentified persons. *See, e.g., id.* ¶ 244 ("[t]he *senior citizen* … spoke wither [*sic*] insurance carrier *Farmers* and she was told that JP's wasn't on their list…") (emphasis added). Further, Plaintiffs' assertion that certain Defendants interfered with insureds who wanted to use Plaintiffs' shops because they were "trusted" is nothing more than a conclusory allegation of prospective relations. *Id.* ¶¶ 248-49. That is insufficient. *See PurCo Fleet*, 38 F. Supp. 2d at 1325. Furthermore, Plaintiffs even acknowledge that various statements allegedly made to "steer" may be at least "facially truthful." *Id.* ¶ 254. *See, e.g., id.* ¶ 244 ("told her they would not guarantee [non-DRP shop] work"). Nowhere do Plaintiffs allege facts showing how a truthful statement can meet the required element of "interference."

Thus, Plaintiffs have failed to allege facts showing any interference or injury.

### D.  The Tortious Interference Claim Is Insufficiently Pled In Other Key Respects

The limited handful of vignettes of purported steering are only against certain of the Plaintiffs and just 6 out of 20 of the Defendants are even identified therein.[18]  *See* SAC ¶¶ 237-49.  Plaintiffs assert that these few terse examples are nevertheless "representative of the numerous specific facts that will be alleged and proven throughout the course of discovery and litigation."  *Id.* ¶ 250.  Plaintiffs' bluster aside, the SAC represented Plaintiffs' opportunity to cure the deficiency identified by this Court and they have failed to do so.

As this Court explained in dismissing the same tortious interference claim in the FAC, "nothing in the Complaint … explains why the Defendants, but not the Plaintiffs, would have this information.  Surely the Plaintiffs must have some basis to believe that certain Defendants interfered with certain of the Plaintiffs' customers."  April 27, 2015 Order at 2.  Plaintiffs cannot use a few alleged "examples" to get a free pass at the pleading stage to assert a claim against all Defendants.  Based on these allegations, the tortious interference claim, as pled against all Defendants, does not contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly,* 550 U.S. at 570; *see also Aliyev v. Fedex Ground Package Sys., Inc.,* No. 2:12-CV-1079-TC, 2014 WL 1338583, at *7 (D. Utah Apr. 3, 2014) (dismissing complaint where "the court cannot justify granting [Plaintiff] permission to conduct what would essentially be a fishing expedition").  The result should be the same here again.

In any event, Plaintiffs' "examples" fail under the heightened pleading standard of Rule 9(b).  The SAC is replete with allegations that Defendants made "false or misleading" statements

---

[18] Those Defendants (as defined by Plaintiffs) are State Farm, Geico, American Family, USAA, Farmers, and Liberty Mutual.

to their insureds with the intent to deter the insureds from the Plaintiffs' shops.   SAC ¶ 231.[19]

Regardless of whether Plaintiffs use the magic word "fraud," they more clearly base their

tortious interference claim on purportedly fraudulent behavior in this SAC.   Accordingly, such

allegations must meet Rule 9(b).   *See, e.g., Freightliner of Utah, LLC v. Terex Advance Mixer,*

*Inc.,* No. 2:07CV00105, 2007 WL 1795755, at *1 (D. Utah June 20, 2007) (applying Rule 9(b)

to "generalized allegations concerning misrepresentation").

Applied here, Plaintiffs mainly allege only vague descriptions of the various supposed

misrepresentations made by unidentified persons to interfere with the few identified (and some

unidentified) allegedly disgruntled customers usually at some point in a given year.   *See, e.g.,*

SAC ¶ 246 (alleging, without specificity, interference at some point in 2015 based on what a

"*customer* was told *by State Farm*"); *id.* ¶ 239 (alleging, without specificity, interference at some

point in 2014 because "the *insurance company* pressured and coerced Mr. Turner"); *id.* ¶ 245

(alleging failed attempt by Liberty Mutual to interfere in 2013 when "they refused to pay for

more days and told her that if she had taken her car to a preferred shop they would have covered

the additional fifteen days"); *id.* ¶ 249 (alleging, without specificity, an event in 2015 when

"Farmers tried to steer Mr. Twitchell away from Defendant Perk's to ABRA").   Rule 9(b)

requires far more.   "In all averments of fraud … , the circumstances constituting fraud … shall

be stated with particularity."   Fed. R. Civ. P. 9(b).   Where, as here, Plaintiffs "make[] only

generalized allegations" with respect to the misrepresentations alleged and "fail[] to sufficiently

---

[19] Magistrate Judge Smith has recommended that Rule 9(b) not apply to earlier iterations of other complaints in this MDL.   *See* Multi-State R&R at 40.   However, the allegations sounding in fraud in the SAC go further, and warrant application of Rule 9(b) here.   *See, e.g.,* SAC ¶¶ 176-77 ("Defendants selectively … assert the definitive nature of [estimating] databases when they perceive doing so to be to their respective financial advantage"); *id.* ¶ 186 (Defendants "mak[e] the false statement that a particular operation isn't a necessary operation"); *id.* ¶ 273 ("actions … conducted by the named Defendants with full knowledge of the falsity of their misrepresentations"); *id.* ¶ 272 (Defendants "defame the Plaintiffs with falsehoods"); *id.* ¶ 287 (Defendants' actions "are intentional, willful and malicious").

state a *precise* time frame beyond the year in which the communications were made, fail[] to identify *specifically* the representatives that made the fraudulent misrepresentations and to whom *specifically* they were made and fail[] to state the *particulars* of the representations and promises in terms of *specific* content which plaintiffs contend were false when made," Plaintiffs fail to meet the particularity standard for fraud.  *Freightliner of Utah, LLC,* 2007 WL 1795755 at *1 (emphasis added).  Thus, the individual examples of tortious interference claim are insufficiently pled in key respects.

In sum, the SAC's tortious interference claim still fails on numerous independent grounds and should be dismissed.

## CONCLUSION

The SAC fails to state any federal antitrust claim or any claim under Utah law claim. Plaintiffs have had two full and fair opportunities to amend their pleading and have failed to cure its deficiencies each time.  Any further amendment would be futile.  *See, e.g., Anderson v. Vanguard Car Rental USA, Inc.,* 304 F. App'x 830, 832 (11th Cir. 2008); *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005); *Friedlander v. Nims,* 755 F.2d 810, 814 (11th Cir. 1985).  The Court should therefore dismiss all of Plaintiffs' claims against Defendants with prejudice.

Dated: June 8, 2015

/s/  David L. Yohai

David L. Yohai (admitted *pro hac vice*)
John P. Mastando III (admitted *pro hac vice*)
Eric Hochstadt (admitted *pro hac vice*)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  212-310-8000
Facsimile:  212-310-8007
Email:  david.yohai@weil.com
Email:  john.mastando@weil.com
Email:  eric.hochstadt@weil.com

*Counsel for Defendants Farmers Insurance Exchange[20], Mid-Century Insurance Company and Bristol West Insurance Company*


  s/Hal K. Litchford

Hal K. Litchford (272485)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
SunTrust Center
200 South Orange Avenue
Post Office Box 1549
Orlando, Florida  32802
Telephone:  (407) 422-6600
Facsimile:  (407) 841-0325
Email*:  hlitchford@bakerdonelson.com*

-and-

Amelia W. Koch *(Admitted Pro Hac Vice)*
Steven F. Griffith, Jr. *(Admitted Pro Hac Vice)*
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000

---

[20] The SAC's case caption improperly identified Farmers Insurance Group, Inc., which is not a corporate entity.  Farmers Insurance Group, Inc. was improperly named in the FAC.  On October 16, 2014, Plaintiffs agreed to dismiss Farmers Insurance Group, Inc. from this action and to substitute Farmers Insurance Exchange. *See* Doc. 91.  Farmers Insurance Exchange is named in the pleading.  *See* SAC ¶ 11.

Email:  akoch@bakerdonelson.com
Email:  sgriffith@bakerdonelson.com

*Counsel for Defendants United Services
Automobile Association and USAA Casualty
Insurance Company*

/s/ *Jeffrey S. Cashdan*

Jeffrey S. Cashdan, admitted pro hac vice
Claire C. Oates, admitted pro hac vice
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone:  (404) 572-4600
Facsimile:  (404) 472-5139
jcashdan@kslaw.com
coates@kslaw.com

/s/ *Michael R. Nelson*

Michael R. Nelson, admitted pro hac vice
Kymberly Kochis, admitted pro hac vice
Francis X. Nolan, admitted pro hac vice
Sutherland Asbill & Brennan LLP
1114 Avenue of the Americas, 40th Floor
New York, NY 10036-7703
Telephone:  (212) 389-5068

michael.nelson@sutherland.com
kymberly.kochis@sutherland.com
frank.nolan@sutherland.com

*Counsel for Defendants Progressive Classic
Insurance Company and Progressive Direct
Insurance Company*

/s/ *Michael E. Mumford*

Ernest E. Vargo, *Admitted Pro Hac Vice*
evargo@bakerlaw.com
Michael E. Mumford, *Admitted Pro Hac Vice*
mmumford@bakerlaw.com
BAKERHOSTETLER LLP
PNC Center, Suite 3200
1900 East 9th Street
Cleveland, OH 44114-3482

Telephone (216) 621-0200
Facsimile (216) 696-0740

*Counsel for Defendants Liberty Mutual Fire*
*Insurance Company and Safeco Insurance*
*Company of America*

/s/ *Michael S. McCarthy*
Michael S. McCarthy, Colorado Atty. No. 6688
Heather Carson Perkins, Colorado Atty. No. 30168
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203-4532
Tel. (303) 607-3703
Fax (303) 607-3600
michael.mccarthy@faegrebd.com

Kathy L. Osborn, Indiana Atty. No. 21927-53
Ryan M. Hurley, Indiana Atty. No. 24956-49
Sarah C. Jenkins, Indiana Atty. No. 26421-53
300 North Meridian Street, Suite 2700
Indianapolis, IN  46204
Tel. (317) 237-0300
Fax (317) 237-1000
Email: Kathy.osborn@faegrebd.com
Email: Ryan.hurley@faegrebd.com
Email:  Sarah.jenkins@faegrebd.com

*Counsel for Defendant American Family Mutual*
*Insurance Company*

/s/ *Mark J. Criser*
Mark J. Criser
Florida Bar No. 141496
Matthew F. Hall
Florida Bar No. 92430
Hill, Ward & Henderson, P.A.
101 E. Kennedy Boulevard, Suite 3700
P.O. Box 2231
Tampa, Florida 33601-2231
Telephone No. (813) 221-3900
Facsimile No. (813) 221-2900
mark.criser@hwhlaw.com

tina.mcdonald@hwhlaw.com
matthew.hall@hwhlaw.com
debra.whitworth@hwhlaw.com

*Attorneys for Farm Bureau Property & Casualty
Company*

/s/ R. Wardell Loveland
R. Wardell Loveland
555 Twin Dolphin Drive, Suite 300
Redwood City, CA 94065
Tel. (650) 592-5400
Fax. (650) 592-5027
Email. RLoveland@chdlawyers.com

*Counsel for CSAA General Insurance Company,
formerly known as Western United Insurance
Company*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of June, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

*/s/David L. Yohai*