**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALPINE STRAIGHTENING SYSTEMS, et al**                        **PLAINTIFFS**

vs.                                                                                          Case No. 6:14-cv-6003

**STATE FARM MUTUAL AUTOMOBILE**
    **INSURANCE CO., et al**                                                  **DEFENDANTS**

---

## MOTION TO RECONSIDER

---

Come Now, Plaintiffs in the above-captioned cause, and filed this, their Motion to Reconsider and state to the Court the following:

1. On March 9, 2016, the trial court issued an order dismissing Plaintiffs' claims for price fixing and boycotting under the Sherman Antitrust Act with prejudice.

2. Plaintiffs respectfully submit the dismissal of these claims results in a substantial injustice.

3. There are generally three accepted grounds justifying reconsideration of an order, (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *Lamar Advert. of Mobile, Inc. v. City of Lakeland, Fla.,* 189 F.R.D. 480, 489 (M.D. Fla. 1999).

4. The amended complaint was required to be filed nearly a year ago. Subsequent to the filing of the amended complaint, Plaintiffs obtained information qualifying as direct evidence of price fixing by the named Defendants and unnamed co-conspirators. Specifically, Plaintiffs obtained a statement from a Progressive employee who stated unequivocally that body shops have no say in

the setting of their own labor rates, that the insurance companies "get together at big meetings" to set body shop labor rates, and that the insurance companies uniformly apply the labor rates agreed upon at these meetings. This representative even identified when the next such meeting was going to occur.

5. This statement did not exist at the time the complaint was amended. Plaintiffs could not have included these explicit admissions of price fixing in the amended complaint as the words had not yet been spoken. Plaintiffs respectfully submit these direct admissions of price fixing are unambiguous and should be accorded the importance defined by the Seventh Circuit Court of Appeals, "the smoking gun in a price-fixing case: direct evidence, which would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

6. In the present matter, Plaintiffs now have two explicit statements from two different representatives of the conspirators admitting to illegal behavior, one from Defendant Progressive, one from Defendant State Farm (see below). The statements of the State Farm representative not only indicate deliberate suppression of prices but also provides facts showing the entire "market rate" assertions relied upon by the Defendants to excuse their actions is pretextual and a sham.

7. Even if these explicit statements could be considered ambiguous, the Court is required to interpret them favorably to the Plaintiffs. It may not select an alternative meaning that is fatal to Plaintiffs' claims. *Mann v. Adams Realty Co., Inc.*, 556 F.2d 288, 294 (5th Cir. 1977). This is so even when considering new facts provided upon motion for reconsideration. *Id.*

8. Plaintiffs respectfully submit this new information justifies a reconsideration of the Court's conclusion that Plaintiffs antitrust claims should be dismissed with prejudice. Plaintiffs'

continued investigation and diligent attempts to uncover additional information and facts should demonstrate to the Court that additional evidence of violations of the Sherman Act exist, as it has produced these additional inculpatory statements and should fully anticipate further evidence to be produced during discovery. Plaintiffs submit that denial of an opportunity to move forward where there exist explicit admissions of wrongdoing would result in manifest injustice.

9. Mindful that a motion to reconsider may not be used as a vehicle to reargue previous submissions, the Plaintiffs do need to bring to the Court's attention certain inaccurate representations which support the Court's stated grounds for dismissal, in addition to the admissions of price fixing set forth above.

10. The Court relies upon the absence of allegations that State Farm kept its "market rate" a secret to support the conclusion there are insufficient facts to support an allegation of conspiracy. However, this is incorrect. Not only does the complaint make this very statement several times, it is supported by several other facts which give rise to an inference of sub rosa information sharing amongst the Defendants:

> 127. State Farm does not disclose or make publicly available the geographic area it determines is a given "market area." State Farm can and does alter a given "market area" to further manipulate the results and punish noncompliant shops by including them in a different market area with lower rates.
>
> 128. State Farm does not publish or otherwise make publicly available its "survey" results.
>
> 129. State Farm has, in fact, made significant efforts to keep this and other internal information confidential. State Farm does not even disclose to its claims team leaders the criteria for determining a "market area" or the criteria for changing a "market area."
>
> 130. Even in litigation, State Farm habitually obtains blanket protective orders for all information produced in discovery on the grounds that training manuals, policies and procedures and internal processes constitute trade secrets, proprietary information or

> confidential information. See e.g., *Hover v. State Farm Mut. Auto. Ins. Co.*, 2014 U.S. Dist. LEXIS 119162 (E.D. Wa. 2014), *Akins v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 82806 (E.D. Mich. 2011), *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), *Hamilton v. State Farm Mut. Auto. Ins. Co.*, 204 F.R.D. 420 (S.D. Ind. 2001).
>
> 131. Despite the fact that State Farm does not make its results publicly available, the other named Defendants—who do not conduct any form of survey—pay only what State Farm pays and parrots State Farm that it is the "market rate."
>
> 387. Evidence of this conspiracy or combination include, but is not limited to, uniformity of action in instances where Defendants should not have access to particular information; to wit, State Farm does not publish or make public its survey results, without mathematical value though it is, and the remaining Defendants do not conduct their own purported survey and yet reach the same "market rate" as State Farm.
>
> 388. The Defendants all raise their "market rates" within days of State Farm raising their rates, although, again, these Defendants are not supposed to have access to State Farm's information.
>
> 389. State Farm regularly and routine seeks to keep what it considers proprietary information, including internal training and assessment manuals, sealed from public view.

11.     The complaint <u>does</u> allege, repeatedly, that State Farm does pretend to keep their rates a secret, at least publicly.  In combination with the direct admission of price fixing obtained from Progressive after the filing of the amended complaint, the Court's conclusion that non-State Farm Defendants could have learned State Farm rates from any body shop in the state is not supported by the currently known facts.  It also constitutes inappropriate speculation, rather than accepting as true the factual allegations of the complaint.

12.     The order also asserts there are no facts indicating the Defendants actually belong to the insurer trade associations or similar organizations which provide opportunities to conspire. Respectfully, the complaint <u>does</u> contain these facts:

A. Trade Associations

301. Currently available documentation establishes every national insurer and the vast majority of regional insurers belong to at least one of the three major insurance industry trade associations:
- American Insurance Association (AIA): Defendants including Farmers, Farm Bureau, Safeco and USAA are all members of the AIA. In addition to general membership, from time to time over the course of at least ten years, Defendants including Farmers, Safeco, and USAA have all served in positions of authority within the AIA, including

302. The Property Casualty Insurer Association of America (PCI): Defendants including Allstate, GEICO, Liberty Mutual and Progressive are all members of PCI. In addition to general membership, from time to time over the course of at least ten years, these named Defendants have all served in positions of authority within the PCI, including the PCI Board.

303. The National Association of Mutual Insurance Companies (NAMIC): Defendant State Farm is a member of NAMIC. In addition to general membership, State Farm has, from time to time over the course of several decades, served in positions of authority within NAMIC, including the NAMIC Board.

304. The members of the companies representing these Defendants on the respective boards in positions of authority and at general meetings are almost exclusively within the highest tier of executive level at each Defendant insurer company.

305. For instance, GEICO CEO and Chair Tony Nicely has frequently assumed a position on the board of PCI. Others who have served over the years include but are not limited to Liberty Mutual's former chairman and CEO Edmund Kelly and Allstate's president, chairman and CEO, Thomas Wilson.

306. As State Farm has been a member of NAMIC since at least 1961, the list of its executives who have served on the board of NAMIC and its various executive committees is extensive.

307. Board meetings and other leadership obligations regularly bring the high ranking members of Defendants' companies together, specifically for the purpose of discussing insurance issues, how to advance insurance interests, lobby for legislative favor and generally increase the profitability of the insurance industry.

308. The associations frequently act in concert, bringing the members and boards together as well, also specifically for the purpose of advancing the insurance industry. For instance, the associations work together to prepare and present a joint statement on Senate Regulatory Reform Legislation, lobbying Congress to renew the Terrorism Risk Insurance Act, as well as the annual P/C Insurance Joint Industry Forum.

B. Insurance Institute of Highway Safety

309. The Insurance Institute of Highway Safety (IIHS) is described as "an independent, nonprofit scientific and educational organization dedicated to reducing the losses - deaths, injuries and property damage - from crashes on the nation's roads."

310. This organization asserts that among other things, it conducts scientific tests upon vehicle crash worthiness and crash avoidance and rates the results, information which is often well publicized as a selling point in advertising the safety of a vehicle, or of a crash part.

311. Most or all Defendants are members of IIHS, either directly or through membership of their parent corporations. Current members of the board of directors include:

● Farmer's head of public policy research and development, government and industry, Brian Braddock;
● GEICO's vice president and legislative counsel, Hank Nayden.;
● Progressive's David J. Skove, general manager, South Region;
● State Farm's Angela Spark, vice president and actuary;
● Liberty Mutual' s president, personal insurance, Timothy Sweeney;

312. Not only does membership and board membership provide the vast majority of the Defendants (including all national insurers) with additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans, but the organization itself is influential in establishing the legitimacy of parts, including aftermarket parts as safe alternatives of like kind and quality to OEM parts.

313. As discussed above, all of the Defendants regularly and routinely compel purchase and use of aftermarket and other non-OEM crash parts for use in the repairs for which each is financially responsible. The organization therefore provides combination and conspiracy opportunities and incentives for multiple avenues of mutual interest and profit to the Defendants

C. CAPA

314. CAPA, the Certified Automotive Parts Association bills itself as a non-profit organization established in 1987 to develop and oversee a test program guaranteeing the suitability and quality of automotive parts. Specifically, aftermarket parts.

315. When either the insurance industry or the collision repair industry discusses parts certification, almost exclusively the reference is to CAPA, which purportedly sets quality standards and conducts studies of aftermarket parts.

316. What is generally not discussed is that CAPA was founded and predominantly funded by representatives of the insurance industry, including Defendant State Farm, specifically for the purpose of reducing collision repair costs.

317. Current Board of Directors for CAPA include State Farm, Allstate, Liberty Mutual and GEICO and Tim Adelmann of ABRA, Inc., a multi-state operator collision repair shop (and operator of some of the most compliant DRP shops in Utah for Defendants' State Farm, Allstate, GEICO, USAA, Farmers and Progressive.)

318. As with membership in the IIHS, board membership for CAP A provides not only additional opportunities to meet and arrange agreements, goals, expectations and mutually beneficial plans by and between the largest property casualty insurers in the United States but CAP A is a crucial cog in its well-established corporate policy of purchasing less expensive aftermarket parts whenever possible.

13. The complaint therefore <u>does</u> include the information the Order states is lacking with regard to Defendants' participation and/or membership in these organizations. Given the new information obtained from a Progressive representative that the insurers get together at big meetings to set body shop labor rates, the membership and involvement in these organizations become very obvious as opportunities to conspire and provides context the Court believes is missing.

14. As it is not discussed at all, the Order appears to have also omitted consideration of the admissions of a State Farm representative that the State Farm "market rate" is merely a sham:

125. A State Farm employee has admitted to one of the Plaintiffs in the Tennessee action (Case No. 6:14-cv-06002), ICON, that State Farm deliberately suppresses labor rates and the purported survey results in a "prevailing competitive price" of "whatever State Farm wants it to be." In speaking of the Louisiana Attorney General's action against State Farm, this same employee has admitted that everything in the Complaint is true, "we do all that," "every iota is the truth . . . . when you read [the complaint], it's like, `that's us.'"

15. This admission supports the remaining factual allegations of the complaint regarding price fixing, to wit, the Defendants' allegiance to the verbalized "market rate" is pretextual as no such "market rate" exists outside the imagination of State Farm. As no Defendant actually has prepared any market analysis, that each and every Defendant adheres to a wholly fictitious identical

rate is inferential of information sharing, agreement and conspiracy. Omission of consideration of this admission is critical to the context the Court feels is lacking and more than supports the plausible existence of a combination or conspiracy to fix prices.

16. Misapprehension of facts asserted in a complaint are appropriate grounds for reconsideration. *Blackwell v. Styrker Howmedica Osteonics Corp.*, 2010 WL 5139256, at *1 (S.D. Ala. Dec. 13, 2010). Plaintiffs respectfully submit this motion does not constitute retreading old ground as it could not be known this had occurred until the order was issued by the Court.

17. The Plaintiffs therefore move this Court to reconsider its order of and allow the Plaintiffs to amend their complaint to include these direct admissions of price fixing in violation of the Sherman Act and additional facts and information supportive of their claims.

18. Plaintiffs have conferred with opposing liaison counsel and been advised Defendants do object to this Motion.

Respectfully submitted, this the 25th day of March, 2016.

**ALPINE STRAIGHTENING SYSTEMS, et al**

By:   **/s/ Allison P. Fry**
John Arthur Eaves, Jr.
Allison P. Fry

Attorneys for the Plaintiffs

John Arthur Eaves Law Offices
101 North State Street
Jackson, MS 39201
Telephone: (601) 355-7961
Facsimile: (601) 355-0530
johnjr@eaveslaw.com
allison@eaveslaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically on the 25th day of March, 2016. This filing will be served upon all ECF-registered counsel by operation of the Court's electronic filing system. Parties and counsel may access this filing through the Court's system.

*/s/ Allison P. Fry*
Allison P. Fry